# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 23-1214

NATIONAL SHOOTING SPORTS FOUNDATION,
*Plaintiff-Appellee*,

v.

ATTORNEY GENERAL OF NEW JERSEY,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:22-cv-06646-ZNQ)

## BRIEF OF APPELLANT

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

MICHAEL L. ZUCKERMAN
*Deputy Solicitor General*

SARA M. GREGORY
*Assistant Attorney General*

TIM SHEEHAN
AMANDA I. MOREJÓN
CHANDINI JHA
JUSTINE M. LONGA
PHOENIX N. MEYERS
SAMUEL L. RUBINSTEIN
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 789-8684
michael.zuckerman@njoag.gov

*Attorneys for Appellant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ......................................................................................1

STATEMENT OF JURISDICTION.............................................................4

STATEMENT OF ISSUES ........................................................................4

STATEMENT OF RELATED CASES .........................................................4

STATEMENT OF THE CASE.....................................................................4

    A.  PLCAA. ......................................................................................4

    B.  Section 58-35...............................................................................5

    C.  Proceedings Below. .....................................................................7

SUMMARY OF ARGUMENT ....................................................................8

STANDARD OF REVIEW ......................................................................12

ARGUMENT ...........................................................................................13

  I.    NSSF Has Not Established Article III Jurisdiction.......................13

  II.   NSSF Has Not Established A Likelihood Of Success. .................17

    A.  NSSF's Preemption Claim Is Not Likely To Succeed. ............17

    B.  NSSF's Unreached Claims Are Also Unlikely To Succeed. ....38

  III.  NSSF Did Not Establish Irreparable Harm. ...............................49

CONCLUSION ........................................................................................52

CERTIFICATE OF COMPLIANCE ..........................................................54

CERTIFICATE OF SERVICE ..................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ....................................................................52

*Acierno v. New Castle County*,
    40 F.3d 645 (3d Cir. 1994) ........................................................12, 50

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ...............................................12, 49, 51

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) .................51

*ADP, LLC v. Rafferty*,
    923 F.3d 113 (3d Cir. 2019) ..............................................................12

*Air & Liquid Systems Corp. v. DeVries*,
    139 S. Ct. 986 (2019) ........................................................................43

*Armstrong v. Exceptional Child Ctr.*,
    575 U.S. 320 (2015) ....................................................................17, 20

*Ass'n of N.J. Rifle & Pistol Clubs v. Port Auth. of N.Y. & N.J.*,
    730 F.3d 252 (3d Cir. 2013) ........................................................19, 20

*Bank of Hope v. Chon*,
    938 F.3d 389 (3d Cir. 2019) ..................................................45, 46, 47

*Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*,
    877 F.3d 136 (3d Cir. 2017) ..............................................................21

*Bell v. Publix Super Mkts.*,
    982 F.3d 468 (7th Cir. 2020) ............................................................43

*Benezet Consulting LLC v. Sec'y Commw. Pa.*,
    26 F.4th 580 (3d Cir. 2022) ..............................................................35

*Blessing v. Freestone*,
520 U.S. 329 (1997)..................................................................18

*Byrd v. Shannon*,
715 F.3d 117 (3d Cir. 2013) ...................................................29

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) .....................................................50

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).............................................................21, 27

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n*,
447 U.S. 557 (1980)..............................................................46, 47

*ChemSol, LLC v. City of Sibley*,
386 F. Supp. 3d 1000 (N.D. Iowa 2019) ................................43

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
142 S. Ct. 1464 (2022)............................................................45

*City of N.Y. v. Beretta U.S.A.*,
524 F.3d 384 (2d Cir. 2008) ..............................................18, 24

*City of Rancho Palos Verdes, Cal. v. Abrams*,
544 U.S. 113 (2005).................................................................19

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
298 F.3d 201 (3d Cir. 2002) ...................................................39

*CMR D.N. Corp. v. City of Phila.*,
703 F.3d 612 (3d Cir. 2013) ...................................................41

*Cooper Distrib. Co. v. Amana Refrigeration*,
63 F.3d 262 (3d Cir. 1995) .....................................................27

*CSX Transp. v. Ala. Dep't of Revenue*,
562 U.S. 277 (2011).................................................................27

*Delana v. CED Sales*,
486 S.W.3d 316 (Mo. 2016) ...................................................36

*Dep't of Revenue of Ky. v. Davis*,
     553 U.S. 328 (2008)..................................................................................38, 41

*District of Columbia v. Heller*,
     554 U.S. 570 (2008)..............................................................................48

*Drummond v. Robinson Township*,
     9 F.4th 217 (3d Cir. 2021) ...................................................................48

*E.O.H.C. v. Secretary, U.S. Dep't of Homeland Sec.*,
     950 F.3d 177 (3d Cir. 2020) .................................................................38

*Egbert v. Boule*,
     142 S. Ct. 1793 (2022)..........................................................................22

*Ellis v. Westinghouse Elec. Co.*,
     11 F.4th 221 (3d Cir. 2021) .................................................................25

*Empire State Rest. & Tavern Ass'n, Inc. v. New York State*,
     360 F. Supp. 2d 454 (N.D.N.Y. 2005)..................................................42

*Energy & Env't Legal Inst. v. Epel*,
     793 F.3d 1169 (10th Cir. 2015) ...........................................................40

*Farina v. Nokia*,
     625 F.3d 97 (3d Cir. 2010) ...................................................................31

*Free Speech Coalition v. Att'y Gen.*,
     825 F.3d 149 (3d Cir. 2016) .................................................................13

*Freedom Holdings, Inc. v. Spitzer*,
     408 F.3d 112 (2d Cir. 2005) .................................................................51

*Freeman v. Corzine*,
     629 F.3d 146 (3d Cir. 2010) .................................................................39

*FTC v. Wyndham Worldwide Corp.*,
     799 F.3d 236 (3d Cir. 2015) ...........................................................11, 42

*Gen. Refractories Co. v. First State Ins.*,
     855 F.3d 152 (3d Cir. 2017) .................................................................22

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ...................................................................... 10, 18

*Grammer v. John J. Kane Reg'l Ctrs.*,
   570 F.3d 520 (3d Cir. 2009) ................................................................. 18

*Greater Philadelphia Chamber of Com. v. Philadelphia*,
   949 F.3d 116 (3d Cir. 2020) ................................................................. 46

*Heffner v. Murphy*,
   745 F.3d 56 (3d Cir. 2014) ................................................................... 39

*Hernandez-Cruz v. Att'y Gen.*,
   764 F.3d 281 (3d Cir. 2014) ................................................................. 26

*Ileto v. Glock*,
   565 F.3d 1126 (9th Cir. 2009) ................................................... 18, 24, 28

*Jake's, Ltd. v. Coates*,
   284 F.3d 884 (8th Cir. 2002) ............................................................... 43

*Johnson v. Arteaga-Martinez*,
   142 S. Ct. 1827 (2022) ......................................................................... 38

*Kaiser Steel Corp. v. Mullins*,
   455 U.S. 72 (1982) ............................................................................... 21

*Kingdomware Techs. v. United States*,
   579 U.S. 162 (2016) ............................................................................. 29

*Komlodi v. Picciano*,
   89 A.3d 1234 (N.J. 2014) ..................................................................... 33

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ................................................................. 52

*Lanin v. Borough of Tenafly*,
   515 F. App'x 114 (3d Cir. 2013) .......................................................... 51

*In re Lead Paint Litig.*,
   924 A.2d 484 (N.J. 2007) ..................................................................... 43

*Lupian v. Joseph Cory Holdings LLC*,
905 F.3d 127 (3d Cir. 2018) ...............................................................30

*Lynch v. Scheininger*,
744 A.2d 113 (N.J. 2000) ....................................................................33

*Maryland v. King*,
567 U.S. 1301 (2012) ...........................................................................52

*Mazo v. N.J. Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) .........................................................35, 46

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)..............................................................................48

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ..............................................................................21

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)...............................................................................29

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) ...............................................................20

*Mugler v. Kansas*,
123 U.S. 623 (1887)...............................................................................30

*N. Sound Capital LLC v. Merck & Co.*,
938 F.3d 482 (3d Cir. 2019) ................................................................29

*N.J. Bankers Ass'n v. Att'y Gen. N.J.*,
49 F.4th 849 (3d Cir. 2022) ..........................................................13, 15

*N.J. Carpenters & Trs. Thereof v. Tishman Constr. Corp. of N.J.*,
760 F.3d 297 (3d Cir. 2014) ................................................................21

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)..........................................................................48

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ................................................................40

*Norfolk S. Corp. v. Oberly*,
  822 F.2d 388 (3d Cir. 1987) ................................................................40

*NSSF v. James*,
  604 F. Supp. 3d 48 (N.D.N.Y. 2022)...................................................25

*Ocean Grove Camp Meeting Ass'n of United Methodist Church v.
  Vespa-Papaleo*,
  339 F. App'x 232 (3d Cir. 2009) .........................................................22

*Patterson v. Shumate*,
  504 U.S. 753 (1992)............................................................................23

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) ..............................................................49

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
  538 U.S. 644 (2003)............................................................................40

*Pike v. Bruce Church*,
  397 U.S. 137 (1970).....................................................................39, 40

*Plains All Am. Pipeline L.P. v. Cook*,
  866 F.3d 534 (3d Cir. 2017) ...............................................................35

*Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*,
  38 F.4th 331 (3d Cir. 2022) ................................................................12

*Ransom v. FIA Card Servs., N.A.*,
  562 U.S. 61 (2011)..............................................................................23

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ...............................................................51

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995)............................................................................45

*S. Dakota v. Wayfair, Inc.*,
  138 S. Ct. 2080 (2018)........................................................................39

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ............................................................20

*In re Sarco, Inc.*,
 No. A-1161-08T4, 2011 WL 1376286 (N.J. Super. Ct. App. Div.
 Apr. 13, 2011) ................................................................................36

*Sherwin-Williams Co. v. County of Delaware*,
 968 F.3d 264 (3d Cir. 2020) ......................................................*passim*

*Singh-Kaur v. Ashcroft*,
 385 F.3d 293 (3d Cir. 2004) ..........................................................27

*Smith & Wesson Corp. v. City of Gary*,
 875 N.E.2d 422 (Ind. Ct. App. 2007) ..............................................24

*Soto v. Bushmaster Firearms Int'l*,
 202 A.3d 262 (Conn. 2019) ..............................................18, 24, 28

*State v. Rivera*,
 16 A.3d 352 (N.J. 2011) ................................................................32

*Suntrust Bank v. Houghton Mifflin Co.*,
 268 F.3d 1257 (11th Cir. 2001) ......................................................21

*Teixeira v. County of Alameda*,
 873 F.3d 670 (9th Cir. 2017) ..........................................................49

*Texas v. United States*,
 523 U.S. 296 (1998) .......................................................................13

*TitleMax of Delaware v. Weissmann*,
 24 F.4th 230 (3d Cir. 2022) ................................................11, 39, 40

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
 898 F.2d 914 (3d Cir. 1990) ......................................................45, 46

*United States v. Hoffert*,
 949 F.3d 782 (3d Cir. 2020) ......................................................42, 48

*United States v. Marcavage*,
 609 F.3d 264 (3d Cir. 2010) ......................................................34, 35

*United States v. Nat'l Dairy Prods. Corp.*,
 372 U.S. 29 (1963) ........................................................................41

*United States v. West*,
  671 F.3d 1195 (10th Cir. 2012) .........................................................28

*United States v. Williams*,
  458 F.3d 312 (3d Cir. 2006) ..............................................................47

*United States v. Williams*,
  553 U.S. 285 (2008).............................................................................41

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981).............................................................................22

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
  537 U.S. 371 (2003).............................................................................27

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 522 (2021)..........................................................................20

*Williams v. BASF Catalysts LLC*,
  765 F.3d 306 (3d Cir. 2014) ..............................................................14

*Wm. Penn Parking Garage v. Pittsburgh*,
  346 A.2d 269 (Pa. 1975)......................................................................42

*Woods v. Steadman's Hardware, Inc.*,
  No. 12-33, 2013 WL 709110 (D. Mont. Feb. 26, 2013) ........................10, 18, 19

*Ex parte Young*,
  209 U.S. 123 (1908)............................................................................20

**Statutes**

18 Pa. Stat. Ann. § 3303 .........................................................................26

18 Pa. Stat. Ann. § 4304(a)(1) ...............................................................26

15 U.S.C. § 7901(a)(3).............................................................................4

15 U.S.C. § 7901(a)(6)..........................................................................4, 28

15 U.S.C. § 7901(a)(7)..........................................................................4, 28

15 U.S.C. § 7901(b)(1)............................................................................29

15 U.S.C. § 7901(b)(7)....................................................................5, 30

15 U.S.C. § 7902(a) ........................................................................5, 19

15 U.S.C. § 7902(b) ...........................................................................19

15 U.S.C. § 7903(5)(A) ..................................................................5, 19

15 U.S.C. § 7903 ..............................................................................1, 8

15 U.S.C. § 7903(2) ............................................................................35

15 U.S.C. § 7903(4) ............................................................................23

15 U.S.C. § 7903(5)(A)................................................8, 20, 23, 30, 36

15 U.S.C. § 7903(5)(A)(ii) ...............................................................5, 8

15 U.S.C. § 7903(5)(A)(iii) .........................................................*passim*

15 U.S.C. § 7903(5)(A)(v) ....................................................................5

15 U.S.C. § 7903(5)(C)......................................................3, 9, 18, 19

15 U.S.C. § 7903(6) ............................................................................35

17 U.S.C. § 107 ...................................................................................21

18 U.S.C. § 922(z)(3)(B) ....................................................................19

18 U.S.C. § 2258B(a)..........................................................................19

28 U.S.C. § 1292(a)(1) ..........................................................................4

28 U.S.C. § 1331 ...................................................................................4

29 U.S.C. § 1105(a)(1) ........................................................................26

29 U.S.C. § 1104(a)(1)(B) ..................................................................26

34 U.S.C. § 20917(c)(5)(A) ................................................................19

720 Ill. Comp. Stat. Ann. 5/26-1(a) ...................................................25

N.J. Stat. Ann. § 2C:2-2(c)(3)............................................................32

N.J. Stat. Ann. § 2C:58-33 ................................................................6, 47

N.J. Stat. Ann. § 2C:58-33(a) ................................................................5

N.J. Stat. Ann. § 2C:58-33(c) ..............................................................41

N.J. Stat. Ann. § 2C:58-34 ..........................................................6, 7, 42

N.J. Stat. Ann. § 2C:58-35 ..........................................................*passim*

N.J. Stat. Ann. § 2C:58-35(a) ....................................................31, 42, 50

N.J. Stat. Ann. § 2C:58-35(a)(1) ..............................................6, 30, 32

N.J. Stat. Ann. § 2C:58-35(a)(2) ..................................................6, 30

N.J. Stat. Ann. § 2C:58-35(a)(3) ........................................................6

N.J. Stat. Ann. § 2C:58-35(b) ............................................................6

N.J. Stat. Ann. § 2C:58-35(e) ..........................................................33

Or. Rev. Stat. § 124.100(5) ..............................................................26

Tex. Penal Code Ann. § 42.01(a)(5) ..................................................26

## Other Authorities

151 Cong. Rec. S8908-01 (July 26, 2005) ..........................................30

151 Cong. Rec. S9087 (July 27, 2005) ................................................30

*Applicable*, Black's Law Dictionary (11th ed. 2019) ............................23

Garen Wintermute, *Firearm Retailers' Willingness to Participate in
    an Illegal Gun Purchase* No. 5 J. Urban Health 865 (2010) ..............44

Restatement (Second) of Torts §§ 440-42 (1965) ..................................33

Webster's Third New International Dictionary (2002) ............................23

# **INTRODUCTION**

Congress enacted the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §§ 7901-7903, to ensure that gun manufacturers and sellers had a defense against lawsuits attempting to hold them liable solely for the misuse of their products by third parties. The statute's text and structure make clear, however, that Congress was not shielding industry members from accountability for their *own* misconduct— least of all from liability pursuant to a codified state statute. PLCAA thus prohibits actions that turn solely on third-party acts, rather than on a defendant's own conduct, and PLCAA includes six different exceptions to its preemptive scope. One of those exceptions, known as the "predicate exception," establishes that PLCAA does not prohibit parties from bringing "an action in which a manufacturer or seller of a qualified [firearms] product knowingly violated a State [] statute applicable to the sale or marketing of the product." *Id.* § 7903(5)(A)(iii).

Mindful of that distinction—and the fact that every industry has both careful actors and bad apples—New Jersey enacted N.J. Stat. Ann. §§ 2C:58-33 to -35 (Section 58-35), a firearms-specific public-nuisance statute granting the New Jersey Attorney General (NJAG) an exclusive cause of action to hold industry members accountable for their own misconduct. For over four months after the law went into effect, no enforcement actions were threatened (let alone filed), and the National Shooting Sports Foundation (NSSF) did nothing. And when NSSF ultimately sued

in November, it pointed to no conduct even arguably implicating Section 58-35 in which its members intended to engage, nor any threatened enforcement. Yet NSSF sought, and received, a facial preliminary injunction, which barred the NJAG from enforcing Section 58-35 against anyone, for any conduct, under any theory.

The district court erred in granting NSSF that relief. The district court's sole justification was that PLCAA preempts Section 58-35 because the state law did not fit within the "predicate exception." In reaching that result, however, the court fundamentally misread the plain text of that exception. The court recognized that PLCAA's language exempts from preemption any suits brought against industry members who knowingly violate a state statute "applicable to the sale or marketing" of firearms. But even though Section 58-35 unquestionably, and exclusively, addresses firearms sales and marketing, the court held that a state statute can be "applicable to" such sales or marketing only if its provisions impose a "concrete obligation with which industry members can confidently ensure compliance." JA15. The problem, of course, is that the word "applicable" does not mean "concrete." The district court cited no dictionaries or examples from common use to support its view, and none exist. Indeed, no opinion interpreting PLCAA, not even a concurrence or dissent, has ever adopted that strained reading. Even NSSF has largely avoided defending it, preferring to stress alternative and unreached arguments.

Although the merits question is not close, there are also multiple reasons that this Court should not even reach the merits of this facial, pre-enforcement challenge. First, NSSF lacks standing to pursue these claims, as this Court recently held in dismissing a markedly similar effort to preemptively attack another hypothetical future public-nuisance suit. *See Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020). Second, NSSF has no private right of action for this claim. PLCAA makes clear that its protections cannot be wielded as a sword, but instead as an affirmative defense against specific "action[s]" that have been "brought." *See* 15 U.S.C. § 7903(5)(C) (clarifying "no provision of [PLCAA] shall be construed to create a public or private cause of action or remedy"). Third, NSSF has only pressed a facial challenge, and it cannot meet the exacting standard for facial relief because numerous applications of Section 58-35 undisputedly satisfy PLCAA. Any of these reasons would still require reversal, even if "applicable" meant "concrete."

Because NSSF is entitled to no relief on this pre-enforcement posture, and because its unprecedented construction of PLCAA lacks merit, this Court should reverse the decision below and vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

As argued below, the NJAG disputes Article III jurisdiction. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has subject-matter jurisdiction over this appeal of the district court's order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1). The State timely appealed. JA1.

## STATEMENT OF ISSUES

I.      Whether NSSF established Article III standing.

II.     Whether NSSF established a likelihood of success on the merits.

III.    Whether NSSF established irreparable harm.

## STATEMENT OF RELATED CASES

The State is unaware of any other challenge to N.J. Stat. Ann. § 2C:58-35.

## STATEMENT OF THE CASE

A.      PLCAA.

Congress passed PLCAA in 2005 to give firearms-industry members a statutory defense to a spate of common-law suits seeking relief "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a)(3); *see also id.* § 7901(a)(6)-(7) (decrying suits "imposing liability on an entire industry for harm that is solely caused by others," particularly if that "common law" action "would expand civil liability in a manner never contemplated … by the legislatures of the several States"). Congress therefore instructed that a "civil action

… brought by any person against a [licensed] manufacturer or seller of a [firearm] product … resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" "may not be brought." 15 U.S.C. §§ 7902, 7903(5)(A).

But because Congress was not protecting sellers from accountability for their *own* misconduct—least of all from liability pursuant to statute—PLCAA enumerates six exceptions to its preemptive sweep. Because PLCAA itself speaks to the kinds of "actions" that may (or may not) be brought, the six exceptions are structured in the same way; instead of speaking to allowable or prohibited conduct, they address what kinds of "actions" may be filed, including "an action brought against a seller for negligent entrustment or negligence per se" or an "action" for design defect. *Id.* § 7903(5)(A)(ii), (v). Consistent with Congress's desire that liability track the intent of "the legislatures of the several States," *id.* § 7901(a)(7), one of these exceptions— known as the predicate exception—authorizes plaintiffs to file "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii).

B.    <u>Section 58-35</u>.

To address the significant problem of misconduct by "bad actors in the gun industry," N.J. Stat. Ann. § 2C:58-33(a), New Jersey enacted Section 58-35 on July 5, 2022. The Legislature determined that such misconduct—including documented

actions like selling illegal ghost guns in New Jersey or consciously selling weapons to straw purchasers—both "fuels the epidemic of gun violence in New Jersey" and helps facilitate "an illegal secondary market." *Id.* § 2C:58-33. The Legislature thus granted the NJAG an exclusive cause of action against industry members engaged in "the sale, manufacturing, distribution, importing, or marketing of a gun-related product" if their conduct violates either of two provisions. *Id.* § 2C:58-35(a)(3), (b). The first covers businesses who engage in "conduct either unlawful in itself or unreasonable under all the circumstances" and thereby "knowingly or recklessly create, maintain, or contribute to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product." *Id.* § 2C:58-35(a)(1). The second covers businesses who fail to "establish, implement, and enforce reasonable controls regarding" their own "manufacture, sale, distribution, importing, and marketing of gun-related products." *Id.* § 2C:58-35(a)(2).

Section 58-34 defines key terms. As relevant here, the statute explains that the term "gun-related product" is territorially cabined to a firearm product (such as a gun) that "was, or was intended to be, sold, manufactured, distributed, imported, or marketed in this State, or which product was possessed in this State and as to which it was reasonably foreseeable that the product would be possessed or used in this State." *Id.* § 2C:58-34. And it explains that "[r]easonable controls" include protocols

to prevent the "sale or distribution" to straw purchasers and other unlawful buyers; to prevent loss or theft; and to ensure compliance with federal and state law. *Id.*

The NJAG has not yet brought any enforcement action under Section 58-35.

C.    Procedural History.

On November 16, 2022, over four months after the statute took effect, NSSF filed this lawsuit on behalf of itself and its members. NSSF brought claims relating to preemption (under PLCAA); the dormant Commerce Clause; vagueness (under the Due Process Clause); the First Amendment; and the Second Amendment. JA25. The next week, NSSF sought a preliminary injunction. JA56. NSSF attached two declarations from industry members stating generally that they "could face liability" and the "risk of litigation and potential liability," JA92-93 ¶¶ 14, 17, unless they stopped advertising or "shut[] down operations entirely," JA93 ¶ 15; *see also* JA94. But the declarations did not specify any intended conduct they feared would violate Section 58-35, or allege any costs they incurred to comply with its provisions, nor even whether they changed any behavior at all.

On January 31, 2023, the district court granted NSSF's motion. JA4. After concluding that NSSF satisfied Article III standing, JA9, the district court held that Section 58-35 was preempted by PLCAA by construing the word "applicable" in PLCAA's predicate exception to require "a concrete obligation with which industry members can confidently ensure compliance," JA15. The court also concluded that

NSSF established irreparable harm because the NJAG has a cause of action under Section 58-35 and created an office to oversee enforcement. JA20. The court's order enjoined state officers "from enforcing the provisions of N.J.S.A. 2C:58-35," JA3, even if the hypothetical defendant were not a member of NSSF, and even if such action would not rely on PLCAA's predicate exception.

This Court granted in part and denied in part the NJAG's motion to stay that injunction pending appeal. Dkt. 16. Under the Stay Order, while this appeal is pending the NJAG may continue to enforce Section 58-35: (a) against anyone other than NSSF, its members, or their agents or licensees; (b) against anyone who is not a "manufacturer," "seller," or "trade association" as defined in 15 U.S.C. § 7903; (c) in cases "not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third party' within the meaning of 15 U.S.C. § 7903(5)(A)"; and (d) "by bringing actions that fall within the exceptions set forth in 15 U.S.C. § 7903(5)(A)(ii), (iii)(I), or (iii)(II)." Dkt. 16 at 1-2. NSSF has since represented to the NJAG that it does not have a "comprehensive member list," such that if the NJAG intends to bring an action against a suspected bad actor, it would have to first ask NSSF "if that company or entity is a member."

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order for three reasons: lack of standing, lack of merit, and lack of irreparable harm.

I.     NSSF has not established Article III jurisdiction for its pre-enforcement challenge. This Court recently dismissed, for lack of standing and ripeness, a company's similar effort to forestall a state-law public-nuisance action it believed a government (a county) would soon file against it. *See Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020). Although the county was already retaining counsel to file such a suit, this Court found it was too speculative whether Sherwin-Williams would ultimately be sued, and what the theories and contours of that public-nuisance action would be. That remarkably on-point decision applies here. NSSF has not pointed to any particular conduct in which its members wish to engage, nor proven whether the NJAG will sue its members or under what theory—including whether any future lawsuit will implicate PLCAA at all. NSSF is not free to "preempt the [NJAG's] supposedly imminent lawsuit with affirmative defenses it could raise in response to any suit that might be filed." *Id.* at 270.

II.    The district court erred in finding that PLCAA preempts Section 58-35, and none of NSSF's alternative constitutional claims fare better.

A.     NSSF's preemption claim cannot support preliminarily enjoining Section 58-35 for three independent reasons. *First*, NSSF lacks a private cause of action to offensively assert PLCAA's preemptive effects under Section 1983. *See* 15 U.S.C. § 7903(5)(C) (stating "no provision of [PLCAA] shall be construed to create a public or private cause of action or remedy"). Instead, like a number of other

important federal laws, PLCAA "only serves as a shield against a class of claims brought against manufacturers and sellers." *Woods v. Steadman's Hardware, Inc.*, No. 12-33, 2013 WL 709110, at *3 (D. Mont. Feb. 26, 2013). It does not confer the affirmative rights NSSF asserts, and certainly not "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).

*Second*, the district court's exclusive basis for its preliminary injunction—that actions brought under Section 58-35 would not fall within the plain text of PLCAA's predicate exception—is wrong. As relevant, 15 U.S.C. § 7903(5)(A)(iii) authorizes any "action" against an industry member that "knowingly violated a State … statute applicable to the sale or marketing of the product." The district court held that even though Section 58-35 exclusively regulates the firearms industry, this statute is not "applicable to" firearms sales or marketing because it does not impose a "concrete obligation with which industry members can confidently ensure compliance." JA15. But there are no dictionaries, examples from common use, or opinions that define "applicable" to mean "concrete." And no opinion interpreting PLCAA itself has ever advanced this atextual construction. Nor does the district court's structural and purposive reasoning overcome this fundamental textual problem.

*Third*, this Court need not decide whether PLCAA establishes a private right, or whether "applicable" means "concrete," because NSSF would still not be entitled to preliminary injunctive relief. NSSF has raised only a facial challenge to Section

10

58-35, which means that to prevail, NSSF must prove that there are no circumstances under which Section 58-35 can be validly enforced. But no one disputes that such circumstances exist—*i.e.*, that there are applications of Section 58-35 that do not implicate PLCAA at all, or that fit one of PLCAA's other exceptions. As a result, no facial relief can issue. And at the very least, even if NSSF were correct on the merits, the district court's injunction—which enjoined enforcement of Section 58-35 against anyone, for any conduct, on any theory—is overbroad.

B.     NSSF's remaining claims are no stronger. Initially, because the district court never addressed them, remand is warranted to allow that court to first evaluate whether they support preliminary relief. Regardless, they do not. *First*, NSSF's dormant Commerce Clause claim fails because Section 58-35 does not "discriminate" against interstate commerce, but applies "evenhandedly" to all industry actors—whether in-state or out-of-state. *See TitleMax of Delaware v. Weissmann*, 24 F.4th 230, 238 (3d Cir. 2022). *Second*, NSSF's void-for-vagueness claim fails because it cannot show that Section 58-35's reasonableness standard is "so vague as to be no rule or standard at all." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015). *Third*, NSSF's First Amendment claim fails because Section 58-35's marketing provision is a viewpoint-neutral regulation of commercial speech that both targets unlawful or misleading speech and satisfies intermediate scrutiny. *Fourth*, NSSF's Second Amendment claim fails because that

11

Amendment confers no freestanding right to *sell* firearms, and NSSF has offered no evidence that Section 58-35 burdens any law-abiding person's ability to obtain arms.

III.    NSSF failed to establish irreparable harm. Neither the mere possibility of having to assert an affirmative defense in a motion to dismiss in future litigation, nor generalized alleged compliance costs that the movant fails to support with *any* evidence, establish irreparable harm. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000). Especially so where NSSF delayed filing suit for over four months, only to then assert the "possibility of a remote future injury." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (citation omitted).

## STANDARD OF REVIEW

In reviewing a preliminary injunction, this Court reviews "findings of fact for clear error, legal conclusions de novo, and [a district court's] decision to grant the preliminary injunction for abuse of discretion." *Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022). The party seeking the injunction must "demonstrate a reasonable likelihood of success and that it would likely suffer irreparable harm absent an injunction." *ADP, LLC v. Rafferty*, 923 F.3d 113, 119-20 (3d Cir. 2019). If the movant satisfies both threshold prongs, "the court balances these factors, along with the relative hardship that the grant or denial of an injunction would inflict on the parties and the public interest." *Id.* at 120.

## ARGUMENT

### I.    NSSF Has Not Established Article III Jurisdiction.

NSSF's suit is untenably speculative and premature. When a party brings a pre-enforcement challenge, Article III's case-or-controversy requirement can be described in terms of standing or ripeness, because both turn on "whether the threat of future harm under [a challenged law] is sufficiently immediate to constitute a cognizable injury." *Free Speech Coal. v. Att'y Gen.*, 825 F.3d 149, 167 n.15 (3d Cir. 2016); *see also, e.g.*, *Texas v. United States*, 523 U.S. 296, 300 (1998) (suit is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all"). Consequently, to invoke Article III jurisdiction, a plaintiff must identify conduct that is "arguably … proscribed by" the challenged statute *and* show "a substantial threat of future enforcement under the statute." *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855-56 (3d Cir. 2022) (cleaned up). For good reason: federal courts have jurisdiction to "review only 'concrete legal issues, presented in actual cases, not abstractions.'" *Sherwin-Williams Co. v. County of Delaware, Pa.*, 968 F.3d 264, 269 (3d Cir. 2020) (citation omitted).

This Court's strikingly on-point precedent confirms that NSSF cannot satisfy this test. Three years ago, this Court dismissed—for lack of standing and ripeness— a company's similar effort to forestall a public-nuisance action it thought would be filed against it. *See Sherwin-Williams*, 968 F.3d at 269-71. After Sherwin-Williams

was sued by two counties for public nuisance based upon the company's sale and manufacture of lead-based paint, Sherwin-Williams offensively sued a third county that it alleged was likewise retaining counsel to "pursue what appears to be identical litigation" to those first two suits. *Id.* at 267. This Court rejected the pre-enforcement challenge, explaining the third county "might sue Sherwin-Williams, but it might not. It might advance the same arguments as other counties, but it might not. The uncertainty surrounding these fundamental questions renders these claims unfit for judicial resolution." *Id.* at 272; *see also id.* at 270 (this "uncertainty—and all of the contingencies that go along with it—expose[d]" the company's "inability to allege an existing injury or one that is certainly impending"); *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 328 (3d Cir. 2014) (finding similar pre-enforcement suit was not ripe as "[t]he identity of the parties, the nature of the claims and defenses, and the substantive law to be applied are all unknown"). What Sherwin-Williams wanted was to "preempt the [County's] supposedly imminent lawsuit with affirmative defenses it could raise in response to any suit that might be filed." *Sherwin-Williams*, 968 F.3d at 270. But this Court saw no cause to stretch the bounds of its jurisdiction, adding that (among other problems) the company failed to show that "defending against a lawsuit (rather than pursuing this one) would" be infeasible. *Id.* at 270-71.

NSSF's suit is even more speculative. As in *Sherwin-Williams*, NSSF seeks to preempt a hypothetical future public-nuisance suit. As in that case, the NJAG

"might sue [NSSF's members], but [he] might not." *Id.* at 272. The NJAG "might advance" the argument that the hypothetical action satisfies PLCAA's predicate exception, but he "might not," *id.*—and might instead argue that the action does not implicate PLCAA, or fits another of PLCAA's exceptions. And while NSSF wants to litigate its abstract interpretations of PLCAA now, it has not shown that raising the defense at a later date is infeasible, nor identified either any "intended conduct" that is "'arguably … proscribed by" Section 58-35 or any "substantial threat of future enforcement under" a statute that has not yet been enforced against anyone. *See N.J. Bankers Ass'n*, 49 F.4th at 855-56 (cleaned up).

The district court's attempts to fill this gap are unpersuasive. Initially, the court observed that NSSF members make or sell firearms. JA7. But there was no question that Sherwin-Williams had made and sold lead paint, yet that could not justify its anticipatory suit to enjoin a public-nuisance claim. *See Sherwin-Williams*, 968 F.3d at 267, 271. And crucially, Section 58-35 does not create liability for making or selling firearms; Section 58-35 imposes liability for an industry member's own *misconduct*. NSSF complains that it is unsure whether particular conduct will fall within Section 58-35, but it has repeatedly failed to identify even one example of possible conduct that could implicate the statute.

The district court also cited the existence of an office charged with enforcing Section 58-35, JA9, but *Sherwin-Williams* forecloses this argument too. After all,

the county there went substantially further than maintaining an office to investigate and enforce a law; it "seemed poised to file with the assistance of outside counsel motivated by a contingent-fee arrangement"—and it was allegedly contemplating "identical litigation" to already-existing litigation. 968 F.3d at 266-67. Yet that was insufficient. *Id.* at 270, 272. Nor can maintaining an office be enough: every State has subsidiary offices charged with enforcing myriad statutes, but that cannot confer general federal jurisdiction for roving challenges to all those provisions.

Nor does it matter, as the district court suggested, that the hypothetical future enforcement would be based on statutory rather than common law. JA8-9. The fact that the hypothetical suits in *Sherwin-Williams* would have been rooted in common law was irrelevant to the holding. Instead, the problem was that Sherwin-Williams asked this Court "to assume not only that the County will sue, but also its theory of liability, its litigation tactics, and that the County will prevail," 968 F.3d at 270, which turned on the posture of the case, not on the underlying source of law. So too here. NSSF asks this Court to assume both the future defendant (even though such defendant may not be protected by PLCAA or be an NSSF member) and the theory of liability (even though such theory may not turn on the predicate exception or even implicate PLCAA). *See* Dkt. 16 (Mar. 10, 2023 Order) (listing actions that would be undisputedly consistent with PLCAA). NSSF's alleged harms are "hypothetical and

conjectural" and "redressable in the context of" a future case, "should it ever occur." *Sherwin-Williams*, 968 F.3d at 272. Article III requires more.

## II.   NSSF Has Not Established A Likelihood Of Success.

This Court should reverse the district court's holding that NSSF was likely to succeed on the merits of its preemption claim. If this Court reviews NSSF's separate, unreached claims, those too are unlikely to succeed.

### A.   NSSF's Preemption Claim Is Not Likely To Succeed.

NSSF will not succeed on its PLCAA claim for multiple independent reasons. First, NSSF lacks a private right to sue under PLCAA. Second, Section 58-35 falls well within PLCAA's plain text. Third, even accepting NSSF's (mis)construction of PLCAA's predicate exception, there are a range of permissible applications under Section 58-35—meaning NSSF is not entitled to facial relief.

#### 1.   *NSSF Cannot Wield PLCAA As A Sword*.

NSSF has no right of action to file an offensive lawsuit asserting that PLCAA preempts New Jersey law. Although NSSF claims that Section 58-35 is inconsistent with PLCAA and the Supremacy Clause, neither affords NSSF the right to file a suit. The Supreme Court has held that "the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action," but supplies a "rule of decision" where there is an alleged conflict between federal and state law. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324-25 (2015). And PLCAA states that "no

provision of [PLCAA] shall be construed to create a public or private cause of action or remedy." 15 U.S.C. § 7903(5)(C). PLCAA thus "only serves as a shield against a class of claims brought against manufacturers and sellers." *Woods v. Steadman's Hardware, Inc.*, No. 12-33, 2013 WL 709110, at *3 (D. Mont. Feb. 26, 2013). That is why, until NSSF filed this and two similar cases, every prior decision interpreting PLCAA arose from an affirmative defense. *See, e.g.*, *Ileto v. Glock*, 565 F.3d 1126, 1136 (9th Cir. 2009); *City of New York v. Beretta U.S.A.*, 524 F.3d 384, 404 (2d Cir. 2008); *Soto v. Bushmaster Firearms Int'l*, 202 A.3d 262, 302-24 (Conn. 2019).

Contrary to NSSF's complaint, *see* JA35, Section 1983 cannot supply its cause of action. A plaintiff filing suit under Section 1983 "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). In understanding the "right" asserted, specificity matters: courts must first "determine exactly what rights, considered in their most concrete, specific form, [plaintiffs] are asserting." *Id.* at 346. And in assessing whether any such right is "enforceable under § 1983," clarity matters: Congress must create such rights "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). It is therefore the plaintiff's burden to establish that a statute "gives rise to federal rights enforceable through § 1983." *Grammer v. John J. Kane Reg'l Ctrs.*, 570 F.3d 520, 525 (3d Cir. 2009). And if a statute provides for its *own* "express, private means of redress," then that "is ordinarily an indication that Congress did not

intend to leave open a more expansive remedy under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005). In particular, as Judge Jordan laid out in a concurrence, even if a statute seeks to benefit a particular class, that class may not have the *right* to "a new federal cause of action" if the law's protections are "framed only as a legal defense." *Ass'n of N.J. Rifle & Pistol Clubs v. Port Auth. of N.Y. & N.J.* (*ANJRPC*), 730 F.3d 252, 262 (3d Cir. 2013) (Jordan, J., concurring in the judgment) (construing statute as conferring only defense to prosecution).

PLCAA's text and structure demonstrate that Congress did not intend it to be enforced through Section 1983. Instead, PLCAA supplies an affirmative defense. Crucially, "PLCAA explicitly prevents its own use as a jurisdictional hook," *Woods*, 2013 WL 709110, at *3, stating that "no provision of [PLCAA] shall be construed to create a public or private cause of action or remedy," 15 U.S.C. § 7903(5)(C). Moreover, PLCAA specifies which kinds of "civil action[s] or proceeding[s]" "may not be brought,"[1] rather than focusing on what substantive conduct is permitted or prohibited. *Id.* §§ 7902(a), 7903(5)(A); *see id.* § 7902(b) (requiring "dismiss[al]" of already-pending qualifying actions).

PLCAA's language makes especially clear that the law operates as a defense. After specifying what "action[s]" may or may not proceed, PLCAA delineates six

---

[1] This is unusual language—the State has found only three statutes that use it. *See* 18 U.S.C. § 922(z)(3)(B); *id.* § 2258B(a); 34 U.S.C. § 20917(c)(5)(A).

exceptions that also turn on the nature of the "action." *Id.* § 7903(5)(A). PLCAA's exceptions thus require a court to review a specific suit to see whether it qualifies as any of six different kinds of "action." Take the predicate exception: it asks whether an "action" is one against a defendant who "knowingly violated" a state statute (and not what mens rea the underlying state law itself provides) and whether the pleaded "violation" is "a proximate cause" of the harm (again, not what causation element the underlying state law provides). *Id.* § 7903(5)(A)(iii). By PLCAA's 2005 enactment, Congress knew "how to be unambiguous about conferring new private rights of action," *ANJRPC*, 730 F.3d at 262 (Jordan, J., concurring in the judgment), but PLCAA's text reveals precisely the opposite intent here.[2]

That PLCAA confers no private right to file offensive suits challenging state statutes hardly undermines its force. All courts "are bound by federal law," and the lack of a private right means only that the party gets to raise preemption as a defense instead. *Armstrong*, 575 U.S. at 326; *cf. Whole Woman's Health v. Jackson*, 142 S.

---

[2] Nor does *Ex parte Young*, 209 U.S. 123 (1908), supply a right to file this suit. As Chief Judge Sutton has explained, "*Ex parte Young* provides a path around sovereign immunity *if* the plaintiff already has a cause of action from somewhere else," but "does not supply a right of action by itself." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 905, 906 (6th Cir. 2014). Thus, "when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*, … [w]hat is required is that Congress created a cause of action for injunctive relief in the statute or otherwise made § 1983 available." *Id.* at 906. Where no such right has been conferred, neither *Ex parte Young* nor freestanding (and related) doctrines of "equity" fill the gap. *Id.* at 904-06; *see also Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902-03, 906 n.19 (10th Cir. 2017).

Ct. 522, 537-38 (2021) (noting that "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims"). Numerous statutory protections are enforceable only as affirmative defenses, not as freestanding causes of action. For instance, "fair use" under 17 U.S.C. § 107 "is an affirmative defense," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994), but the fact that it "must be procedurally asserted as an affirmative defense" and not as a cause of action "does not detract from its constitutional significance," *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1260 n.3 (11th Cir. 2001). *See also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86 (1982) (explaining that a coal producer could raise a statute as a defense even though it could not use that statute to seek "affirmative remedies"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 142 (2007) (Thomas, J., dissenting) (in patent law, distinguishing affirmative defense and "freestanding cause of action"). PLCAA itself was raised *exclusively* as a defense to "action[s]" that had been "brought" until NSSF, for apparently the first time in PLCAA's history, filed this and two comparable suits last year.

The State did not raise this issue below, but this Court should decline NSSF's foreseeable invitation to hold it forfeited. This Court reviews a "pure question of law even if not raised below" if, as here, "the issue's resolution is of public importance." *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017); *N.J. Carpenters & Trs. Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d

21

297, 305 (3d Cir. 2014) (agreeing it is "appropriate … to reach an issue that the district court did not if the issues provide purely legal questions"); *Gen. Refractories Co. v. First State Ins.*, 855 F.3d 152, 162 (3d Cir. 2017) (adding public interest "require[s] that the issue be heard" despite forfeiture if resolution "may affect a wide range" of entities "beyond the immediate parties to the suit"). Because NSSF would have this Court invalidate a state statute in one fell swoop, and because the private-rights question is one of pure law that implicates fundamental separation-of-powers concerns, *see Egbert v. Boule*, 142 S. Ct. 1793, 1802-03 (2022), this appeal meets that test.[3] This Court should reach the question and hold that PLCAA confers only an affirmative defense, not a private right of action.

2.    *NSSF's Construction Of PLCAA Fails On The Merits.*

If this Court reaches the merits of NSSF's PLCAA claim, the need for reversal is even more palpable. The district court's atextual reading of PLCAA is inconsistent with every other opinion to construe PLCAA's plain text. And NSSF's alternative PLCAA-based arguments are no better than the one the district court adopted.

---

[3] Moreover, the case remains at the preliminary-injunction stage. As preliminary-injunction timelines mean "parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981), the failure to raise an issue at this stage does not foreclose raising it later. *See, e.g.*, *Ocean Grove Camp Meeting Ass'n of United Methodist Church v. Vespa-Papaleo*, 339 F. App'x 232, 240 (3d Cir. 2009) (allowing party to press abstention during merits stage even though unraised during preliminary-injunction stage).

**1.** The district court's central error was its unprecedented construction of the predicate exception. Under PLCAA, an action cannot be brought if it (1) is against a licensed manufacturer or seller *and* (2) seeks relief "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" *yet* (3) does not fall into any of six statutory exceptions. *See* 15 U.S.C. § 7903(5)(A). One of those six—the predicate exception—permits an "action in which [an industry member] knowingly violated a State or Federal statute applicable to the sale or marketing of the product," where "the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii). The district court concluded that Section 58-35 was not a state statute "applicable to the sale or marketing of the product." JA14. Its sole justification was that a law cannot be "applicable to" firearms sales unless its terms "impose a *concrete* obligation with which industry members can confidently ensure compliance." *Id.* at 15 (emphasis added).

That is an unsustainable construction of the word "applicable." If a law leaves "applicable" undefined, as PLCAA does, courts "look to the ordinary meaning of the term." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). That resolves this question: "'Applicable' means 'capable of being applied: having relevance' or 'fit, suitable, or right to be applied: appropriate.'" *Id.* (quoting Webster's Third New International Dictionary 105 (2002)); *see also Applicable*, Black's Law Dictionary (11th ed. 2019) (same); *Patterson v. Shumate*, 504 U.S. 753, 758-59 (1992) (defining

an "applicable nonbankruptcy law" to mean "any relevant nonbankruptcy law"). But that should have been dispositive: No one can dispute that Section 58-35 expressly relates to sale activities of firearms industry members—or that it fits or has relevance to such sales. Even NSSF has stated before this Court that laws such as Section 58-35 "expressly apply to the firearm industry." Dkt. 14 at 16.

Before the decision below, no judicial opinion—majority, concurrence, or dissent—had diverged from the plain meaning of "applicable" when interpreting PLCAA. To be sure, some jurists have construed "applicable" to include laws that simply *encompass* firearms sales or marketing, *e.g.*, *Soto*, 202 A.3d at 302-24; *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 432-34 (Ind. Ct. App. 2007), while others hold that "applicable" covers only statutes *focused* on gun sales or marketing, *see, e.g.*, *Ileto*, 565 F.3d at 1136; *Soto*, 202 A.3d at 327-28 (Robinson, J., dissenting in part). And some fall in between—finding that "applicable" refers to statutes that either "expressly regulate firearms" or "that courts have applied to the sale or marketing of firearms." *Beretta*, 524 F.3d at 404. But under any of those approaches, Section 58-35—which expressly and exclusively regulates firearm-industry sales— is "applicable to" firearm sales. Indeed, as one district court explained, "[n]o reasonable interpretation of 'applicable to' can exclude a statute which imposes liability exclusively on gun manufactures for the manner in which guns are

manufactured, marketed, and sold." *NSSF v. James*, 604 F. Supp. 3d 48, 59 (N.D.N.Y. 2022).

There is no support for the district court's unprecedented construction. Most obviously, a legal standard of "sufficiently concrete" is nowhere in PLCAA's text. *See Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 234 (3d Cir. 2021) (courts may not "add to or alter the words [Congress] employed"). Neither the district court nor NSSF identified dictionary definitions, common use, or judicial opinions to support the conclusion that applicable means concrete. Everyday parlance confirms the two concepts are wholly distinct. A school policy insisting that students refrain from "unreasonable conduct" in the library would clearly *apply to* students in the library regardless of its *concreteness*. And it makes no sense to assume that Congress wanted Legislatures to guess whether their enactments are "concrete" enough.

The district court's three bases for its applicable-means-concrete construction cannot pass muster. *First*, the court stated that because an "action" can fit within PLCAA's predicate exception only if it alleges a "knowing" violation of state law, the underlying "applicable" law itself must contain "a sufficiently concrete duty." JA15. But it cited no authority for that proposition, and in fact, laws often impose civil or even criminal liability for knowing violations of a duty to be "reasonable" or "prudent." Disorderly conduct laws often prohibit "knowingly" acting "in such unreasonable manner as to alarm or disturb another." 720 Ill. Comp. Stat. Ann. 5/26-

1(a); Tex. Penal Code Ann. § 42.01(a)(5) ("knowingly" making "unreasonable noise in a public place"). ERISA prohibits knowingly participating in a breach of fiduciary duty, 29 U.S.C. § 1105(a)(1), including the failure to discharge duties with the care that a "prudent" person would use, *id.* § 1104(a)(1)(B). And this Court has considered a child-endangerment law that applied a "knowing mens rea" to conduct as general as "endanger[ing] the welfare of [a] child by violating a duty of care, protection or support." *Hernandez-Cruz v. Att'y Gen.*, 764 F.3d 281, 285-86 (3d Cir. 2014); 18 Pa. Stat. Ann. § 4304(a)(1).

Nor are these rare examples. *See, e.g.*, Or. Rev. Stat. § 124.100(5) (liability where one "knowingly acts or fails to act under circumstances in which a reasonable person should have known of" physical or financial abuse by others); 18 Pa. Stat. Ann. § 3303 ("knowingly or recklessly failing to take reasonable measures to prevent or mitigate a catastrophe"). And PLCAA itself says the predicate exception would "includ[e]" "any case" against a dealer for selling a firearm despite having "*reasonable cause* to believe[] that the actual buyer" was a prohibited purchaser. 15 U.S.C. § 7903(5)(A)(iii)(II) (emphasis added). Said simply, PLCAA's requirement that an "action" must plead a "knowing" violation cannot support the district court's conclusion that an "applicable" statute would not turn on reasonableness.

*Second*, the district court erred in concluding that the two examples Congress gave of actions that would fit the predicate exception support its applicable-means-

concrete view. JA16. The predicate exception saves actions predicated on a violation

of a "statute applicable to the sale or marketing of the product, … including":

> (I)    suits involving record-keeping failures or falsifications, and

> (II)   suits "in which the manufacturer or seller aided, abetted, or conspired"
> to sell a gun, "knowing, or having reasonable cause to believe, that the
> actual buyer of the qualified product was prohibited from possessing"
> that weapon under federal law.

15 U.S.C. § 7903(5)(A)(iii)(I)-(II). But the district court's inferential leaps—that the

predicate exception is limited to whatever these two examples have in common, and

that what they have in common is "concreteness"—lack merit.

First, Congress's decision to offer two examples did not limit the exception's

reach. Instead, the exception expressly *includes* the examples, which confirms "that

Congress intended to illustrate a broad concept rather than narrowly circumscribe a

term with exclusive categories." *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir.

2004); *see also, e.g.*, *Campbell*, 510 U.S. at 578. And while courts sometimes

interpret catch-all terms at the end of statutory lists in light of specific, preceding

examples, *see, e.g.*, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est.*

*of Keffeler*, 537 U.S. 371, 384 (2003), that canon is inapplicable when (as here) the

statute lists two "distinct and independent" examples that are simply included within

a broader—and otherwise plain—statutory meaning, *CSX Transp. v. Ala. Dep't of*

*Revenue*, 562 U.S. 277, 295 (2011); *Cooper Distrib. Co. v. Amana Refrigeration*, 63

F.3d 262, 280 (3d Cir. 1995) (Alito, J.) (*ejusdem generis* canon "is inapplicable" to

a list of examples prefaced by the phrase "including, but not limited to"); *United States v. West*, 671 F.3d 1195, 1200-01 (10th Cir. 2012) (same and citing cases); *see also Soto*, 202 A.3d at 315 (citing legislative history confirming the two examples were not intended "to define or clarify" the predicate exception).

In any event, even if these examples *could* redefine the meaning of the term "applicable," its definition still would not be "concrete." After all, there are other, obvious commonalities the two examples share. Both track legislative enactments, rather than common law suits—the latter being a core concern behind PLCAA. *See* 15 U.S.C. § 7901(a)(7) (decrying "common law" lawsuits that expand liability in ways not contemplated "by the legislatures of the several States"). Both apply to the firearms industry specifically, rather than to commerce writ large. *See Ileto*, 565 F.3d at 1136 (interpreting phrase "applicable" to draw this distinction). And both involve wrongdoing by the firearms-industry defendant, rather than imposing liability based "solely" upon the acts of third parties. *See* 15 U.S.C. § 7901(a)(6). Under any of those commonalities, actions under Section 58-35 would go forward, which is why NSSF had to gerrymander its applicable-means-concrete theory. Yet that theory does not even fit the two examples—one of which authorizes actions against dealers who had "reasonable cause to believe" the buyer was prohibited. *Id.* § 7903(5)(A)(iii)(II). None of this supports such a strained reading of "applicable."

*Third*, the district court relied on its view of Congress's "purpose." *See* JA16 (stating that Congress targeted suits against firearms sellers for "harm solely caused by the criminal or unlawful misuse of firearm products … by others" (quoting 15 U.S.C. § 7901(b)(1)). As an initial matter, the district court's interpretive method is wrong: "vague notions of a statute's 'basic purpose'" are "inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993). That is so even when Congress's high-level purpose is put into introductory clauses, as "prefatory clauses … cannot change the scope of the operative clause." *Kingdomware Techs. v. United States*, 579 U.S. 162, 173 (2016). Simply put, "because no legislation pursues its purposes at all costs, courts have no license to disregard clear language based on an intuition that Congress must have intended something broader." *N. Sound Capital LLC v. Merck & Co.*, 938 F.3d 482, 491-92 (3d Cir. 2019) (cleaned up). Rather, if "the language of the statute has a reasonably plain meaning," the court's "sole function is to enforce the statute's language." *Byrd v. Shannon*, 715 F.3d 117, 122-23 (3d Cir. 2013). And no framing of PLCAA's purpose could make "applicable" mean "concrete."

Regardless, the tension the district court identified between PLCAA's goals and Section 58-35 is illusory. The parties *agree* that Congress generally wanted to foreclose industry liability "for the harm solely caused by the criminal or unlawful misuse of firearm products … by others." 15 U.S.C. § 7901(b)(1). But that is

consistent with Section 58-35, because Section 58-35 imposes liability based on industry actors' *own* misconduct. *See* N.J. Stat. Ann. § 2C:58-35(a)(1)-(2). That is precisely the type of suit PLCAA's exceptions allow. *See* 15 U.S.C. § 7903(5)(A); *id.* § 7901(a)(7) (concern about lawsuits exceeding intentions of "the legislatures of the several States"). Indeed, even if this Court were to indulge NSSF's purposivist arguments, the evidence only *undermines* NSSF's view. *See* 151 Cong. Rec. S9087, S9088 (July 27, 2005) (sponsor stating PLCAA "does not prevent [companies] from being sued for their own misconduct"); 151 Cong. Rec. S8908-01, S8911 (July 26, 2005) (another PLCAA sponsor agreeing that "[p]laintiffs can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they … sell to someone they know should not be sold to or did not follow steps to determine whether the individual was properly subject to buying a gun").

Finally, even if the interpretive question were close, the presumption against preemption would require that the State prevail. Federal courts "apply a presumption against preemption" when reviewing federal laws pertaining to "'areas of traditional state regulation' or police power," *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 & n.5 (3d Cir. 2018), including their traditional authority to address public nuisances, *see*, *e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 669 (1887). That presumption applies even where a federal law includes an express preemption provision. *Lupian*, 905 F.3d at 131 & n.5. In other words, the presumption requires NSSF to establish

that its applicable-means-concrete reading is the *only* plausible one, *Farina v. Nokia*, 625 F.3d 97, 118 (3d Cir. 2010), which it plainly cannot do.

**2.** The district court did not reach NSSF's other two PLCAA theories—that Section 58-35 cannot fit within the predicate exception because it (allegedly) does not require either (1) "knowing" violations or (2) proximate cause. *See* JA71, 73; JA17 & n.2. These too lack merit.

Both arguments run into a threshold, dispositive defect: PLCAA's plain text does not require a particular state statute to contain a knowing mens rea or proximate causation element at all. As to the former, the predicate exception does not require a *statute* to include a knowledge component; it simply requires that any "action" brought involve a "knowing[] violat[ion]" of law. 15 U.S.C. § 7903(5)(A)(iii). The same is true for causation. The predicate exception does not require a proximate-causation element in the statutory text; rather, it requires the "action" "brought" to involve a "violation" that is "a proximate cause of the harm for which relief is sought." *Id.* So even were NSSF correct that Section 58-35 failed to require either element (and it is not), that would be no basis to preempt the law.[4]

In any event, NSSF misunderstands Section 58-35. N.J. Stat. Ann. § 2C:58-35(a) *does* require knowing conduct—a point NSSF simply missed because it was

---

[4] This is, of course, further evidence that NSSF's pre-enforcement suit is premature and rests on a misunderstanding of PLCAA as supporting a private right to challenge *statutes*, rather than as a defense to specific *actions*.

unaware that, under state law, a "knowledge" requirement is read into otherwise-silent text housed within Title 2C. *See* N.J. Stat. Ann. § 2C:2-2(c)(3); *State v. Rivera*, 16 A.3d 352, 359 n.6 (N.J. 2011) (relying on this "gap-filler"). And Section 58-35 requires knowing conduct in the same way the predicate exception does: knowledge as to the core act, but not as to all possible elements. Indeed, one of Congress's *own* examples of regulable conduct is (1) (knowingly) aiding, abetting, or conspiring with another to sell a firearm while (2) "knowing, *or having reasonable cause to believe*, that the actual buyer" is not allowed to receive it. 15 U.S.C. § 7903(5)(A)(iii)(II) (emphasis added). In other words, PLCAA itself makes clear that a permissible suit can involve a knowing core act (aiding, abetting, or conspiring with another to sell a firearm) and a mental state of at least negligence as to some other elements (*e.g.*, the actual buyer being a prohibited person).

Both prongs of Section 58-35 are congruent. Subsection (a)(1) follows the exact pattern of Congress's second example: it requires knowledge as to the core act (the defendant's own conduct), but not as to whether that conduct is "unlawful" or "unreasonable under all circumstances" and/or whether it "create[s], maintain[s], or contribute[s] to a public nuisance." N.J. Stat. Ann. § 2C:58-35(a)(1). Subsection (a)(2), having incorporated a "knowledge" requirement, *supra* at 31-32, likewise requires knowledge as to the core act, without requiring that sellers *know* whether a

given control is "reasonable." It too functions just like the predicate exception's second example. *See* 15 U.S.C. § 7903(5)(A)(iii)(II).

Section 58-35 also requires proof of proximate cause, which can be shown by proving "the harm to the public was a *reasonably foreseeable* effect of [defendant's] conduct, notwithstanding any intervening actions, including but not limited to criminal actions by third parties." N.J. Stat. Ann. § 2C:58-35(e) (emphasis added). Even though the statute includes that express requirement, NSSF believes PLCAA requires more. According to NSSF, when PLCAA said that an "action" must involve proximate causation, Congress must have meant that intervening actions *always* break the chain of causation. *See* Dkt. 14 at 12 (describing this as "true" proximate cause). But NSSF is conflating the tort concepts of "intervening" and "superseding" causes. Reasonably foreseeable intervening causes (the concept discussed by Section 58-35) do not break causation, *see Komlodi v. Picciano*, 89 A.3d 1234, 1252 (N.J. 2014), while superseding causes are an extraordinary *type* of intervening cause that are *not* reasonably foreseeable and thus do break the causal chain, *see* Restatement (Second) of Torts §§ 440-42 (1965); *Lynch v. Scheininger*, 744 A.2d 113, 122-26 (N.J. 2000). Section 58-35 leaves that hornbook distinction in place, and there is no evidence Congress had one specific definition of proximate causation in mind in PLCAA—let alone one unambiguous enough to supplant this classic dividing line.

3.   *NSSF Is Not Entitled To The Preliminary Relief It Demands*.

Finally, this Court need not even decide whether NSSF enjoys a private right or is properly construing the predicate exception, because even if both were true, NSSF still would not be entitled to facial preliminary relief. And at the very least, the district court's injunction is overbroad and must be reversed.

**1.** Even if NSSF were correctly interpreting PLCAA's predicate exception, its PLCAA claim still could not satisfy the standard for facial challenges.

As a threshold matter, there can be no serious dispute that NSSF is demanding a facial injunction. A "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case," whereas an as-applied suit "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). Here, NSSF leveled a sweeping challenge to Section 58-35, without identifying any specific conduct it believes is implicated by the law, *see supra* at 14-16, and sought an order enjoining enforcement of Section 58-35 in full. JA97. That is what the district court ordered: a ban on enforcing Section 58-35 against anyone, for any conduct. JA64-65, 97.

Although NSSF briefly name-checked the idea of as-applied relief, JA54, NSSF never argued "particular" facts that would support an as-applied challenge,

such as conduct by any of its members that NSSF fears would implicate Section 58-35. *Marcavage*, 609 F.3d at 273; *see also Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 134 n.6 (3d Cir. 2022) (construing lawsuit that "purport[s] to raise both a facial and an as-applied challenge" as raising only facial attack given lack of discernible as-applied claim). Indeed, as noted above, NSSF cannot even identify its membership, let alone highlight any specific conduct that would ground an as-applied challenge. *See Benezet Consulting LLC v. Sec'y Commw. Pa.*, 26 F.4th 580, 585 (3d Cir. 2022) (noting as-applied injunction is by definition "limited to the specific plaintiffs and circumstances of the litigation").

As a result, NSSF cannot prevail unless it satisfies its burden of showing "that 'no set of circumstances exists under which the [law] would be valid.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 543 (3d Cir. 2017). But as this Court's stay order illustrates, Section 58-35 has a wide range of applications that fit even with NSSF's (mis)construction of PLCAA's predicate exception. After all, whatever that exception means, Section 58-35 can be enforced "against anyone who does not qualify as a 'manufacturer,' 'seller,' or 'trade association' within the meaning of 15 U.S.C. § 7903(2), (6), ([8])"—*e.g.*, a seller of ghost guns that lacks a federal license. *See New York v. Arm or Ally*, No. 22-6124, Compl., Dkt. 1-1 (S.D.N.Y.). Actions under Section 58-35 can be brought if they are "not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third

party' within the meaning of 15 U.S.C. § 7903(5)(A)"—as where they are tied only to the dealer's pattern of sales to straw purchasers or other irresponsible conduct, rather than how the firearms are ultimately used. *Cf. In re Sarco, Inc.*, No. A-1161-08T4, 2011 WL 1376286, at \*1-3 (N.J. Super. Ct. App. Div. Apr. 13, 2011) (series of failures leading to 43 missing handguns). And actions can proceed if they fit PLCAA's other exceptions. *See Delana v. CED Sales*, 486 S.W.3d 316, 319, 325-26 (Mo. 2016) (action against seller of gun to "severely mentally ill" buyer who had previously attempted suicide with weapon bought from same store fit "negligent entrustment" exception).

That Section 58-35 has myriad permissible applications stops this abstract demand for facial preliminary relief in its tracks. Indeed, a theory based entirely on one *exception* to PLCAA preemption is an especially unnatural hook for facial invalidation of a state statute. But facial relief is all that is at issue here. As a result, this Court can simply reverse for NSSF's failure to meet its burden—leaving NSSF to develop and press an as-applied challenge, without addressing either the private-right or statutory-construction questions on this posture.

**2.** At the very least, and for much the same reason, this Court should narrow the district court's overbroad injunction even if it adopts NSSF's erroneous views of PLCAA. As explained above, NSSF's sole preemption theory turns on the scope of PLCAA's predicate exception—but that has no bearing on "actions" brought under

Section 58-35 that do not implicate PLCAA, fall into other exceptions, or even fall into the predicate exception's own two examples. As a result, this Court—consistent with its stay order—should at least tailor any injunction to cover only hypothetical applications of the statute that would rise or fall with the parties' debate regarding the predicate exception's scope.

If this Court were to effectively convert its stay into a narrowed injunction, two adjustments would still be necessary. First, should the preliminary injunction remain trained on NSSF and its members, the NJAG would need to know the identity of those members, without having to give NSSF notification each time about who it might investigate—and the lack of such information simply highlights how abstract this whole enterprise is. Second, this Court's stay specifically allowed enforcement actions to proceed that directly fit the two examples stated in the predicate exception. *See* 15 U.S.C. § 7903(5)(A)(iii)(I)-(II). But as explained above, even NSSF admits that these two examples are non-exhaustive. *See supra* at 27-28 (*ejusdem* argument). While hard to do in the abstract, on NSSF's own view the narrowing question would be what type of "commonality" with these two examples suffices—so the State must at least be allowed to proceed with any actions that share that commonality.

In short, even if this Court believes that NSSF has a right to bring an offensive PLCAA claim, construed the predicate exception correctly, and met its burden for this facial attack, the scope of the injunction below still warrants reversal.

B.    NSSF's Unreached Claims Are Also Unlikely To Succeed.

In addition to its PLCAA preemption claim, NSSF challenged Section 58-35 under the Commerce Clause, the Due Process Clause's void-for-vagueness doctrine, the First Amendment, and the Second Amendment. As a threshold matter, the district court declined to reach those issues, *see* JA9 n.1, JA14, and the proper course would be to remand these distinct questions to the district court in the first instance to decide if they justify preliminary relief. *See, e.g.*, *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1835 (2022) (resolving statutory claim but remanding the constitutional claims because "court[] below did not reach them" and should "consider [them] in the first instance"); *E.O.H.C. v. Secretary, U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 187 (3d Cir. 2020) (one of many examples "leav[ing] question to the District Court in the first instance"). But if this Court reaches these alternative constitutional theories in the first instance, none are likely to succeed.

1.    *Dormant Commerce Clause.*

This Court's cases, and blackletter Commerce Clause principles, foreclose NSSF's arguments. The Commerce Clause's "dormant" aspect "is driven by concern about 'economic protectionism.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). In general, state statutes that "discriminate against interstate commerce" are usually unconstitutional, while "laws that 'regulate even-handedly to effectuate a legitimate local public interest will be upheld unless the burden imposed on such

38

commerce is *clearly excessive* in relation to the putative local benefits.'" *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (emphasis added) (describing analysis under *Pike v. Bruce Church*, 397 U.S. 137 (1970)).

NSSF has never argued that Section 58-35 "discriminates" against interstate commerce—nor could it, because the law on its face applies "evenhandedly" to all gun-industry actors, whether in-state or out-of-state, *see TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 238 (3d Cir. 2022), and it does not have "the effect of eliminating a competitive advantage possessed by out-of-state firms," *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 211 (3d Cir. 2002). And none of this analysis changes just because some industry activity can take place elsewhere. *See Heffner v. Murphy*, 745 F.3d 56, 73 (3d Cir. 2014) (if challenged law "imposes the very same burdens on" in-state and out-of-state entities, it imposes "a burden on commerce without discriminating against *interstate* commerce").

NSSF instead claims that, even absent discrimination, Section 58-35 must still be unconstitutional because it regulates "wholly out-of-state conduct." Dkt. 14 at 19. But this Court has rejected the argument that "[w]here the extraterritoriality doctrine has been invoked," as here, "discrimination does not matter and is not an element of the claim." *TitleMax*, 24 F.4th at 238 n.7; *see also Freeman v. Corzine*, 629 F.3d 146, 162 (3d Cir. 2010) (plaintiff challenging a law based on extraterritoriality must show the statute "forc[es] producers or consumers in other States [to] surrender

whatever competitive advantages they may possess"); *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015) (Gorsuch, J.) (same, and emphasizing the contrary rule would require courts to "strike down" entirely commonplace "state health and safety regulations"). Rather, in balancing harms against the local benefits under *Pike*, this Court held that "[t]he only burdens to be considered in the balancing test are those that 'discriminate against interstate commerce.'" *TitleMax*, 24 F.4th at 240. Thus, "once it is clear that the laws do not discriminate between in-staters and out-of-staters, 'the inquiry as to the burden on interstate commerce should end' and further analysis of the local benefits is unnecessary." *Id.* at 241.[5]

While it is unclear whether NSSF still presses a *Pike* argument at all, NSSF has plainly failed to meet its burden if so. After all, Section 58-35 treats all sellers the same, like any other nondiscriminatory law that regulates a chain of commercial activity that ends in-state. *See, e.g.*, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001) (rejecting similar challenge to Vermont labeling law's application to mercury-containing light bulbs). In contrast to this total lack of discriminatory burden (let alone a "clearly excessive" burden), *see TitleMax*, 24 F.4th at 240,

---

[5] While NSSF cites several Supreme Court cases (*see* Dkt. 14 at 19-20) that referred to extraterritorial effects in invalidating "price control or price affirmation" laws, the Supreme Court and this Court have held that those decisions are "not applicable" to a state statute, like Section 58-35, that is neither. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003); *TitleMax*, 24 F.4th at 239 & n.10; *Epel*, 793 F.3d at 1171-75 (extensive discussion and rejection of NSSF's argument).

Section 58-35's local benefits—for example, helping to curb "an illegal secondary market for" firearms, N.J. Stat. Ann. § 2C:58-33(c)—are quintessential public safety interests, far removed from the protectionism that the Commerce Clause targets. *See Davis*, 553 U.S. at 337-38. Indeed, NSSF did not even attempt to develop a contrary record below to support any claim that the speculated harms are "clearly excessive" to the valid state interests.[6]

2.    *Vagueness (Due Process).*

NSSF cannot meet the extraordinary burden of proving that Section 58-35 is unconstitutionally vague. A law is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). That a statute "may contain some ambiguities does not render it impermissibly vague." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013); *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (law is not vague "simply because difficulty is found in determining whether certain marginal offenses fall within [its] language"). This test is "especially

---

[6] This claim, too, cries out for NSSF to identify specific conduct, or at least develop an as-applied challenge. A hypothetical future enforcement action could involve any sales practices by a company based in New Jersey, or online sales by an out-of-state company shipped to an in-state resident, none of which implicate even NSSF's view of the Dormant Commerce Clause. It cannot support NSSF's facial attack. In any event, defendants in the straw-man cases NSSF imagines—where the conduct has no tie to New Jersey—have a more obvious defense to plead: personal jurisdiction.

lax for civil statutes that regulate economic activities." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015). "For those statutes, a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *Id.*

Section 58-35 is hardly "so vague as to be no rule or standard at all." It only subjects covered companies to civil liability based upon conduct that is "unlawful in itself" or is "unreasonable under all the circumstances," or that reflects their failure to establish "reasonable controls" (which the Legislature even clarified through a four-part definition). N.J. Stat. Ann. §§ 2C:58-34, -35(a), (b). NSSF has not claimed the word "unlawful" is vague, but there is nothing vague about requiring reasonable conduct either. Rather, laws often require "reasonableness," *see Wm. Penn Parking Garage v. Pittsburgh*, 346 A.2d 269, 292 (Pa. 1975) (noting that "'reasonableness' pervades the common law" and collecting examples across states), and state "statutes that employ the term 'unreasonable' have survived constitutional challenges based upon vagueness time and time again, as 'unreasonable' is a 'widely used and well understood word,'" *Empire State Rest. & Tavern Ass'n, Inc. v. New York State*, 360 F. Supp. 2d 454, 463 (N.D.N.Y. 2005) (quoting *Cameron v. Johnson*, 390 U.S. 611, 616 (1968), and collecting Supreme Court cases); *see also United States v. Hoffert*, 949 F.3d 782, 789 (3d Cir. 2020) (even in criminal context, that a jury must assess actor's "reasonableness is not sufficient to make [a statute] too vague to afford a practical guide to permissible conduct"). And most of tort law turns on the ability to

understand the concept of reasonableness. *See, e.g.*, *Air & Liquid Systems Corp. v. DeVries*, 139 S. Ct. 986, 993 (2019) (noting "basic tort-law principles … impose[] a duty to exercise reasonable care on those whose conduct presents a risk of harm to others"). This Court should decline NSSF's invitation to hold vast swaths of the 1L curriculum unconstitutional.

NSSF has also argued that Section 58-35 requires industry members to predict what will reasonably protect health and safety, *see* JA84-85, but business regulations regularly impose such responsibilities on proprietors. In *Jake's, Ltd. v. Coates,* 284 F.3d 884 (8th Cir. 2002), for example, a nude-dancing establishment challenged an ordinance allowing license revocation if it conducted its business "in such a manner as … to constitute a menace to the health, safety, or general welfare of the community." *Id.* at 890. That court unanimously rejected "as frivolous" a claim that the ordinance conferred "unbridled discretion," noting that this type of "discretion-limiting standard" was "not unlike the definition of a public nuisance long known to the law." *Id.*; *see also ChemSol, LLC v. City of Sibley*, 386 F. Supp. 3d 1000, 1021 (N.D. Iowa 2019) (agreeing "public nuisance" test is "a concept long known to and upheld by the law" and is not "unconstitutionally vague"); *cf. In re Lead Paint Litig.*, 924 A.2d 484, 497 (N.J. 2007) (noting while public nuisance is "expressed in rather general terms," those terms are "not without meaning"). Nor are such standards different from what consumer-protection law regularly requires. *See Bell v. Publix*

43

*Super Mkts.*, 982 F.3d 468, 474-75 (7th Cir. 2020) (citing laws addressing labels that are "likely to deceive reasonable consumers").

Notably, NSSF's suggestion that it is impossible to establish a standard from the language in Section 58-35 is belied by the fact that NSSF itself devised protocols to mitigate the kinds of harms Section 58-35 exists to address. For instance, NSSF offers "a free 'Don't Lie Retailer Kit,'" which it advertises as helping retailers to "recognize and stop any would-be straw purchaser," and which identifies specific practices (including suggested questions) for dealers to follow. JA161-62 ¶¶ 17-19. Said another way, there should be no doubt that firearms sellers *can* responsibly comply with the law—and the State hopes the vast majority will. But some bad apples do not act reasonably, *see* Garen Wintermute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 No. 5 J. Urban Health 865 (2010) (study finding 30 of 149 licensed sellers in California (20%) were expressly willing to engage in a straw purchase), and Section 58-35 exists to abate such misconduct through long-familiar legal standards. In short, nothing about Section 58-35 is even unusual, let alone "so vague as to be no rule or standard at all." *See Wyndham Worldwide*, 799 F.3d at 250.

3.    *First Amendment.*

NSSF challenges Section 58-35's marketing provisions, but the provisions are subject to, and easily pass, intermediate scrutiny.[7]

To start, Section 58-35 addresses only commercial speech. "Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Bank of Hope v. Chon*, 938 F.3d 389, 394 n. (3d Cir. 2019). Courts analyze "three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 933 (3d Cir. 1990). Here, "affirmative answers to all three prongs" offer "strong support" that the relevant provisions are "commercial in nature." *See id.* at 934. By targeting only "marketing of a gun-related product," Section 58-35 plainly addresses only "advertisement[s]" geared toward a "specific product" for which the particular seller has "an economic motivation." *See id.* at 933. That is paradigmatic commercial-speech regulation.

A viewpoint-neutral regulation of commercial speech, like this one, is subject to intermediate scrutiny, whether it is content-based or not.[8] *See City of Austin, Texas*

---

[7] Even if accepted, this claim could at most support a preliminary injunction against Section 58-35's severable "marketing" provisions—not the entire law.

[8] The provisions are plainly viewpoint-neutral. NSSF cites nothing in the law that targets "particular views taken by speakers" or that is based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v.*

*v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022); *Greater Philadelphia Chamber of Com. v. Philadelphia*, 949 F.3d 116, 137-38 (3d Cir. 2020). For good reason: unlike non-commercial speech, commercial speech "makes a different contribution to the exposition of ideas," "tends to be more durable" given the speaker's "economic self-interest," and emanates from sources that are "uniquely situated to evaluate the truthfulness of their speech." *U.S. Healthcare*, 898 F.2d at 933-34. That means the statute need only survive the familiar test of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).

*Central Hudson* begins with a gateway inquiry: "speech that is misleading or concerns illegal activity is unprotected" altogether. *Bank of Hope*, 938 F.3d at 395. By contrast, "if the speech is lawful and not misleading," three more prongs kick in: (1) the State "must have a substantial interest," (2) "the restriction must directly advance that interest," and (3) it "must be no broader than necessary." *Id.* Here, it is hard to see how Section 58-35 could apply to lawful, non-misleading speech at all—let alone in "a substantial number" of applications, "judged in relation to [the law's] plainly legitimate sweep." *See Mazo*, 54 F.4th at 134. After all, Section 58-35(a)(1) applies only to marketing that is "either unlawful in itself or unreasonable under all

---

*Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). To the contrary, industry members can express whatever positions they hold about gun regulation (or even this statute) without consequence. But they cannot, *e.g.*, inform customers that something is legal they know to be illegal.

the circumstances," and Section 58-35(a)(2) requires only reasonable controls that are similarly geared toward preventing unlawful or misleading marketing. Most if not all the conceivable applications—and, again, there has been no enforcement thus far—would thus pass *Central Hudson* scrutiny at the threshold step.

In any event, even if the marketing provisions were ever somehow enforced against lawful, non-misleading speech—an issue that any defendant could litigate with particularity at that time—they satisfy the rest of the *Central Hudson* analysis. The State has a substantial interest in preventing the harms from unlawful or heedless marketing of dangerous weapons, *see* N.J. Stat. Ann. § 2C:58-33(a), (c); *see also United States v. Williams*, 458 F.3d 312, 320 (3d Cir. 2006), and these provisions directly advance that interest, as NSSF has never disputed. The provisions are also "no broader than necessary," *Bank of Hope*, 938 F.3d at 395—a point underscored by the fact that, read accurately, they are unlikely to trigger the second stage of the *Central Hudson* analysis at all and thus are not overinclusive.

Finally, for essentially the same reasons given above with respect to NSSF's due-process vagueness claim, its First Amendment vagueness claim is unavailing. *See supra* at 41-44. Nor could NSSF reasonably claim—on any First Amendment grounds—that its' members speech will be chilled. There is nothing in the record to show such speech *has* been chilled, and the State's own evidence shows NSSF's two declarants' companies' advertising has continued apace. *See* JA154-60. This dearth

of evidence makes sense: ensuring that companies are only liable if they engage in *unlawful* or *unreasonable* marketing serves to "mitigate [the] law's vagueness," as it provides leeway for marketing without fear of liability for a good-faith mistake. *Hoffert*, 949 F.3d at 789 (citation omitted). And it highlights the need to address these questions in an actual case or controversy—not based on NSSF's speculation.

    4. *Second Amendment.*

  NSSF cannot establish the threshold step of the Second Amendment analysis: that the Amendment's "plain text covers" conduct regulated by Section 58-35. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126-27 (2022). To the contrary, the Amendment's text covers an individual's right to "keep and bear arms," and "no court, modern or otherwise, [holds] that the Second Amendment secures a standalone right to *sell* guns." *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021); *Bruen*, 142 S. Ct. at 2134 (defining "keep" and "bear" as ensuring an individual can be "armed and ready … in a case of conflict") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)). That helps explain why the Supreme Court itself stated that "nothing" in its elucidation of the Second Amendment right "should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh,

J., concurring). And nothing in NSSF's paragraph-long Second Amendment section of its preliminary-injunction brief, JA85-86, supports a contrary rule.

The question might well be different if a commercial restriction "infringed" on law-abiding individuals' ability to obtain lawful weapons for self-defense. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 1007-08 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (emphasizing commercial restrictions are permissible but recognizing the rule would be different were law to require sales to "take place only between 11 p.m. and midnight, on Tuesdays" or "impos[e] a $1,000,000 point-of-sale tax on the purchase of firearms"). But that is not this case, and NSSF did not introduce a shred of evidence, or even cite any reason to believe, that Section 58-35 has impacted a single law-abiding individual's ability to obtain lawful weapons for self-defense—no doubt because it cannot. In any event, commercial restrictions on firearm sales are historically rooted, *see Teixeira v. County of Alameda*, 873 F.3d 670, 683-87 (9th Cir. 2017) (en banc) (surveying the history and explaining "colonial governments substantially controlled the firearms trade"), as is the public-nuisance doctrine. NSSF's Second Amendment claim is without merit.

## III.    NSSF Did Not Establish Irreparable Harm.

NSSF is not entitled to the extraordinary remedy of a preliminary injunction "unless [it] shows that it specifically and personally risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). That harm cannot be

speculative: a movant "must make a clear showing of immediate irreparable harm," *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992), not the "possibility of a remote future injury." *Acierno v. New Castle County*, 40 F.3d 645, 655 (3d Cir. 1994) (citation omitted). Below, NSSF principally sought to prove irreparable harm through (1) its members' fear of facing lawsuits from which they claim an immunity under PLCAA and (2) its members' asserted compliance costs. *See* JA86-87. But it built a record for neither of these claims, and each is groundless.

As to the first, the concern of facing litigation is speculative, as NSSF's own declarations make clear. *Compare, e.g.*, JA93 (bare assertion that Beretta "could face liability" under Section 58-35 "if a criminal misuses or illegally possesses one of [its] products in New Jersey"), *with* N.J. Stat. Ann. § 2C:58-35(a) (imposing liability exclusively for an entity's *own* misconduct). And while *Sherwin-Williams* formally considered the question in the Article III context, it establishes that the risk of a future lawsuit does not work irreparable harm today, since "[a]ny injury" to the party's constitutional rights "would not be irreparable" where that speculating party could "raise those claims as affirmative defenses" *if* ever sued. 968 F.3d at 270.

NSSF's assertion of compliance costs is equally speculative. NSSF does not actually claim its members did anything differently after Section 58-35's enactment, *see* JA90, 94, much less identify any specific steps taken, or introduce proof of any changes. NSSF does not even identify conduct that it thinks could arguably implicate

Section 58-35, or explain why it waited four-and-a-half months to file suit—a delay which undercuts its claim of immediate harm. *See Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013). And a bare allegation that some party will incur *some* future costs is insufficient for irreparable harm. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). That is true even if damages cannot be later recovered due to sovereign immunity, because the costs must still be non-speculative and based in evidence. *See Adams*, 204 F.3d at 488; *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022).

Nor do any remaining theories establish irreparable harm. NSSF's failure to meet its burden cannot be excused simply because the "enforcement of [Section 58-35] is specifically articulated within the statute." JA20. After all, nearly every statute confers authority to enforce its provisions, but that is always insufficient to show a particular party "specifically and personally risks irreparable harm." *Adams*, 204 F.3d at 487. Were it otherwise, then every statute would create irreparable harm, rendering this "threshold" requirement a nullity. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And as already explained above with regard to standing, the mere existence of an office with authority to enforce Section 58-35 does nothing to show irreparable harm. *See supra* at 15-16; *Sherwin-Williams*, 968 F.3d at 270-72; *Adams*, 204 F.3d at 487.

Finally, even assuming a showing of irreparable harm, it hardly outweighs the equities and the public interest. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And that harm is profound where it undermines the State's "law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Here, the injunction shields even the most unscrupulous actors from Section 58-35—including dealers who persistently sell to straw purchasers despite obvious signs that the weapons are being illegally diverted; dealers who sell firearms despite clear red flags that the buyer poses a serious threat to themselves or others; and dealers who routinely help purchasers evade background checks, such as ghost-gun sellers. The groundless specter of hypothetical suits for which responsible, law-abiding entities would have strong affirmative defenses cannot justify striking Section 58-35 from the books on this preliminary posture.

## **CONCLUSION**

This Court should reverse the decision below and vacate the injunction.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Michael L. Zuckerman
        Michael L. Zuckerman
        Deputy Solicitor General

Dated:  March 31, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because the brief contains 12,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), having been prepared in a proportionally spaced typeface of at least 14 points set in Times New Roman.

3.     This brief complies with L.A.R. 31.1(c) in that prior to being electronically submitted, it was scanned by the following virus-detection software and found to be free from computer viruses:

> Company: McAfee, Inc.
> Product: McAfee Endpoint Security, version 10.7.

Dated: March 31, 2023          /s/ Michael L. Zuckerman
                               Michael L. Zuckerman
                               Deputy Solicitor General
                               Office of the New Jersey Attorney General

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Michael L. Zuckerman
Michael L. Zuckerman
Deputy Solicitor General
Office of the New Jersey Attorney General
