No. 23-1214

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

NATIONAL SHOOTING SPORTS FOUNDATION,

*Plaintiff- Appellee,*

*v.*

ATTORNEY GENERAL OF NEW JERSEY,

*Defendant-Appellant.*

On Interlocutory Appeal from the United States District Court
for the District of New Jersey

No. 3:22-cv-06646
The Honorable Zahid N. Quraishi

## BRIEF FOR AMICI CURIAE ILLINOIS, CALIFORNIA, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN SUPPORTING DEFENDANT-APPELLANT AND REVERSAL

SARAH A. HUNGER
*Deputy Solicitor General*
ANNA W. GOTTLIEB
*Assistant Attorney General*
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
Sarah.Hunger@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for State of Illinois

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICI STATES ............................................................. 1

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ........................................................................................... 6

I.    State Laws Like Section 58-35 Benefit The Public By
      Encouraging Responsible Business Practices. ............................... 6

II.   Statutes Like Section 58-35 Are A Permissible Exercise Of
      State Sovereign Authority. ........................................................... 13

      A.    The text and legislative history of PLCAA confirm that
            Section 58-35 fits within the predicate exception. ............... 14

      B.    The dormant Commerce Clause does not limit the States'
            authority to enact measures like Section 58-35 that are
            designed to protect their residents from gun violence
            within their borders. ........................................................... 21

CONCLUSION ...................................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Beverage Ass'n v. Snyder,*
735 F.3d 362 (6th Cir. 2013) ........................................................ 24

*A.S. Goldmen & Co. v. New Jersey Bureau of Sec.,*
163 F.3d 780 (3d Cir. 1999) ......................................................... 31

*Baldwin v. G.A.F. Seeling, Inc.,*
294 U.S. 511 (1935) ............................................................... 29, 30

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) ............................................................... 29, 30

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ................................................................... 16

*City of New York v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008).......................................................... 19

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014) ...................................................................... 15

*Dep't of Revenue of Kentucky v. Davis,*
553 U.S. 328 (2008) ................................................................... 22

*Empacadora de Carnes de Fresnillo, S.A. v. Curry,*
476 F.3d 326 (5th Cir. 2007) ........................................................ 28

*Energy & Env't Legal Inst. v. Epel,*
793 F.3d 1169 (10th Cir. 2015) ................................................ 24, 30

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ................................................................... 16

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Healy v. Beer Inst. Inc.*,
    491 U.S. 324 (1989) .................................................................. 29, 30

*Ileto v. Glock*,
    565 F.3d 1126 (9th Cir. 2009) ................................................. 18, 19

*Instructional Sys., Inc. v. Comput. Curriculum Corp.*,
    35 F.3d 813 (3d Cir. 1994) ...................................................... 23, 31

*Lupian v. Joseph Cory Holdings LLC*,
    905 F.3d 127 (3d Cir. 2018) ........................................................... 16

*Maine v. Taylor*,
    477 U.S. 131 (1986) .................................................. 6, 15, 22, 23

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................. 13, 24

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ........................................................................ 28

*Online Merchants Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) .......................................................... 24

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*,
    511 U.S. 93 (1994) ........................................................................... 21

*Pharm. Rsch. & Mfrs. of America v. Walsh*,
    538 U.S. 644 (2003) ........................................................................ 30

*Plumley v. Massachusetts*,
    155 U.S. 461 (1894) ........................................................................ 28

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Sherwin-Williams Co. v. Cnty. of Del., Pa.,*
    968 F.3d 264 (3d Cir. 2020) ............................................................. 4

*Shuker v. Smith & Nephew, PLC,*
    885 F.3d 760 (3d Cir. 2018) ........................................................... 16

*Sligh v. Kirkwood,*
    237 U.S. 52 (1915) ......................................................................... 28

*Soto v. Bushmaster Firearms Int'l, LLC,*
    202 A.3d 262 (Conn. 2019) ........................................................... 18

*South Dakota v. Wayfair, Inc.,*
    138 S. Ct. 2080 (2018) ................................................................... 22

*TitleMax of Del., Inc. v. Weissmann,*
    24 F.4th 230 (3d Cir. 2022) ......................................... 23-24, 30, 31

*Wos v. E.M.A. ex rel. Johnson,*
    568 U.S. 627 (2013) ......................................................................... 2

**Statutes and Regulations**

Alaska Stat. Ann. § 46.03.715 ................................................................ 27

Ariz. Rev. Stat. § 36-1674(A)(3) ........................................................... 26

Cal. Health & Safety Code § 108552 ...................................................... 26

Cal. Health & Safety Code § 108555(a) ................................................. 26

2022 Cal. Legis. Serv. Ch. 98 (A.B. 1594) (eff. July 1, 2023) ................... 7

Del. Code Ann. tit. 10, § 3930 ................................................................. 7

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Idaho Code Ann. § 6-1406 ........................................................ 25

Idaho Code Ann. § 39-2609 ...................................................... 25

410 Ill. Comp. Stat. 45/4 ......................................................... 26

415 Ill. Comp. Stat. 60/14 ........................................................ 25

415 Ill. Comp. Stat. 92/5 .......................................................... 25

430 Ill. Comp. Stat. 140/15 ...................................................... 26

La. Stat. Ann. § 30:2575(A) ..................................................... 27

La. Stat. Ann. § 30:2575(C) ..................................................... 27

La. Stat. Ann. § 30:2576(A) ..................................................... 27

Kan. Stat. Ann. § 60-3304 ....................................................... 25

Ky. Rev. Stat. Ann. § 217.801 .................................................. 26

Me. Rev. Stat. tit. 22 § 13-16A ................................................ 26

Minn. Stat. Ann. § 325E.40 ..................................................... 25

Nev. Rev. Stat. § 701.260 ........................................................ 25

N.J. Stat. Ann. § 2C:58-33 ................................................... 1, 7

N.J. Stat. Ann. § 2C:58-34 ................................................. 8, 25

N.J. Stat. Ann. § 2C:58-35 ........................................ 1, 2, 3, 7, 25

N.Y. Gen. Business § 898-a-e .................................................... 7

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Ohio Admin. Code § 3717-1-03.1 ................................................................ 28

Tenn. Comp. R. & Regs. § 68-131-113 ..................................................... 25

15 U.S.C. § 7901 ........................................................................... 15, 16, 17

15 U.S.C. § 7903 ................................................................................. 16, 18

Vt. Stat. Ann. tit. 9 § 2470f ...................................................................... 26

Wash. Rev. Code Ann. § 7.72.030 ........................................................... 25

Wash. Rev. Code § 70A.430.020 .............................................................. 26

W. Va. Code § 19-11A-3 ........................................................................... 28

W. Va. Code § 19-11A-4 ........................................................................... 28

W. Va. Code § 19-11A-5 ........................................................................... 28

W. Va. Code § 19-11A-7 ........................................................................... 28

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ...................................................................... 21

**Other Authorities**

151 Cong. Rec. (July 26, 2005) ................................................................ 20

151 Cong. Rec. (July 27, 2005) ................................................................ 20

Rachana Bhowmik, *Aiming for Accountability: How City Lawsuits Can Help Reform an Irresponsible Gun Industry*, 11 J.L. & POL'Y 67 (2002) ................................................................................................... 9

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

City of Chicago, Gun Trace Report 2017 .................................................. 8

Philip J. Cook et al., *Some Source of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, 104 J. OF CRIM. L. & CRIMINOLOGY 717 (2015) .................................................. 9, 11

Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785 (2001) ................................. 25

Christopher S. Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use (2007) ........................................................ 9

Scott Malone, *States Settle With Mattel On Lead Toys*, REUTERS, Dec. 15, 2008 .................................................................. 26

Chelsea Parsons et al., *Stolen Guns in America*, Center for American Progress (July 25, 2017) .................................................. 12

Chris A. Reese et al., *Trends and Disparities in Firearm Fatalities in the United States, 1990-2021* (Nov. 1., 2022), JAMA Network Open, Nov. 29, 2022 ........................................................ 6

Consumer Reports, Fisher-Price pulls second lead-tainted blood-pressure cuff off shelves in Illinois, Dec. 18, 2007 ........................ 26

Thomas R. Simon et al., *Notes from the Field: Increases in Firearm Homicide and Suicide Rates— United States, 2020-2021*, 71 MORBIDITY AND MORTALITY WKLY. REP. 1286 (2022) .................... 6-7

U.S. Dep't of Justice, Office of the Inspector General, *Review of ATF's Federal Firearms Licensee Inspection Program* (Apr. 2013) ......... 12

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS News, Oct. 17, 2022 .............................................................. 10

Daniel W. Webster et al., *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 Inj. Prevention 225 (2006) .................................................................. 11

Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. of Urban Health 778 (2006) ........................................................................ 11

Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. Urban Health 865 (2010) .......... 10, 11

Garen J. Wintemute, *Frequency of and responses to illegal activity related to commerce in firearms: findings from the Firearms Licensee Survey*, BMJ Inj. Prevention, Mar. 11, 2013 ................ 10

## INTEREST OF AMICI STATES

Illinois, California, Connecticut, Delaware, District of Columbia, Hawai'i, Maryland, Massachusetts, Michigan, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "amici States") submit this brief in support of Defendant-Appellant New Jersey Attorney General Matthew J. Platkin ("New Jersey") pursuant to Federal Rule of Appellate Procedure 29(a)(2).  The amici States have a substantial interest in the public health, safety, and welfare.  This includes an interest in preserving all lawful tools to deter and remediate the effects of gun violence within their borders, including by providing statutory remedies for misconduct by gun industry members that causes or contributes to such violence.

That interest is implicated by the district court's decision in this case, which preliminarily enjoined New Jersey from enforcing N.J. Stat. Ann. § 2C:58-35 ("Section 58-35").  Section 58-35 creates a public-nuisance cause of action granting the New Jersey Attorney General authority to bring suit against a gun industry member for the member's unlawful conduct—specifically, when the member either (1) knowingly or recklessly creates, maintains, or contributes to a public nuisance in

New Jersey through the sale, manufacturing, distributing, importing, or marketing of gun-related products, or (2) fails to establish, implement, and enforce reasonable controls regarding the manufacture, sale, distribution, importing, and marketing of gun-related products.  N.J. Stat. Ann. §§ 2C:58-34, 2C:58-35.

Although the amici States have taken different approaches when enacting measures designed to curb and remediate the effects of gun violence, they agree that causes of action like the one created by Section 58-35—which address the gun industry members' own misconduct—fall well within the States' sovereign authority to protect their residents and to "provide tort remedies . . . as they see fit." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 640 (2013) (internal quotations omitted).  The district court's contrary determination interferes with this important sovereign authority and, as New Jersey explains, *see* NJ Br. 9-11, is incorrect as a matter of law.  Accordingly, the amici States urge this court to reverse the district court's order granting the preliminary injunction.

## SUMMARY OF ARGUMENT

In July 2022, the State of New Jersey enacted Section 58-35 to promote responsible business practices and provide an exclusive cause of action to the New Jersey Attorney General to hold gun industry members accountable for any harm inflicted through their own actions. N.J. Stat. Ann. §§ 2C:58-33, 2C:58-35. This legislation not only protects the health and safety of New Jersey residents but also falls well within the bounds of the States' longstanding police powers.

Several months later, Plaintiff-Appellee National Shooting Sports Foundation ("NSSF") mounted a broad challenge to Section 58-35 seeking to declare the statute facially unconstitutional and enjoin New Jersey from pursuing future enforcement actions against gun industry members. JA53-54. Specifically, NSSF alleged that Section 58-35 is preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA") and is unconstitutional under the dormant Commerce Clause, the Due Process Clause, and the First and Second Amendments. JA36-52.

NSSF moved for a preliminary injunction on each of those theories, JA56, which New Jersey opposed by arguing that NSSF lacked

3

standing, could not satisfy its heavy burden to show that Section 58-35 is facially invalid, and was not likely to succeed on the merits of its claims, JA99.  The district court granted NSSF's motion upon concluding that NSSF was likely to succeed on the merits of its preemption claim.  JA17.  The court did not reach NSSF's other claims. *Id.*

The amici States agree with New Jersey that as a threshold matter, preliminary injunctive relief was unwarranted because NSSF lacks standing to bring this sweeping action based solely on speculative future harm and, relatedly, has not satisfied its heavy burden to show facial invalidity.  *See* NJ Br. 13-16, 34-36; *Sherwin-Williams Co. v. Cnty. of Del., Pa.*, 968 F.3d 264, 269-71 (3d Cir. 2020).  The amici States further agree with New Jersey that, in any event, NSSF is not likely to succeed on the merits of any of its claims.  *See, e.g.*, NJ Br. 9-12.  They write separately, however, to highlight how NSSF's preemption and dormant Commerce Clause theories cannot be squared with the States' sovereign authority to enact legislation that benefits the public by deterring gun industry members from engaging in irresponsible practices that actively contribute to gun violence.

To start, statutes like Section 58-35 serve the vital purpose of protecting the public welfare. A number of studies suggest a direct link between the harmful effects of gun violence and the irresponsible actions of gun industry members, such as dealers failing to enact reasonable controls to prevent straw purchasing, illegal trafficking, and theft. And statutes like Section 58-35 respond to these well-documented public safety problems by promoting responsible business practices and providing a remedy when gun industry members engage in conduct that causes harm to the public.

Furthermore, NSSF's preemption and dormant Commerce Clause theories encroach upon the States' sovereign authority in ways that neither PLCAA nor the dormant Commerce Clause requires. As for PLCAA, there are numerous indications in the Act's plain text and legislative history demonstrating that Congress intended for States to continue regulating gun industry members in a manner consistent with the requirements of Section 58-35. And as to the dormant Commerce Clause, New Jersey's decision to create a statute to address certain gun violence occurring within its borders is consistent with the States' well-established "authority under their general police powers to regulate

matters of legitimate local concern, even though interstate commerce may be affected." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (internal quotations omitted). Indeed, Section 58-35 is similar in relevant respects to myriad state statutes regulating goods and services that pose a safety risk to residents within state borders. For these reasons and those outlined by New Jersey, this court should reverse the grant of a preliminary injunction in this case.

## ARGUMENT

## I.    State Laws Like Section 58-35 Benefit The Public By Encouraging Responsible Business Practices.

State statutes like Section 58-35 serve the narrow but important purpose of deterring gun industry members from engaging in irresponsible practices that actively contribute to the increasing gun violence facing individual States and, where necessary, hold those who engage in such tactics accountable for their own actions.[1] These laws

---

[1] In 2021 alone, firearms killed nearly 49,000 people, the highest number recorded since data collection began, and firearm fatalities at the hands of another individual increased by eight percent over the previous year. *E.g.*, Chris A. Reese et al., *Trends and Disparities in Firearm Fatalities in the United States, 1990-2021*, JAMA NETWORK OPEN, Nov. 29, 2022, bit.ly/3ZPpZMC; Thomas R. Simon et al., *Notes from the Field: Increases in Firearm Homicide and Suicide Rates—*

address a number of well-documented and harmful practices by gun industry members that have been shown to contribute to gun violence, such as dealers failing to enact reasonable controls to prevent firearms from entering the illegal market.

As the New Jersey legislature explained, "some actors in the gun industry have implemented sales, distribution and marketing practices that have contributed to the development of an illegal secondary market for [] increasingly dangerous instrumentalities." N.J. Stat. Ann. § 2C:58-33(c).[2] One way that Section 58-35 deters such conduct is by requiring that gun industry members "establish, implement, and enforce reasonable controls regarding [their] manufacture, sale, distribution, importing, and marketing of gun-related products." N.J. Stat. Ann. § 2C:58-35(a)(2). The legislature explained that reasonable controls include instituting business practices that are designed to prevent the sale of firearms to "a straw purchaser, a firearm trafficker,

---

*United States, 2020-2021*, 71 MORBIDITY AND MORTALITY WKLY. REP. 1286, 1286-87 (2022), bit.ly/3GXNyg2.

[2] Other States have also enacted public nuisance laws related to firearms. *See* Del. Code Ann. tit. 10, § 3930; N.Y. Gen. Bus. Law § 898-a-e; *see also* 2022 Cal. Legis. Serv. Ch. 98 (A.B. 1594) (eff. July 1, 2023).

a person prohibited from possessing a firearm under State or federal law, or a person who the gun industry member has reasonable cause to believe is at substantial risk of using a gun-related product to harm themselves or unlawfully harm another." N.J. Stat. Ann. § 2C:58-34(1). Reasonable controls also encompass compliance with state and federal law and the implementation of safeguards designed to prevent the loss or theft of gun-related products. N.J. Stat. Ann. § 2C:58-34(2)-(4).

Empirical evidence supports the New Jersey legislature's determination that such measures will stem the flow of firearms into the illegal market. Studies show that a large number of firearms in the illegal market originate from a small number of gun industry members. For example, a 2017 report determined that a quarter of all firearms recovered at crime scenes in Chicago between 2013 and 2016 were purchased at just ten dealers.[3] In fact, just two of those stores accounted for ten percent of all crime guns recovered during that same period.[4] Similarly, a California study showed that 12 percent of gun

---

[3] City of Chicago, Gun Trace Report 2017, at 4, bit.ly/3ItoLS2.

[4] *Id.*

8

dealers were responsible for selling 86 percent of the firearms recovered from the scene of violent firearm-related offenses committed in the State between 1996 and 2000.[5]  Finally, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") reported that 14 percent of federally licensed gun dealers sold all of the firearms recovered at the scene of gun crimes nationwide in 1998.[6]

It is also well documented that gun industry members contribute to the harm caused by firearms entering the illegal market when they engage in unlawful or irresponsible business practices, such as by selling firearms to known straw purchasers (that is, someone purchasing on behalf of another person) or to individuals who do not provide appropriate documentation.[7]  As to the former, studies confirm

---

[5]  Christopher S. Koper, Crime Gun Risk Factors:  Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use 12 (2007), bit.ly/3G6uMkO.

[6]  *Id.*

[7]  *E.g.*, Philip J. Cook et al, *Some Source of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, 104 J. OF CRIM. L. & CRIMINOLOGY 717, 723 (2015); Rachana Bhowmik, *Aiming for Accountability:  How City Lawsuits Can Help Reform an Irresponsible Gun Industry*, 11 J.L. & POL'Y 67, 108-09 (2002).

that most dealers are confronted at one time or another with individuals whom they believe may be a straw purchaser:  In 2011, for example, two-thirds of surveyed gun dealers admitted that they had been approached by possible straw purchasers.[8]  While the vast majority of dealers do not sell firearms to such individuals, one study found that one in five dealers would sell a firearm to an individual whom they suspected was purchasing it on behalf of someone else, including someone who may not legally be allowed to buy it.[9]  A consequence of this conduct in the aggregate is that a large number of firearms enter the illegal market; indeed, by some estimates, nearly half of all guns that are trafficked on the secondary market began as straw purchases.[10]  But studies show that when gun dealers either are

---

[8]  Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS NEWS, Oct. 17, 2022, bit.ly/3IlT0ue; Garen J. Wintemute, *Frequency of and responses to illegal activity related to commerce in firearms: findings from the Firearms Licensee Survey*, BMJ INJ. PREVENTION, Mar. 11, 2013, at 2, bit.ly/3WQgOL1.

[9]  Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. URBAN HEALTH 865, 870 (2010), bit.ly/3QCeSUn.

[10]  Wintemute, *supra* note 8, at 6.

held accountable for their sales to straw purchasers or choose to engage in more responsible business practices that prevent such sales, there is a significant decrease in the flow of firearms into the illegal market.[11]

Studies also show that some gun dealers do not record sales in the manner required under state and federal law. According to one report, there were no records of the requisite federal forms for five percent of firearms recovered at crime scenes, even though those firearms were traced to a specific seller, suggesting that the sales were "off the books."[12] When an undocumented sale occurs, the firearms may enter the illegal secondary market or, alternatively, may be used by the purchasers themselves to harm others.[13]

Finally, theft is another way in which firearms "are diverted from the lawful market and into illegal gun trafficking networks," where they

---

[11] *See, e.g.*, Daniel W. Webster et al., *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 INJ. PREVENTION 225, 225-30 (2006); Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. OF URBAN HEALTH 778, 778-87 (2006).

[12] Cook, *supra* note 7, at 744-45.

[13] Wintemute, *supra* note 8, at 6.

are "'almost assuredly destined for criminal use in the immediate area of the theft.'"[14]  According to ATF data, between 2010 and 2015 nearly 10,000 firearms "that were recovered by police in connection with a crime and traced by ATF had been reported stolen or lost from gun stores."[15]  In those instances, investigators are deprived of critical information that could be relevant to solve the crime, such as the initial purchaser of the firearm.[16]  As a number of experts have explained, the most effective way to mitigate this problem is to implement anti-theft measures, like installing alarm systems and video cameras and storing firearms in a secure manner.[17]

---

[14]  Chelsea Parsons et al., *Stolen Guns in America*, Center for American Progress (July 25, 2017), http://bit.ly/40pa9ci (quoting ATF, *Congressional Budget Submissions: Fiscal Year 2018*, at 12 (2017)).

[15]  *Id.* (citing ATF Theft and Loss Reports from 2010 to 2015); *see also* U.S. Dep't of Justice, Office of the Inspector General, *Review of ATF's Federal Firearms Licensee Inspection Program*, at 2 (Apr. 2013), https://bit.ly/3ne1ZVX (discussing magnitude of stolen firearms).

[16]  Parsons, *supra* note 14.

[17]  *Id.* (citing ATF, *ATF Safety and Security Information for Federal Firearms Licensees* (2010); ATF, *Loss Prevention for Firearms Retailers* (2016); John Bocker, *Security Basics: How to Criminal-Proof a Gun Store or Shooting Range*, NSSF (June 6, 2017)).

All told, statutes like Section 58-35 provide States with critical tools to deter and remediate irresponsible business practices by gun industry members that cause or contribute to the gun violence that continues to harm the States' residents.

## II. Statutes Like Section 58-35 Are A Permissible Exercise Of State Sovereign Authority.

As explained, the purpose of New Jersey's law is to protect its residents from actions by gun industry members that create or contribute to gun violence within the State's borders and to hold them accountable for their harmful conduct.  It is well established that measures of this nature are well within the States' longstanding authority to enact legislation targeted to ensuring the health and safety of their residents.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

Nevertheless, the district court concluded that NSSF was likely to succeed on its claim that New Jersey had exceeded its authority by improperly legislating in an area preempted by PLCAA.  JA16-17.  But Section 58-35 is not preempted because although PLCAA provides a defense to certain civil remedies against gun industry members, the Act's plain text and legislative history make clear that Congress intended for States to continue to enact laws like Section 58-35, which

regulate the marketing and sale of firearms and allow civil enforcement actions where gun manufacturers and sellers violate state regulations through their own conduct.

Furthermore, there is no merit to NSSF's claim—which the district court did not reach but that NSSF continues to press as an alternative basis for preliminary injunctive relief, JA17; 3d Cir. Doc. 14 at 19-20—that New Jersey's law impermissibly regulates interstate commerce in violation of the dormant Commerce Clause. Section 58-35 does not violate the dormant Commerce Clause because, like countless other state laws, it permissibly regulates conduct that endangers the health and safety of New Jersey residents, and any effects on interstate commerce are only incidental.

### A.     The text and legislative history of PLCAA confirm that Section 58-35 fits within the predicate exception.

The district court concluded that NSSF was likely to succeed on its preemption claim because Section 58-35 is in "direct conflict" with the purpose of PLCAA—to prohibit lawsuits based on "'the harm solely caused by the criminal or unlawful misuse of firearm products or

ammunition products by others.'" JA16 (quoting 15 U.S.C.

§ 7901(b)(1)). This determination is incorrect for several reasons.

At the threshold, the district court misstated the purpose and

scope of Section 58-35, which it described as subjecting gun industry

members to "civil liability for the harm solely caused by the criminal or

unlawful misuse of firearm or ammunition products by others." *Id.* But

as explained, *see supra* Section I, Section 58-35 holds gun industry

members accountable for their *own* wrongdoing—for example, engaging

in irresponsible sales practices—and not for misconduct attributable

solely to third parties. And the text and legislative history of PLCAA

make clear that Congress intended to allow States to continue to enact

laws like Section 58-35, which serve the narrow but important purpose

of holding gun industry members responsible for their own wrongdoing.

States have inherent police powers to govern for the benefit of

their citizens, including "broad regulatory authority to protect the

health and safety of [their] citizens." *Taylor*, 477 U.S. at 151. States

likewise may exercise their "traditional authority to provide tort

remedies . . . as they see fit." *CTS Corp. v. Waldburger*, 573 U.S. 1, 19

(2014) (internal quotations omitted). But in enacting PLCAA—which

preempts certain state-level causes of action against gun manufacturers and sellers—Congress limited that longstanding authority by restricting the availability of certain tort remedies under state law. 15 U.S.C. §§ 7901, 7903.

When Congress intrudes on state authority in this way, courts facing questions about the scope of the preempted causes of action must apply a "presumption against the pre-emption of state police power regulations," *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992), only to be overcome if "the clear and manifest purpose of Congress" was to supersede the historic police powers of the States, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (where intrusion on state authority occurs, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" the balance of federal and state powers) (internal quotations omitted); *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (applying the "presumption against preemption to claims . . . that invoke the historic police powers of the States") (cleaned up); *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 (3d Cir. 2018) ("When a federal statute contains a provision preempting state

law claims that pertain to areas of traditional state regulation or police power, we apply a presumption against preemption.") (internal quotations omitted).  And here, PLCAA's text does not clearly show that Congress intended to curb the States' authority to enact laws like Section 58-35.  On the contrary, the Act's text shows that Congress intended that States retain the authority to enact laws that, like Section 58-35, hold gun industry members accountable for their own wrongdoing.

To start, PLCAA's text shows that Congress did not intend to extinguish state authority to enact laws like Section 58-35.  Although the Act prohibits civil actions against certain gun industry members for "harm *solely* caused by the criminal or unlawful misuse of [the members'] firearms," Congress did not clearly state that it intended to provide immunity from all lawsuits brought under state law.  15 U.S.C. § 7901(b)(1) (emphasis added).  Indeed, Congress emphasized in its statement of findings and purpose that "[t]he possibility of imposing liability on an entire industry for harm that is *solely* caused by others is an abuse of the legal system" would, among other things, "erode[ ] public confidence in our Nation's laws."  *Id.* § 7901(a)(6) (emphasis

added).  The repeated use of the word "solely" indicates that Congress

sought to protect firearms manufacturers and sellers from civil liability

under circumstances where the harm was entirely the result of others'

unlawful conduct.  But there is no indication that Congress intended to

foreclose remedies, such as those created by Section 58-35, against

manufacturers and sellers for their own conduct.  *See, e.g.*, *Soto v.

Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 309 (Conn. 2019) ("At no

time and in no way does the congressional statement [of facts and

purposes] indicate that firearm sellers should evade liability for the

injuries that result if they promote the illegal use of their products.").

To that end, Congress carved out six exceptions to PLCAA

immunity.  15 U.S.C. § 7903(5)(A).  Relevant here, Congress explicitly

exempted actions in which a manufacturer or seller of firearms

"knowingly violated a State or Federal statute applicable to the sale or

marketing of the product."  *Id.* § 7903(5)(A)(iii).  This exception "has

come to be known as the 'predicate exception,' because a plaintiff . . .

must allege a knowing violation of a 'predicate statute.'"  *Ileto v. Glock*,

565 F.3d 1126, 1132 (9th Cir. 2009).

18

The operative phrase in the predicate exception is whether the statute at issue is one that is "applicable to" the sale or marketing of firearms. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 399-401, 404 (2d Cir. 2008). As New Jersey explains, *see* NJ Br. 24, while courts have reached different conclusions as to the precise contours of that language, there is consensus that at the very least, it encompasses statutes that expressly regulate the firearm industry, *Beretta*, 524 F.3d at 402; *see also, e.g.*, *Ileto*, 565 F.3d at 1134-35 (concluding that PLCAA preempts "general tort law claims" but would not preempt sales and marketing statutes that apply to the "firearms industry specifically"). And here, it is clear that Section 58-35—which applies only to gun industry members—expressly regulates the firearm industry.

But even if PLCAA's text were not clear, the Act's legislative history confirms that Congress did not intend to preempt state authority to hold gun industry members accountable for their own actions. Two of PLCAA's sponsors, Senator Larry Craig of Idaho and Senator Jeff Sessions of Alabama, underscored this point repeatedly when explaining the scope of PLCAA. Senator Craig emphasized that PLCAA "is not a gun industry immunity bill" and "does not prevent

[gun manufacturers and sellers] from being sued for their own misconduct." 151 Cong. Rec. S9061, 9088 (July 27, 2005); *see also, e.g.*, *id.* at S9089 ("if a gun dealer or manufacturer violates the law, this bill is not going to protect them from a lawsuit brought against them for harm resulting from that misconduct"). Instead, the law "only stops one extremely narrow category of lawsuits": those that "attempt to force the gun industry to pay for the crimes of third parties over whom they have no control." *Id*. at S9088; *see also id.* (stating that PLCAA's drafters "tried to make that limitation as clear as we possibly can").

Senator Sessions similarly characterized PLCAA's preemption as "incredibly narrow," 151 Cong. Rec. S8908-11 (July 26, 2005), and made clear that "[p]laintiffs are not prevented from having a day in court," *id.* at S8911. On the contrary, they "can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they produce a product that is improper or they sell to someone they know should not be sold to or did not follow steps to determine whether the individual was [eligible] to bu[y] a gun." *Id.* In short, Senator Sessions noted, "[m]anufacturers and sellers are still responsible for their own negligent or criminal conduct." *Id.* at S8911.

Thus, Section 58-35, which creates a cause of action directed at the harmful conduct of gun industry members (and not harms caused solely by third parties), fits squarely within the parameters outlined in the statutory text and envisioned by PLCAA's sponsors. The district court's determination that NSSF is likely to succeed on its preemption claim should thus be reversed.

> **B.** **The dormant Commerce Clause does not limit the States' authority to enact measures like Section 58-35 that are designed to protect their residents from gun violence within their borders.**

In addition to falling within the predicate exception to PLCAA, public nuisance laws like Section 58-35 respect the dormant Commerce Clause. NSSF's arguments to the contrary—in particular, that Section 58-35 is impermissibly extraterritorial because it regulates out-of-state transactions—do not align with the States' longstanding authority to, and practice of, permissibly regulating matters of local concern.

The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In addition to this affirmative grant of authority, the Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate

21

flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 98 (1994).

As the Supreme Court has explained, this negative aspect of the Commerce Clause balances dual objectives:  on the one hand, it "prevent[s] States from engaging in economic discrimination so they [do] not divide into isolated, separable units," *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2093-94 (2018), and, on the other, it protects the sovereign authority of States to "regulate matters of legitimate local concern," *Taylor*, 477 U.S. at 138 (internal quotations omitted).  The former objective recognizes that the Framers sought "to prevent a State from retreating into the economic isolation that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (cleaned up); *see also* James Madison, Vices of the Political System of the United States, April 1787, No. 4 (noting that trade barriers against out-of-state products were "destructive of the general harmony" among the States under the Articles of Confederation).  This "distrust of economic Balkanization," however, is tempered by the latter

objective, which reflects that the Framers favored a substantial "degree of local autonomy." *Davis*, 553 U.S. at 338.

In other words, the "limitation imposed by the Commerce Clause on state regulatory power is by no means absolute"; on the contrary, "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Taylor*, 477 U.S. at 138 (cleaned up). Therefore, so "long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens." *Id.* at 151 (cleaned up).

As New Jersey explains, *see* NJ Br. 38-40, Section 58-35 does not run afoul of these principles. On the contrary, Section 58-35 is a permissible exercise of the States' traditional sovereign authority to redress a serious public safety problem facing New Jersey residents— irresponsible business practices that create or contribute to gun violence. To be sure, ensuring compliance with Section 58-35 may impact some out-of-state conduct. But often "it is inevitable that a state's law . . . will have extraterritorial effects." *Instructional Sys., Inc.*

*v. Comput. Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994); *see also, e.g.*, *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 238 n.7 (3d Cir. 2022) (same); *Online Merchants Guild v. Cameron*, 995 F.3d 540, 559 (6th Cir. 2021) ("in a modern economy just about every state law will have some 'practical effect' on extraterritorial commerce").

Indeed, countless nondiscriminatory laws that govern in-state activities or conditions—including in areas such as this one where States are exercising their core sovereign authority to protect the health and safety of their residents, *Medtronic*, 518 U.S. at 475—can have incidental effects on conduct, operations, and markets outside of a State's borders, *e.g., Online Merchants Guild*, 995 F.3d at 559; *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1175 (10th Cir. 2015) (Gorsuch, J.); *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 378-79 (6th Cir. 2013) (Sutton, J., concurring).

Perhaps most relevant here, States routinely regulate the sale or use of goods within their borders to ensure that their residents are not exposed to unsafe conditions, much in the way that Section 58-35 deters irresponsible business practices related to the sale, marketing, and manufacturing of firearms by imposing liability for conduct that creates

24

or contributes to unsafe conditions in New Jersey. *See* N.J. Stat. Ann. §§ 2C:58-34, 2C:58-35. For instance, States have long imposed products-liability standards by authorizing them to sue manufacturers for defective product design and manufacturing to the extent such design or manufacturing causes in-state harm—no matter where that design or manufacturing took place.[18]

Relatedly, States regularly establish safety standards for the manufacture, sale, or use of toys, health care products, and household goods to prevent harm to purchasers and, in many instances, to the public more broadly.[19] As one example, some States prohibit the sale of

---

[18] *See, e.g.*, Idaho Code Ann. § 6-1406 (setting out governing standards for product liability cases); Kan. Stat. Ann. § 60-3304 (defining when a product is defective); Wash. Rev. Code Ann. § 7.72.030 (identifying when a manufacturer may be held liable); Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 795 (2001) ("Nuisance actions against polluters across the border," for example, "will assuredly affect their costs; so too will products liability actions against out-of-state manufacturers, local obscenity restrictions on real-space pornography providers, and state blue-sky registration requirements on multijurisdictional issuers.").

[19] *E.g.*, Idaho Code Ann. § 39-2609 (banning sale and use of fireworks in certain places); 415 Ill. Comp. Stat. 60/14 (fertilizers); 415 Ill. Comp. Stat. 92/5 (phosphorous detergents); Mich. Code § 324.8512b (fertilizers); Minn. Stat. Ann. § 325E.40 (petroleum-based sweeping

toys and other children's products containing toxic substances like lead or cadmium.[20]  These laws protect children in those States from toys that pose unique dangers to them, and have allowed States to pursue actions against manufacturers that produce, sell, or otherwise introduce these products into the stream of commerce.  But because toys are not always manufactured and distributed within the States that impose such requirements, the implementation and enforcement of these standards can affect conduct occurring out of state, just like Section 58-35.[21]

---

compounds); Nev. Rev. Stat. § 701.260 (incandescent lamps); Tenn. Comp. R. & Regs. § 68-131-113 (antifreeze).

[20] *E.g.*, Ariz. Rev. Stat. § 36-1674(A)(3) (toys with lead-based paint); Cal. Health & Safety Code § 108555(a) (toys "contaminated with any toxic substance"); *id*. § 110552 (lead in candy); 410 Ill. Comp. Stat. 45/4 (children's products that contain a lead-bearing substance); 430 Ill. Comp. Stat. 140/15 (children's jewelry containing certain levels of cadmium); Ky. Rev. Stat. Ann. § 217.801 (lead paint on toys and children's furniture); Me. Rev. Stat. tit. 22 § 13-16A ("lead-containing children's product"); Vt. Stat. Ann. tit. 9 § 2470f (children's product containing lead); Wash. Rev. Code § 70A.430.020 (children's products containing lead, cadmium, or phthalates).

[21] *See, e.g.*, Consumer Reports, Fisher-Price pulls second lead-tainted blood-pressure cuff off shelves in Illinois, Dec. 18, 2007, bit.ly/40LTkbP (investigation by the Illinois Attorney General led to out-of-state manufacturer agreeing to remove toys from retail stores in Illinois); Scott Malone, *States Settle With Mattel On Lead Toys*, REUTERS, Dec.

By way of another example, Louisiana passed a series of laws in 2006 to reduce the amount of mercury in the environment after determining that controlling the amount of "mercury release[d] to the environment is essential for the reduction of human health risks."[22]  To accomplish this goal, the State severely limited the sale, distribution, and, in many instances, the use of items containing mercury.[23] Similarly, Alaska prohibits the sale and use of a particular type of marine antifouling paint that contains a toxic substance originally used to eliminate algae and other marine organisms from growing on ships.[24] In fact, Alaska prohibits importing into the State or using a vessel with this paint in any State water, without regard for where the vessel or paint had been originally sold.[25]

---

15, 2008, https://reut.rs/3ysjBQR (describing settlement between toy manufacturer and 39 state attorneys general over use of paint containing lead in several toy lines in violation of each State's law).

[22]  La. Stat. Ann. § 30:2572(A).

[23]  *See, e.g.*, La. Stat. Ann. § 30:2575(C) (prohibiting use of mercury compounds in Louisiana schools); La. Stat. Ann. § 30:2576(A) (prohibiting products that exceed a particular mercury level from being "offered for final sale or use or distributed for promotional purposes").

[24]  Alaska Stat. Ann. § 46.03.715.

[25]  *Id.*

Finally, States establish standards governing the food supply within their borders, including for food products that are produced or manufactured either in-state or in other States.[26]  Courts, including the Supreme Court, have long upheld these types of regulations, as well as others, as valid exercises of state sovereign authority—even though they have incidental effects on business decisions and operations outside of the regulating State.[27]

Before the district court, however, NSSF asserted that Section 58-35 violates these principles because it regulates out-of-state conduct, as

---

[26] *E.g.*, Ohio Admin. Code § 3717-1-03.1 (regulating the harvesting and processing conditions for fish and wild mushrooms sold in the State); W. Va. Code §§ 19-11A-3, 19-11A-4, 19-11A-5, 19-11A-7 (regulating labelling, packaging, and distribution standards for dairy products).

[27] *E.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 458, 470 (1981) (upholding state law "banning the retail sale of milk in plastic . . . containers," while "permitting such sale in . . . paperboard milk cartons," against dormant Commerce Clause challenge); *Sligh v. Kirkwood*, 237 U.S. 52, 57, 60 (1915) (rejecting dormant Commerce Clause challenge to Florida law prohibiting delivery of citrus fruits that are "immature and unfit for consumption"); *Plumley v. Massachusetts*, 155 U.S. 461, 479-480 (1894) (rejecting dormant Commerce Clause challenge and upholding conviction for fraudulently selling margarine manufactured in Illinois as butter in Massachusetts); *Empacadora de Carnes de Fresnillo, S.A. v. Curry*, 476 F.3d 326, 335-36 (5th Cir. 2007) (rejecting dormant Commerce Clause challenge to Texas law prohibiting processing, sale, or transfer of horsemeat for human consumption).

opposed to imposing conditions that merely have effects on out-of-state activities.  JA74-75; JA278.  At the threshold, this position relies on a mistaken view of Section 58-35.  Like the examples just discussed, Section 58-35 regulates in-state conduct—by imposing liability on gun industry members that "create, maintain, or contribute to a public nuisance *in this State*" and on those that fail to institute reasonable controls over a gun-related product, which is defined in relevant part as a product that "was, or was intended to be, sold, manufactured, distributed, imported, or marketed *in this State*," or a product that "was possessed *in this State* and as to which it was reasonably foreseeable that the product would be possessed or used *in this State*."  N.J. §§ 2C:58-34, 2C:58-35 (emphases added).

Additionally, NSSF's argument finds no support in relevant precedent.  NSSF relies heavily on the Supreme Court's decisions in *Healy v. Beer Institute Inc.*, 491 U.S. 324 (1989), *Brown-Forman Distillers Corporation v. New York State Liquor Authority*, 476 U.S. 573 (1986), and *Baldwin v. G.A.F. Seeling, Inc.*, 294 U.S. 511 (1935), for the proposition that a State may not enact a statute that "imposes liability for transactions that take place out of state."  JA75; JA278-79.  But

these cases are inapposite because they each involved a price control or price affirmation statute that linked in-state pricing to out-of-state prices, which had the "effect of raising costs for out-of-state consumers or rival businesses." *Epel*, 793 F.3d at 1173; *see also Healy*, 491 U.S. at 332, 337 (invalidating Connecticut law requiring beer producers to certify that their in-state price was no higher than their prices in nearby States); *Brown-Forman Distillers*, 476 U.S. at 579-82 (invalidating New York statute requiring liquor distillers to certify that their in-state prices would be no higher than out-of-state prices for any 30-day period); *Baldwin*, 294 U.S. at 519-21 (invalidating New York statute that prohibited milk dealers from offering out-of-state milk at lower price than in-state milk). Because Section 58-35 does not impose a price control or price affirmation scheme on other States, it does not implicate the principles articulated in *Healy*, *Brown-Forman*, and *Baldwin*.

Nor does Section 58-35 violate the dormant Commerce Clause under any of this court's decisions, as New Jersey explains, *see* NJ Br. 39-41. Indeed, this court has recognized the narrowness of the Supreme Court's doctrine. *E.g.*, *TitleMax of Del.*, 24 F.4th at 239 (citing favorably

*Pharm. Rsch. & Mfrs. of America v. Walsh*, 538 U.S. 644, 669 (2003), for proposition that "the extraterritoriality rule in *Healy* is 'not applicable' to cases where a statute does not tie prices of in-state products to out-of-state prices"); *Instructional Sys.*, 35 F.3d at 825 (Supreme Court has "never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border").

Furthermore, neither of the two decisions of this court cited by NSSF before the district court support its position. On the contrary, this court upheld the challenged statutes against Commerce Clause challenges in each of those cases. *See TitleMax of Del.*, 24 F.4th at 239 (upholding Pennsylvania loan collection statute against lender's Commerce Clause challenge in context of loans made against Pennsylvania-registered vehicles but at TitleMax facilities located outside of Pennsylvania); *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (rejecting dormant Commerce Clause challenge to application of New Jersey securities law to sale where offer was made in New Jersey and accepted by New York resident in New York).

In sum, Section 58-35 respects the bounds of the dormant Commerce Clause by regulating a matter of pressing local concern—the harmful misconduct of gun industry members—in a manner that does not violate the dormant Commerce Clause.

## CONCLUSION

This Court should reverse the district court's preliminary injunction order.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

By:  s/ Sarah A. Hunger
SARAH A. HUNGER
*Deputy Solicitor General*
ANNA W. GOTTLIEB
*Assistant Attorney General*
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
Sarah.Hunger@ilag.gov

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 MLK Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

Dated:  April 7, 2023

# CERTIFICATE OF COMPLIANCE

1.    Pursuant to Third Circuit Local Appellate Rule 46.1(d), I certify that I am a member of the bar of this Court.

2.    I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,308 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

3.    Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic copy of this brief is identical to the text in the paper copies of the brief.

4.    Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that a virus detection program was performed on this electronic brief and that no virus was detected.

/s/ Sarah A. Hunger
SARAH A. HUNGER

April 7, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER