No. 23-1214

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

NATIONAL SHOOTING SPORTS FOUNDATION,

*Plaintiff-Appellee*,

*v.*

ATTORNEY GENERAL OF NEW JERSEY,

*Defendant-Appellant*

On Appeal from the United States District Court
for the District of New Jersey
No. 3:22-cv-06646-ZNQ

## BRIEF OF EVERYTOWN FOR GUN SAFETY SUPPORT FUND, BRADY, AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS AMICI CURIAE IN SUPPORT OF APPELLANT

Eric Tirschwell
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
etirschwell@everytown.org
(646) 324-8222

April 7, 2023

## CORPORATE DISCLOSURE STATEMENTS

Everytown for Gun Safety Support Fund is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

Brady is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

Giffords Law Center to Prevent Gun Violence is a nonprofit organization. It has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS.................................................... i

TABLE OF AUTHORITIES................................................................ iii

INTERESTS OF AMICI CURIAE ..................................................... 1

INTRODUCTION................................................................... 2

ARGUMENT ......................................................................... 5

    I.  The District Court's Holding that PLCAA Likely Preempts Section 58-35 Was in Error.................................................................. 5

    II.  Section 58-35 Has a "Plainly Legitimate Sweep," Which is Fatal to NSSF's Facial Preemption Claim ......................................... 12

        A. Section 58-35 Authorizes Certain Actions that Are Entirely Outside PLCAA's Scope .............................................. 13

        B. PLCAA's Predicate Exception Expressly Permits Claims Based Upon Violations of State Statutes Like Section 58-35 ...... 15

    III. Section 58-35 Requires Reasonable Conduct That Is Well Understood by the Gun Industry and Essential to the Prevention of Firearms Diversion.................................................................. 19

CONCLUSION ............................................................... 27

CERTIFICATE OF SERVICE.......................................................... 29

CERTIFICATE OF COMPLIANCE ............................................... 30

# TABLE OF AUTHORITIES

## Cases

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008) ............................................................ 4, 5, 6

*Bostock v. Clayton Cnty., Ga.*,
    140 S.Ct. 1731 (2020) ........................................................ 3, 11

*Brady v. Walmart, Inc.*, No. 8:21-cv-1412, 2022 WL 2987078 (D. Md. July
    28, 2022)............................................................................. 18

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011) .......................................................... 7, 8

*ChemSol LLC v. City of Sibley*,
    386 F. Supp. 3d 1000 (N.D. Iowa 2019) ......................... 20

*Chiapperini v. Gander Mountain Co., Inc.*,
    48 Misc.3d 865 (N.Y. Sup. Ct. Monroe Cnty. 2014) ....... 18

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992). ......................................................... 6

*City of Gary v. Smith & Wesson Corp.*,
    126 N.E.3d 813 (Ind. Ct. App. 2019) ............................... 17

*City of Lincoln Ctr. v. Farmway Co-op, Inc.*,
    316 P.3d 707 (Kan. 2013) ................................................ 19, 20

*City of New York v. Beretta*,
    524 F.3d 384 (2d Cir. 2008) ............................................ 1, 7

*City of Columbus v. Kim*,
    886 N.E.2d 217 (Ohio 2008) ........................................... 20

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ......................................................... 11

*Corporan v. Wal-Mart Stores East, LP*,
    No. 16-CV-2305, 2016 WL 3881341(D. Kan. Jul. 18, 2016)........... 13

*Delana v. CED Sales, Inc.*,
    486 S.W.3d 316 (Mo. 2016)............................................. 8

*Estate of Kim v. Coxe*,
    295 P.3d 380 (Alaska 2013) ............................................ 1, 6, 7, 8, 13

*Goldstein v. Earnest*,
  Case No. 37-2020-00016638-CU-PO-CTL (Cal. Super. Ct. San Diego Co.
  Jul. 2, 2021) ............................................................................................... 17, 18

*Green v. Kyung Chang Indus. USA, Inc.*,
  No. A-21-838762-C (Nev. Dist. Ct. Clark. Cnty. Jan. 31, 2022) ...................... 15

*Hanover Bank v. C.I.R.*,
  369 U.S. 672 (1962) ............................................................................................ 7

*In re Luckygunner LLC*,
  No. 14-21-00194-CV, 2021 WL 1904703 (Tex. Ct. App. May 12, 2021) ......... 1

*Lawton v. Steele*,
  152 U.S. 133 (1894) ............................................................................................ 6

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ............................................................................................ 6

*NAACP v. AcuSport, Inc.*,
  271 F. Supp. 2d 435 (E.D.N.Y. 2003) .......................................................... 24, 25

*Orlando Sports Stadium, Inc. v. Florida*,
  262 So. 2d 881 (Fla. 1972) ............................................................................... 20

*Prescott v. Slide Fire Sols., LP*,
  410 F. Supp. 3d 1123 (D. Nev. 2019) ........................................... 10, 13, 17, 18

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ............................................................................................ 6

*Soto v. Bushmaster Firearms Int'l, LLC*,
  202 A.3d 262 (Conn. 2019) ......................................................................... 10, 17

*State v. Lenihan*,
  219 N.J. 251 (N.J. 2014) .............................................................................. 11, 12

*New Jersey v. Sharkey*,
  497 A.2d 1291 (N.J. Super. Ct. App. Div. 1985) ............................................. 20

*Tretta v. Osman*,
  No. 20STCV48910, 2021 WL 9273931 (Cal. Sup. Ct. L.A. Cnty. June 28,
  2021) ................................................................................................................ 14

*United States v. Salerno*,
  481 U.S. 739 (1987) .......................................................................................... 12

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ..................................................................................... 4, 12

*Williams v. Beemiller, Inc.*,
100 A.D.3d 143 (N.Y. App. Div. 4th Dep't 2012), *amended by* 103 A.D.3d
1191 (N.Y. App. Div. 4th Dep't 2013) ........................................................... 18

## Statutes

15 U.S.C. § 7901 ....................................................................................... 8, 9

15 U.S.C. § 7902 .......................................................................................... 5

15 U.S.C. § 7903(2) ................................................................................... 14

15 U.S.C. § 7903(4) ................................................................................... 15

15 U.S.C. § 7903(5) ............................................................................. *passim*

15 U.S.C. § 7903(6) ................................................................................... 14

18 U.S.C. § 922(g) ..................................................................................... 16

18 U.S.C. § 922(n) ..................................................................................... 16

Cal. Bus. & Prof. Code § 17200 ............................................................... 18

Conn. Gen. Stat. § 42-110b(a) .................................................................. 17

Ind. Code § 32-30-6-6 ............................................................................... 17

N.J. Stat. Ann. § 2C:33-12 ........................................................................ 11

N.J. Stat. Ann. § 2C:58-33 ..................................................................... 2, 6

N.J. Stat. Ann. § 2C:58-34 ........................................................... 14, 15, 20

N.J. Stat. Ann. § 2C:58-35 ................................................................. *passim*

Nev. Rev. Stat. 598.0915(5) ............................................................... 17, 18

## Other Authorities

151 Cong. Rec. S 9087-01 ........................................................................... 9

151 Cong. Rec. S 9059-04 ........................................................................... 9

Anthony A. Braga et al., *Interpreting the Empirical Evidence on Illegal Gun
Market Dynamics*, 89 J. URBAN HEALTH 779 (2012) ........................................ 22

Anthony A. Braga et al., *Underground Gun Markets and the Flow of Illegal
Guns into the Bronx and Brooklyn: A Mixed Methods Analysis*, 98 J.
URBAN HEALTH 596 (2020) ............................................................................ 23

Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly destroyed it*, WASH. POST (Feb. 27, 2018) .......................................................... 26

Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use,*, NAT'L INST. OF JUST. (2007) ............................................. 23

Daniel W. Webster et al., *Effects of undercover police stings of gun dealers on the supply of new guns to criminals*, 12 INJ. PREVENTION 225 (2006) ......... 23

Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. URBAN HEALTH 778 (2006) ......................................................................................... 26

Daniel W. Webster & Jon S. Vernick, *Policies to prevent firearm trafficking*, 13 INJ. PREVENTION 78 (2007) ....................................................... 23

Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices Through Litigation, in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 123 (Daniel W. Webster & Jon S. Vernick eds. 2013) ............................................... 27

Garen J. Wintemute et al., *Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes*, 11 INJ. PREVENTION 357 (2005) ........................................... 23

Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase,* 87 J. URBAN HEALTH 865 (2010) .............................. 23

Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS MINN. (Oct. 17, 2022) .................................................................. 24

Susan B. Sorenson & Katherine A. Vittes, *Buying a handgun for someone else: firearm dealer willingness to sell,* 9 INJ. PREVENTION 147 (2003) ........... 23

Everytown Research & Policy, *Everystate: New Jersey* ......................................... 2

N.J. Exec. Order No. 83 (Sept. 10, 2019) ........................................................ 21, 22

NSSF, *NSSF, ATF Jointly Launch Operation Secure Store* (Jan. 23, 2018) .......... 21

NSSF, *St. Louis Campaign Targets Illegal Gun Purchases* (Mar. 30, 2023) ........ 21

Restatement (Second) of Torts § 821B (Am. L. Inst. 1975) .................................. 2

U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy* (Jan. 18, 2001) .................................... 25

U.S. Dep't of Justice, Off. of Just. Programs, *Don't Lie for the Other Guy (Video)* (2002) ............................................................................. 21

*Walmart Policies and Guidelines: Firearms and Ammunition Guidelines*,
    WALMART ..................................................................................................... 24

## INTERESTS OF AMICI CURIAE

Amici Everytown for Gun Safety Support Fund ("Everytown"), Brady, and Giffords Law Center to Prevent Gun Violence are national gun violence prevention organizations that conduct research on gun violence and the role that the gun industry can play in reducing such violence. Additionally, Amici have extensive experience litigating cases under the Protection of Lawful Commerce in Arms Act ("PLCAA"), and are familiar with the nature and scope of PLCAA's litigation protection. *See, e.g.*, *City of New York v. Beretta*, 524 F.3d 384 (2d Cir. 2008) (Brady serving as plaintiff's counsel in case involving interpretation of PLCAA); *Estate of Kim v. Coxe*, 295 P.3d 380 (Alaska 2013) (same); *In re Luckygunner LLC*, No. 14-21-00194-CV, 2021 WL 1904703, at *1-2 (Tex. Ct. App. May 12, 2021) (Everytown serving as plaintiff's counsel in case involving interpretation of PLCAA), *further mandamus review denied*, No. 21-0463 (Tex. Feb. 18, 2022). Amici submit this brief in support of Appellant, the Attorney General of New Jersey ("New Jersey"), in order to provide the Court with information about how New Jersey's public nuisance statute interacts with the strictures of PLCAA.[1]

---

[1]    All parties consent to the filing of this brief. No party's counsel authored this brief in whole or part and, apart from Amici, no person contributed money to fund its preparation or submission.

1

# INTRODUCTION

New Jersey faces an epidemic of gun violence. On average, 427 New Jerseyans die by guns each year and 874 more are wounded.[2] This tragic situation results in massive physical and emotional damage to the State's residents. Moreover, this violence carries an annual economic cost of $5.3 billion in the State, of which $168.9 million is borne by taxpayers.[3]

Acting within its historic police power to protect the health and safety of its residents, New Jersey enacted Assembly Bill 1765, codified at N.J. Stat. Ann. §§ 2C:58-33 *et seq*. ("Section 58-35"), declaring that certain unlawful or unreasonable conduct by gun industry members constitutes a public nuisance. Section 58-35(a); *see also* Restatement (Second) of Torts § 821B cmt. C (Am. L. Inst. 1975) ("[A]ll of the states have numerous special statutes declaring certain conduct or conditions to be public nuisances[.]").

However, the district court preliminarily enjoined enforcement of Section 58-35, holding that PLCAA—which provides a defense for certain civil actions against firearms manufacturers, dealers, and distributors—likely preempts Section 58-35 in its entirety. JA23. The district court came to this conclusion even though, on its face, PLCAA does not apply when a gun industry member "knowingly violate[s] a State

---

[2]    Everytown Research & Policy, *Everystate: New Jersey*, https://everystat.org/#NewJersey.

[3]    *Id*.

or Federal statute applicable to the sale or marketing" of firearms and "the violation was a proximate cause of the harm for which relief is sought[.]" *See* 15 U.S.C. § 7903(5)(A)(iii) (the "predicate exception").

In coming to this conclusion, the district court made a fundamental and fatal error, refusing to apply PLCAA's plain language and adding a requirement that appears nowhere in the statute itself, i.e., that the predicate exception only applies to state and federal statutes that are "sufficiently concrete." JA15; *see also* JA67-68. The Supreme Court's statutory construction principles, which recognize the limits of federal judicial authority, forbid this rewriting. *See Bostock v. Clayton Cnty, Ga.*, 140 S. Ct. 1731, 1738 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").

Part I of this brief thus addresses the district court's erroneous and impermissible interpretation of PLCAA's preemptive scope. Both PLCAA's text and legislative history evidence Congress' intent to preserve the states' legislative power to regulate the sale and marketing of firearms. In failing to apply PLCAA as it was passed by Congress, the district court wrongly engaged in lawmaking and re-wrote the statute; and it did so despite the recognized federalism principle that courts construing a federal law cannot hold that a state's historic police powers have been

3

preempted by the Federal Government unless such preemption is the "clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal citation omitted).

Part II addresses Section 58-35's "plainly legitimate sweep." *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("a facial challenge must fail where the statute has a 'plainly legitimate sweep.'") (citations omitted). NSSF challenged Section 58-35 before New Jersey brought any civil claims pursuant to it and without acknowledging that civil litigation against gun industry actors is far from unprecedented. The reality is that many claims may be brought under Section 58-35, either without implicating PLCAA or by fitting into one of its six exceptions.

Finally, Part III addresses the district court's seeming acceptance of NSSF's claim that it is impossible for its members to determine what conduct unreasonably endangers the health and safety of the public. In reality, well-known reasonable practices and controls are available to gun industry actors to minimize the diversion of firearms to the criminal market. Far from imposing an incomprehensible standard, Section 58-35 aligns with decades of evidence and experience that illuminate the contours of responsible gun industry participation.

For the reasons stated herein, Amici support New Jersey's request that the Court reverse the grant of NSSF's motion for a preliminary injunction.

**ARGUMENT**

I.   **The District Court's Holding that PLCAA Likely Preempts Section 58-35 Was in Error**

PLCAA requires dismissal of a "qualified civil liability action" asserted against a gun industry defendant eligible for the statute's protection. 15 U.S.C. §§ 7902, 7903(5)(A)(i)-(vi). An action constitutes a "qualified civil liability action" if it meets the statute's general definition of this term *and* does not satisfy one of the listed relevant exceptions. *Id.* § 7903(5)(A). PLCAA thus protects gun industry actors from some, but not all, civil actions arising from gun violence.

One of the exceptions to PLCAA's preemptive reach is the predicate exception, which states that "an action in which a [gun industry member] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm or ammunition] product" is not a qualified civil liability action, when the relevant statutory violation "was a proximate cause of the harm for which relief is sought[.]" *Id.* § 7903(5)(A)(iii). By endorsing NSSF's theory that PLCAA preempts Section 58-35 because the latter could *never* qualify as a predicate statute, the district court disregarded PLCAA's text and legislative history, as well as fundamental statutory construction principles.

Courts considering a "question of express or implied pre-emption" start with the "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the *clear and manifest* purpose of

5

Congress." *Altria Grp.*, 555 U.S. at 77 (emphasis added) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (alteration in original)). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Id.*; *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens [b]ecause these are primarily, and historically matters of local concern . . . ."). Furthermore, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

Here, Section 58-35 fits squarely within the State's police power to declare a public nuisance to "promote and protect the health, safety, and welfare of the people of New Jersey." Section 58-33(d)*; see also Lawton v. Steele*, 152 U.S. 133, 139-40 (1894) (where activities are "detrimental to the interests of the public," it is "within the power of the legislature to declare them to be nuisances"). Nothing in PLCAA's text clearly and manifestly expresses Congress' intent to abrogate that exercise of police power. Quite the opposite: PLCAA expressly provides for continued state regulation of the gun industry. *See Estate of Kim v. Coxe*, 295 P.3d 380, 389 (Alaska 2013) ("Although expressly preempting conflicting state tort [common] law, the PLCAA *allows* Alaska's legislature to create liability for harms proximately caused

by knowing violations of statutes regulating firearm sales and marketing."). PLCAA's operative clause makes clear that, while certain civil actions against industry members are preempted, actions predicated on the violation of a "State or Federal statute applicable to the sale or marketing of [firearms]" are not. 15 U.S.C. § 7903(5)(A)(iii).

As demonstrated in New Jersey's brief, under PLCAA's plain text, Section 58-35 is unquestionably a state statute applicable to the sale or marketing of firearms. *See* NJ Br. at 23-33. Moreover, the Second Circuit outlined an instructive standard for identifying predicate statutes: namely, the predicate exception encompasses statutes (a) that "expressly regulate firearms," (b) that "courts have applied to the sale and marketing of firearms," and (c) that "do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *City of New York v. Beretta*, 524 F.3d 384, 404 (2d Cir. 2008). Section 58-35 fits well within the first of those categories.

To hold otherwise, the district court first ignored the plain text and then violated another bedrock principle of statutory construction by adding words to the statute—specifically, adding the words "sufficiently concrete," which appear nowhere in PLCAA. *See Hanover Bank v. C.I.R.*, 369 U.S. 672, 687 (1962) (explaining that courts cannot "add to or alter the words employed to effect a purpose which does not appear on the face of the statute"); *see also Chamber of Com. of U.S.*

7

*v. Whiting*, 563 U.S. 582, 607 (2011) ("Implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." (cleaned up)).

Beyond this fatal mistake, the district court erred in multiple additional ways in trying to justify its rewriting of PLCAA's plain text.

*First*, the district court quoted part of PLCAA's preamble and concluded that Section 58-35 "would directly conflict with the intention of Congress." JA16. Even assuming that PLCAA's prefatory language counsels in favor of preempting Section 58-35 (which it does not), it is impermissible to elevate a statute's prefatory language over its operative clauses. *See, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 322 (Mo. 2016) ("The general statement of the purpose of the PLCAA does not redefine the plain language of a statute."); *Coxe*, 295 P.3d at 387 (refusing to "elevate the PLCAA's preamble over the substantive portion's clear language"). And PLCAA's operative clause makes clear that a gun industry defendant is not entitled to PLCAA's protection when it knowingly violates a state statute, like Section 58-35, that is applicable to the sale and marketing of firearms.

In any case, PLCAA's preamble confirms that Congress was concerned with what it perceived as unwarranted *judicial* expansion of liability standards applicable to the firearms industry, not state *legislative* power to regulate the industry. *See, e.g.*,

8

15 U.S.C. § 7901(a)(7) (stating that civil actions against industry members "do not represent a bona fide expansion of the common law" and noting that such actions had never been contemplated "by the legislatures of the several States."); *id.* § 7901(a)(8) (stating that existing lawsuits "attempt to use the judicial branch to circumvent the Legislative branch of government"). When read as a whole, there is no conflict between PLCAA's preamble and operative provisions; both support New Jersey's interpretation.

Comments by PLCAA's sponsors during Congressional debate reinforce that Congress did not intend to preempt the states' *legislative* ability to regulate firearms:

- Senator Craig: "Advocates of gun control are trying to usurp State power by circumventing the legislative process through judgments and judicial decrees. Allowing activist judges to legislate from the bench will destroy state sovereignty. This bill will protect it." 151 Cong. Rec. S 9087-01 (daily ed. July 27, 2005) (statement of Sen. Larry Craig).

- Senator Coburn: "These lawsuits are part of an anti-gun activist effort to make an end run around the legislative system . . . . When you can't pass it in the legislature, you get an activist judge to get done what you wanted to do in the first place[.]" 151 Cong. Rec. S 9059-04 (daily ed. July 27, 2005) (statement of Sen. Thomas Coburn).

- Senator Hatch: "These abusive gun liability actions usurp the authority of the Congress and of State legislators." 151 Cong. Rec. S 9059-04 (daily ed. July 27, 2005) (statement of Sen. Orrin Hatch).

Section 58-35 thus embodies exactly the sort of power Congress left to state legislatures. And while Congress is free to amend PLCAA, rewriting a federal statute is not a court's role.

*Second*, the district court agreed with NSSF that a PLCAA predicate statute must resemble the two examples provided in the predicate exception. JA16. But those examples do not set the outer bounds of qualifying predicate statutes. Indeed, the permissive word "including" precedes these examples, which indicates that they are illustrative, not exhaustive. 15 U.S.C. § 7903(5)(A)(iii). Furthermore, the text of the predicate exception clearly covers State or Federal statutes applicable to the "marketing" of firearms. *See id*; *see also Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1138-39 (D. Nev. 2019); *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 301 (Conn. 2019), *cert. denied*, 140 S. Ct. 513 (2019). Yet the two examples listed in the predicate exception do not address marketing at all; they concern only the sale or transfer of a firearm. 15 U.S.C. § 7903(5)(A)(iii)(I)-(II). Thus, reading the two textual examples to limit the scope of the predicate exception would impermissibly conflict with the predicate exception's broader operative clause.[4]

*Finally*, the district court concluded that the entirety of Section 58-35 is likely preempted because the predicate exception requires a knowing violation of a State

---

[4]    The legislative history of PLCAA demonstrates that these particular examples were added in 2005 because they were implicated in the high-profile sniper shootings that terrorized Washington D.C. in 2002. *See Soto*, 202 A.3d at 316. The victims' families had brought a lawsuit against the gun store that permitted the shooter to acquire his weapons. Opponents of PLCAA argued that previous versions of the PLCAA bill would have prevented this meritorious lawsuit from proceeding; thus, PLCAA's proponents added these examples to deflect that criticism. *Id.*

or federal statute, "which implies some requirement sufficiently concrete that a manufacturer or seller could knowingly violate it." JA15. As noted, the words "sufficiently concrete" appear nowhere in PLCAA, and a court has no power to add or "imply" words and additional requirements that nowhere appear in the statute itself. *See Bostock*, 140 S. Ct. at 1738; *cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("Courts must presume that a legislature says in a statute what it means and means in a statute what is says there."). Moreover, as New Jersey's brief demonstrates, there is nothing paradoxical about requiring a knowing violation of a law that requires reasonable conduct. *See* NJ Br. at 25-26; *see also* N.J. Stat. Ann. § 2C:33-12 (providing that a person is guilty of maintaining a property-based public nuisance when "[b]y conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons").

And it is not clear what the court meant when it impermissibly added words to the statute by imposing the "sufficiently concrete" test or why, for example, Section 58-35's mandate that gun industry members not engage in "unlawful" conduct does not meet it. *See* §58-35(a)(1); *see also State v. Lenihan,* 219 N.J. 251 (N.J. 2014) (rejecting a vagueness challenge to criminal provision prohibiting a person from "knowingly violat[ing] a law intended to protect the public health and

safety or knowingly fail[ing] to perform a duty imposed by a law intended to protect the public health and safety and recklessly causes serious bodily injury"). While "concreteness" is not a common judicial test, vagueness is. And as discussed *infra* at pages 19-20, public nuisance statutes using language similar to Section 58-35 have consistently been upheld against vagueness challenges.

If, at some point in the future, New Jersey files a lawsuit against a PLCAA-protected defendant predicated on a Section 58-35 violation, and it cannot show that the defendant's conduct was knowing, then that lawsuit must be dismissed. This is *exactly* what PLCAA contemplates. But at this pre-enforcement stage, PLCAA does not provide grounds for enjoining Section 58-35 in its entirety.

## II.    Section 58-35 Has a "Plainly Legitimate Sweep," Which is Fatal to NSSF's Facial Preemption Claim

Even if PLCAA may ultimately preempt some Section 58-35 actions, NSSF's *facial* preemption challenge must fail because many possible Section 58-35 actions are clearly consistent with PLCAA. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("a facial challenge must fail where the statute has a 'plainly legitimate sweep.'"); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

As this Court recognized in partially staying the district court's preliminary

12

injunction, PLCAA does not provide total protection from litigation or shield gun industry actors from every civil action arising from gun violence. *See* Dkt. 16. Some civil actions against members of the gun industry fall entirely outside PLCAA's scope; others fall within one of PLCAA's exceptions.

Importantly, because PLCAA's preemption applies to actions, rather than statutes, courts determine on a case-by-case basis whether PLCAA shields a defendant, based on the facts of a particular case. *See, e.g.*, *Coxe*, 295 P.3d at 393-94 (reversing grant of summary judgment to licensed dealer where parties genuinely disputed facts material to the dealer's PLCAA defense); *Prescott*, 410 F. Supp. at 1139-40 (denying motion to dismiss on PLCAA grounds where plaintiffs' allegations about bump stock manufacturer's marketing misrepresentations satisfied the elements of the predicate exception); *Corporan v. Wal-Mart Stores East, LP*, No. 16-CV-2305, 2016 WL 3881341, at *3-4 (D. Kan. Jul. 18, 2016) (concluding that, with anticipated factual amendments, plaintiff's complaint would sufficiently allege the elements of the predicate exception). Thus, even if PLCAA may preempt *some* claims arising under a state statute, that is not reason to discard the entire statute pursuant to a facial preemption challenge.

## A. Section 58-35 Authorizes Certain Actions that Are Entirely Outside PLCAA's Scope

As relevant here, PLCAA's statutory text limits its preemption of "qualified civil liability actions" in two notable ways. First, while federally licensed firearms

13

manufacturers, distributors, importers, and dealers can receive PLCAA protection, PLCAA does *not* preempt civil liability claims against manufacturers, distributors, or dealers of firearms or firearm components *who do not have a federal firearms license*. *See* 15 U.S.C. § 7903(2), (6) (defining "manufacturers" and "sellers" as entities licensed under the federal Gun Control Act). The text of Section 58-35, by contrast, encompasses both licensed and unlicensed companies. *See* Section 58-34 (defining "gun industry member").

This divergence is meaningful because many makers and sellers of ghost guns (build-it-yourself firearms sold without serial numbers and background checks) do not believe their products qualify as firearms and therefore do not seek a federal license. *See, e.g.*, *Tretta v. Osman*, No. 20STCV48910, 2021 WL 9273931, at *1,*4 (Cal. Sup. Ct. L.A. Cnty. June 28, 2021) (denying defendant ghost gun seller's motion to dismiss because plaintiff alleged the seller did not have a federal firearms license and was therefore ineligible for PLCAA protection.).[5] Thus, if New Jersey asserts a Section 58-35 action against, for instance, an *unlicensed* ghost gun seller, that action would not constitute a "qualified civil liability action" preempted by PLCAA.

In addition, PLCAA does not prohibit actions arising from misuse of firearms

---

[5]    Where Amici cite *Tretta* and other unpublished decisions, they do so to show the current state of the law, rather than in reliance on the decisions' precedential value.

accessories. *See* 15 U.S.C. § 7903(4) ("qualified products" covered by PLCAA include firearms, ammunition, and components of each, but not firearms accessories); *see also Green v. Kyung Chang Indus. USA, Inc.*, No. A-21-838762-C, slip op. at *1 (Nev. Dist. Ct. Clark Cnty. Jan. 31, 2022) (no PLCAA preemption for claims against large-capacity magazine manufacturer because magazine was not a "qualified product").[6] Section 58-35, however, expressly encompasses firearms accessories. *See* Section 58-34 (defining "gun-related product"). Thus, New Jersey can assert Section 58-35 actions arising from accessories without encountering PLCAA.

### B. PLCAA's Predicate Exception Expressly Permits Claims Based Upon Violations of State Statutes Like Section 58-35

Even where PLCAA is implicated, one of PLCAA's six exceptions may be applicable to a particular lawsuit. *See* 15 U.S.C. § 7903(5)(A). As discussed *supra* at Part I, the predicate exception is particularly relevant here. *Id*. § 7903(5)(A)(iii). It requires plaintiffs to establish: (a) scienter; (b) violation of a predicate statute; and (c) proximate causation.

Notably, because the predicate exception itself requires scienter and causation, the underlying predicate statute need not also include these elements. In

---

[6]    Slip opinion available at https://brady-static.s3.amazonaws.com/GREEN-V.-KYUNG-CHANG-INDUSTRY-USA-INC-dayton-ohio-mass-shooting.pdf. The case is on appeal before the Nevada Supreme Court, at case number 84844.

fact, PLCAA provides, as an illustrative example, that the predicate exception is satisfied in any case in which a gun company aided and abetted disposal of a firearm or ammunition product "knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18." 15 U.S.C. § 7903(5)(A)(iii)(II). Neither of these two predicate statutes examples includes express knowledge and proximate causation requirements.

Thus, if New Jersey invokes the predicate exception to assert Section 58-35 actions against gun industry members, it will need to establish a violation of a predicate statute—which could be Section 58-35 *or* another statute the defendant concurrently violated—*and* the scienter and causation elements set forth by PLCAA. If the State meets this burden for a particular Section 58-35 action, the action can proceed on the merits.

Even under NSSF's unduly narrow view of PLCAA's predicate exception, there are myriad ways in which an enforcement action by New Jersey would not be preempted by PLCAA. For example, Section 58-35(a)(1) mandates that "[a] gun industry member shall not, by conduct *either unlawful in itself* or unreasonable under all the circumstances, knowingly or recklessly create, maintain or contribute to a public nuisance . . . ." (emphasis added). Thus, if a gun industry defendant knowingly violated federal or State gun laws, and such conduct proximately caused harm to the

people of New Jersey, nothing in PLCAA would bar New Jersey from enforcing

Section 58-35 against that defendant. Similarly, if a defendant refused to implement

or enforce *any* "reasonable procedures, safeguards, [or] business practices" designed

to prevent the sale of firearm products to straw-purchasers, traffickers, or minors,

that defendant would clearly be in knowing violation of Section 58-35(a)(2).

Moreover, in PLCAA cases, courts have recognized that nothing in PLCAA

prohibits reliance on predicate statutes that impose flexible standards of conduct. *See*

*Soto*, 202 A.3d at 305-06 (holding that the Connecticut Unfair Trade Practices Act

(CUTPA) constitutes a PLCAA predicate statute),[7] *cert. denied*, 140 S. Ct. 513

(2019); *City of Gary v. Smith & Wesson Corp.*, 126 N.E.3d 813, 832-33 (Ind. Ct.

App. 2019) (reaffirming the court's earlier 2007 holding that plaintiff-municipality

sufficiently invoked the predicate exception based on gun manufacturers' alleged

violations of Indiana's general public nuisance statute)[8]; *Prescott*, 410 F. Supp. 3d

at 1137-39 (finding that Nevada's Deceptive Trade Practices Act (NDTPA) qualifies

as a predicate statute)[9]; *Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL,

---

[7]     CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

[8]     Indiana's public nuisance statute provides: "Whatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action." Ind. Code § 32-30-6-6.

[9]     The NDTPA prohibits knowingly making a "false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or

slip op. at *3-5 (Cal. Super. Ct. San Diego Cnty. July 2, 2021) (holding that California's Unfair Competition Law (CUCL) constitutes a predicate statute and granting plaintiffs leave to amend their standing allegations).[10] So too with Section 58-35, which applies a reasonableness standard to gun industry members.

Furthermore, and contrary to NSSF's assertions below, PLCAA also permits the application of reasonableness standards to PLCAA-protected defendants in cases where common law actions satisfy the predicate exception. *See, e.g.*, *Brady v. Walmart, Inc.*, No. 8:21-cv-1412, 2022 WL 2987078, at *6-10, *13-16 (D. Md. July 28, 2022) (denying motion to dismiss negligence claim against dealer because predicate exception was met); *Prescott*, 410 F. Supp. at 1137-43 (denying motion to dismiss negligence claim against bump stock manufacturer); *Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 151-52 (N.Y. App. Div. 4th Dep't 2012), *amended by* 103 A.D.3d 1191, 1192 (N.Y. App. Div. 4th Dep't 2013) (same); *Chiapperini v. Gander Mountain, Co.*, 48 Misc.3d 865, 874-78 (N.Y. Sup. Ct. Monroe Cnty. 2014) (same).

---

services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith." Nev. Rev. Stat. 598.0915(5).

[10]   The CUCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The slip opinion is available at https://brady-static.s3.amazonaws.com/Minute-Order-7-2-21-S0499865.PDF.

III.    **Section 58-35 Requires Reasonable Conduct That Is Well Understood by the Gun Industry and Essential to the Prevention of Firearms Diversion**

At bottom, NSSF's central contention, which the district court appeared to accept, is that it is impossible for its members to determine what constitutes "unreasonable" conduct under Section 58-35(a)(1) or "reasonable controls" under Section 58-35(a)(2). *See, e.g.*, JA64. This argument is belied by the text of the statute, abundant caselaw upholding public nuisance statutes against vagueness challenges, and decades of research, government guidance, and industry experience that make clear how industry members can act to avoid unreasonably endangering the public.

Starting with the statutory text, Section 58-35 first prohibits gun industry members from knowingly or recklessly creating, maintaining, or contributing to a public nuisance through sale, manufacturing, distribution, importation, or marketing conduct that is "either unlawful in itself or unreasonable under all the circumstances[.]" Section 58-35(a)(1). A "public nuisance" is defined as "any condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others or which otherwise constitutes a public nuisance under common law." Section 58-34. This formulation of a statutory public nuisance is commonly used and upheld against vagueness challenges. *See City of Lincoln Ctr. v. Farmway Co-*

*op, Inc.,* 316 P.3d 707, 714-16 (Kan. 2013) (upholding statute prohibiting "by act, or by failure to perform a legal duty, intentionally causing or permitting a condition to exist which injures or endangers the public health, safety or welfare").[11]

Second, Section 58-35(a)(2) mandates even more specific "reasonable controls." They are defined as "reasonable procedures, safeguards and business practices" designed to (i) prevent the sale of firearms to straw purchasers, gun traffickers, and other prohibited individuals; (ii) prevent the loss or theft of firearms; (iii) ensure compliance with existing State and federal law; and (iv) prevent the promotion of unlawful sale, distribution, and marketing of firearms. Section 58-34. Nowhere does the district court explain why it would be difficult for gun industry members to, for example, implement reasonable business practices designed to prevent sales to purchasers who are unlawfully buying guns for someone else

---

[11]      *See also City of Columbus v. Kim*, 886 N.E.2d 217, 218-20 (Ohio 2008) (upholding, against vagueness challenge, ordinance prohibiting the harboring of "unreasonably loud or disturbing" animals); *ChemSol LLC v. City of Sibley*, 386 F. Supp. 3d 1000, 1009, 1019-23 (N.D. Iowa 2019) (upholding anti-odor public nuisance provision that prohibited commercial activity generating "unreasonably noxious exhalations, unreasonably offensive smells, or other unreasonable annoyances"); *Orlando Sports Stadium, Inc. v. Florida*, 262 So. 2d 881, 883-84 (Fla. 1972) (rejecting vagueness challenge to public nuisance provisions that prohibited the use and maintenance of buildings and other structures for unlawful drug use or for the violation of "any law of the state"); *cf. New Jersey v. Sharkey*, 497 A.2d 1291, 1294-95 (N.J. Super. Ct. App. Div. 1985) (upholding provision criminalizing distribution of "look-alike" drugs and stating: "That the Legislature chose not to set forth a detailed listing of all proscribed activity. . ., but instead utilized a general approach in describing the illegal conduct, does not render the legislation void for vagueness.").

(known as straw purchasers), or business practices designed to prevent thefts.

In fact, for the past 23 years, NSSF has worked with the federal government to "educate[e] firearm retailers to better detect and prevent illegal straw purchases" by distributing "retailer kits containing a training video and information for storeowners and staff."[12] Among other tactics, NSSF encourages licensed dealers to ask all buyers a series of questions in order to identify suspicious purchasers.[13] Similarly, in 2018, NSSF launched a joint initiative with the federal government to help gun stores "make well-informed security related decisions to deter and prevent thefts."[14]

Moreover, NSSF's own documentation submitted to a New Jersey State agency demonstrates that NSSF and its members are able to articulate steps the industry can take to protect the public. In 2019, New Jersey passed Executive Order No. 83 ("EO 83") to address gun violence in the state, requiring state officials to ensure that firearm manufacturers and dealers conducting business with the State

---

[12]    NSSF, *St. Louis Campaign Targets Illegal Gun Purchases* (Mar. 30, 2023), *available at* https://www.nssf.org/articles/st-louis-campaign-targets-illegal-gun-purchases/ (last visited Apr. 3, 2023).

[13]    *See* U.S. Dep't of Just., Off. of Just. Programs, *Don't Lie for the Other Guy (Video)* (2002) (providing overview of Don't Lie for the Other Guy training video made available to firearms dealers by NSSF), https://tinyurl.com/46wv4x69 (last visited Apr. 5, 2023).

[14]    NSSF, *NSSF, ATF Jointly Launch Operation Secure Store* (Jan. 23, 2018), *available at* https://www.nssf.org/articles/nssf-atf-jointly-launch-operation-secure-store/ (last visited Apr. 5, 2023).

certify adherence to public safety principles.[15] Pursuant to EO 83, a New Jersey State agency issued a Request for Information ("RFI") that, in part, asked industry members to confirm that they had in place certain policies and procedures designed to prevent straw purchases, trafficking, and theft. In a multi-page response, NSSF had no trouble identifying the corresponding industry programs and policies, such as the Don't Lie for the Other Guy program, that promote the specific public safety principles raised in EO 83.[16]

Thus, Section 58-35 was not passed in a vacuum. First, New Jersey's EO 83 and RFI identified for gun industry members the policies and programs that, in the State's view, should be adopted to protect the public. In addition, decades of research evidence, government guidance, and industry practices also inform what members of the industry can do to avoid unreasonably endangering the public. For example, straw sales represent one of the most widely recognized mechanisms of diversion into the illicit market.[17] But research has long shown that some federally licensed gun dealers facilitate considerable and disproportionate firearms diversion at or soon

---

[15]    N.J. Exec. Order No. 83 (Sept. 10, 2019), available at https://nj.gov/infobank/eo/056murphy/pdf/EO-83.pdf.

[16]    NSSF's response to EO 83 was attached to NSSF member Remington Arms's RFI submission to the State, available at https://s3.amazonaws.com/brady-static/Remington-NJ-EO83.pdf. (last visited Apr. 6, 2023).

[17]    *See, e.g.*, Anthony A. Braga et al., *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URBAN HEALTH 779, 780-82, 791 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3462834/.

after the retail stage.[18] Notably, in response to several phone surveys, between 20-50% of surveyed dealers expressed a willingness to sell guns to likely straw purchasers.[19] Other known methods of diversion at the retail stage include off-the-books sales by corrupt dealers and high volume sales to the same buyer.[20]

Researchers, government actors, and even industry participants themselves have, through decades of study and experience, identified a range of clear, manageable procedures that would reduce the risk of firearms diversion. For instance, the owner of a licensed dealer in Minnesota recently spoke about his store's capacity to reduce and prevent straw sales, including by recognizing red flags of

---

[18] Anthony A. Braga et al., *Underground Gun Markets and the Flow of Illegal Guns into the Bronx and Brooklyn: A Mixed Methods Analysis*, 98 J. URBAN HEALTH 596, 598 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8566688/; Daniel W. Webster et al, *Effects of undercover police stings of gun dealers on the supply of new guns to criminals*, 12 INJ. PREVENTION 225, 225 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2586780/; Garen J. Wintemute et al., *Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes*, 11 INJ. PREVENTION 357, 357 (2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730299/.

[19] Garen Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. URBAN HEALTH 865, 872 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2937134/; Susan B. Sorenson & Katherine A. Vittes, *Buying a handgun for someone else: firearm dealer willingness to sell*, 9 INJ. PREVENTION 147, 148 (2003), https://repository.upenn.edu/spp_papers/34/.

[20] Daniel W. Webster & Jon S. Vernick, *Policies to prevent firearm trafficking*, 13 INJ. PREVENTION 78, 78 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2610592/; Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use* at 6, NAT'L INST. OF JUST. (2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf.

straw sales such as (i) buyer nervousness; (ii) a buyer's lack of knowledge about her guns of choice, or use of reference photographs to identify them; and (iii) a buyer texting during a transaction.[21] Walmart, one of the largest gun dealers in the country, has published guidelines for responsible firearms sales, which include practices like videotaping the point of sale, performing inventory audits, and conducting regular training for firearms sales associates.[22]

Further up the supply chain, it is well-established that manufacturers and distributors can institute practices to reduce diversion, including (i) monitoring downstream actors for risky sales patterns; (ii) refusing to supply bad actor dealers that have a record of frequently selling guns that are ultimately recovered by law enforcement; (iii) requiring downstream dealers to conduct anti-straw-sale trainings; and (iv) monitoring downstream dealers through visitation and other regular contact. *See NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 446, 449-52, 523 (E.D.N.Y. 2003) (trial evidence established that firearms manufacturers and distributors "could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns— substantially reduce the harm occasioned by the diversion of guns to the illegal

---

[21]    Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS MINN. (Oct. 17, 2022), https://www.cbsnews.com/minnesota/news/how-is-a-gun-retailer-supposed-to-stop-straw-purchases/.

[22]    *Walmart Policies and Guidelines: Firearms and Ammunition Guidelines* WALMART (last visited Apr. 5, 2023), https://corporate.walmart.com/policies.

market and by the criminal possession and use of those guns");[23] U.S. Dep't of Just.,

*Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*

(Jan. 18, 2001) (recommending anti-diversion safeguards that manufacturers and

other industry actors should pursue).[24]

In fact, Smith & Wesson—one of the nation's largest gun manufacturers—

once agreed to implement a detailed protocol that included similar distribution

controls. *Agreement Between Smith & Wesson and the Departments of the Treasury*

*and Housing and Urban Development, Local Governments and States* at Part II

(Mar. 7, 2000).[25] Among other procedures, the manufacturer agreed to require that

sellers of their products (i) track dealers that sold disproportionate numbers of guns

that were ultimately recovered by law enforcement; (ii) limit multiple handgun

purchases by the same individual within a short period; (iii) maintain an electronic

firearms inventory; (iv) conduct monthly inventory audits; and (v) implement anti-

theft security plans. *Id*. Though the settlement was ultimately not enforced for

reasons unrelated to its efficacy, it remains a testament to the capacity of industry

members to identify and adopt reasonable practices to reduce firearms diversion and

---

[23]    The court ultimately dismissed the case on other grounds, concluding that the plaintiff lacked standing to bring a common law public nuisance claim. 271 F. Supp. 2d at 499.

[24]    *Available at* https://www.justice.gov/archive/opd/Strategy.htm#Industry%20Self-Policing.

[25]    *Available    at*    https://www.nraila.org/articles/20000317/smith-wesson-settlement-agreement.

other risk factors for gun violence.[26]

Similarly, researchers studied a Milwaukee dealer that stopped selling "junk guns"—that is, inexpensive and easily concealable handguns known to be attractive to criminal buyers—in the wake of negative press attention.[27] Previously, the dealer had been linked to 65% of guns that law enforcement recovered in Milwaukee within a year after retail sale.[28] After the change, data showed reductions in Milwaukee crime guns recoveries along several metrics: the number of junk guns sold by the dealer and recovered within one year decreased by 96%; the number of other likely trafficked guns sold by the dealer and recovered within a year decreased by 42%; and, notably, the *overall* number of likely trafficked guns recovered within a year of retail sale decreased by 44%.[29] In other words, "a single gun dealer's sales practices had a profound impact on the local illicit gun market in Milwaukee."[30]

A similar result was observed in New York City. In 2006, the City sued over two dozen dealers that were top sources for guns recovered by the New York Police

---

[26] Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly destroyed it,* WASH. POST (Feb. 27, 2018), https://www.washingtonpost.com/news/retropolis/wp/2018/02/27/a-gunmaker-once-tried-to-reform-itself-the-nra-nearly-destroyed-it/.

[27] Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. URBAN HEALTH 778, 778, 785 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2438583/.

[28] *Id. at* 781.

[29] *Id.* at 782-83.

[30] *Id.* at 784.

Department ("NYPD"). Many of the dealers agreed to settlements and to appointment of a special master to monitor their practices.[31] Researchers evaluated data related to 10 of these dealers and determined that, after the start of the litigation, the NYPD became 84% less likely to recover guns that they sold.[32]

In short, and contrary to NSSF's assertions in this lawsuit, industry members are capable of identifying reasonable conduct to avoid endangering the public, and have done so in the past. Section 58-35's text, as well as decades of research findings, guidance from courts, governmental agencies, and NSSF itself provide industry members with sufficient direction regarding compliance with the statute.

## CONCLUSION

For the reasons stated above and in New Jersey's brief, Amici respectfully submit that the Court should reverse the district court's order.

---

[31]     Daniel W. Webster & Jon S. Vernick, *Spurring Responsible Firearms Sales Practices Through Litigation*, *in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 123, 126 (Daniel W. Webster & Jon. S. Vernick eds. 2013), *available at* https://muse.jhu.edu/pub/1/oa_monograph/chapter/757455.

[32]     *Id.* at 128.

April 7, 2023

OF COUNSEL:

**BRADY**
Douglas N. Letter
Erin Davis
Philip Bangle
Shira Lauren Feldman
Robert M. Cross
840 First Street NE, Suite 400
Washington, DC 20002
Phone: 202-370-8160
dletter@bradyunited.org
edavis@bradyunited.org
pbangle@bradyunited.org
sfeldman@bradyunited.org
rcross@bradyunited.org

*Counsel for Brady*

**GIFFORDS LAW CENTER
    TO PREVENT GUN VIOLENCE**
Esther Sanchez-Gomez
268 Bush St. #555
San Francisco, CA 94104
Phone: 415-433-2062
esanchezgomez@giffords.org

David Pucino
244 Madison Ave., Ste. 147
New York, NY 10016
Phone: 415-433-2062
dpucino@giffords.org

*Counsel for Giffords Law Center to
Prevent Gun Violence*

Respectfully submitted,

**EVERYTOWN LAW**
*/s/ Eric Tirschwell*
Eric Tirschwell
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
Phone: 646-324-8222
etirschwell@everytown.org

OF COUNSEL:

**EVERYTOWN LAW**
Alla Lefkowitz
P.O. Box 14780
Washington, DC 20044
Phone: 202-545-3257
alefkowitz@everytown.org

Carolyn Shanahan
Nina P. Sudarsan
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
Phone: 646-324-8126
cshanahan@everytown.org
nsudarsan@everytown.org

*Counsel for Amici Curiae Everytown,
Brady, and Giffords Law Center to Prevent
Gun Violence*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 7, 2023

*/s/ Eric Tirschwell*
Eric Tirschwell

# CERTIFICATE OF COMPLIANCE

I, Eric Tirschwell, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 6,470 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface of at least 14 points set in Times New Roman.

3. That a virus detection program, SentinelOne, was run on the file and no virus was detected.

4. That the text of the electronic version of this brief is identical to the text of the paper copies.

Dated: April 7, 2023

*/s/ Eric Tirschwell*
Eric Tirschwell
