No. 23-1214

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

NATIONAL SHOOTING SPORTS FOUNDATION,

*Plaintiff-Appellee*,

v.

ATTORNEY GENERAL OF NEW JERSEY,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of New Jersey,
No. 22-cv-06646

———————————

## BRIEF FOR APPELLEE

———————————

JONATHAN M. PREZIOSI
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
1037 Raymond Boulevard
Suite 800
Newark, NJ 07102
(979) 792-8736

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellee*

May 1, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the National Shooting Sports Foundation certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES..................................................................................... iv

INTRODUCTION .................................................................................................... 1

JURISDICTION........................................................................................................ 4

STATEMENT OF THE ISSUES .............................................................................. 5

STATEMENT OF THE CASE.................................................................................. 5

      A.      Legal and Factual Background..................................................... 5

      B.      Procedural Background ................................................................11

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................. 14

STANDARD OF REVIEW ..................................................................................... 14

SUMMARY OF ARGUMENT............................................................................... 14

ARGUMENT .......................................................................................................... 17

I.      The State's Efforts To Evade The Merits Fail ............................................. 17

      A.      Article III Is Satisfied ......................................................... 17

      B.      The State's Remaining Arguments Are Waived and Wrong ............. 21

II.     A1765 Is Preempted ................................................................................. 26

III.     A1765 Is Unconstitutional In Multiple Respects ....................................... 37

      A.      A1765 Directly Regulates Out-of-State Conduct ............................. 37

      B.      A1765 Violates the First Amendment ............................... 41

      C.      A1765 Violates the Second Amendment........................... 46

      D.      A1765 Violates the Due Process Clause ........................... 48

IV.     The Other Factors All Favor Injunctive Relief............................................ 51

CONCLUSION ....................................................................................................... 54

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)............................................................... 42, 43

*A.S. Goldmen & Co. v. N.J. Bur. of Sec.*,
    163 F.3d 780 (3d Cir. 1999)...............................................38

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002)............................................................45

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)............................................................33

*Baldwin v. G.A.F. Seelig, Inc.*,
    294 U.S. 511 (1935)............................................................39

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017)............................................................36

*Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*,
    877 F.3d 136 (3d Cir. 2017).................................................22

*Blessing v. Freestone*,
    520 U.S. 329, 340 (1997)................................................ 23, 24

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)............................................................46

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011)........................................................ 41, 44

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
    273 F.3d 536 (3d Cir. 2001)........................................... *passim*

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
    492 F.3d 484 (4th Cir. 2007)...............................................39

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)............................................................42

*City of Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002) ..................................................................6

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
  801 N.E.2d 1222 (Ind. 2003) ..................................................................6

*City of N.Y. v. Beretta U.S.A. Corp.*,
  524 F.3d 384 (2d Cir. 2008) ........................................................ *passim*

*City of Phila. v. Beretta U.S.A. Corp.*,
  277 F.3d 415 (3d Cir. 2002) ........................................................ 6, 26, 48, 49

*Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*,
  975 F.3d 300 (3d Cir. 2020) ..................................................................53

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ..................................................................38

*DiMartino v. Buckles*,
  129 F.Supp.2d 824 (D. Md. 2001) ..................................................................35

*District of Columbia v. Beretta U.S.A. Corp.*,
  940 A.2d 163 (D.C. 2008) ..................................................................8

*Downey v. Pa. Dep't of Corr.*,
  968 F.3d 299 (3d Cir. 2020) ..................................................................19

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ........................................................ 46, 47

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996) ..................................................................49

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ..................................................................48

*Frein v. Pa. State Police*,
  47 F.4th 247 (3d Cir. 2022) ..................................................................46

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ........................................................ 23, 24

*Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*,
    570 F.3d 520 (3d Cir. 2009) .......................................................... 23, 24

*Greater Phila. Chamber of Com. v. City of Phila.*,
    949 F.3d 116 (3d Cir. 2020) ...............................................................43

*Hamilton v. Beretta U.S.A. Corp.*,
    750 N.E.2d 1055 (N.Y. 2001) ...................................................... 37, 50

*Hazardous Waste Treatment Council v. South Carolina*,
    945 F.2d 781 (4th Cir. 1991).............................................................53

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)...........................................................................38

*Hillman v. Maretta*,
    569 U.S. 483 (2013)...........................................................................26

*Holmes v. Secs. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)...........................................................................36

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ........................................ 18, 23, 31, 49

*In re Acad., Ltd.*,
    625 S.W.3d 19 (Tex. 2021) ......................................................... 7, 19, 23

*Instr. Sys., Inc. v. Comput. Curriculum Corp.*,
    35 F.3d 813 (3d Cir. 1994) ................................................................39

*Jam v. Int'l Fin. Corp.*,
    139 S.Ct. 759 (2019)..........................................................................36

*James v. Arms Tech., Inc.*,
    820 A.2d 27 (N.J. Super. Ct. App. Div. 2003) ......................................6

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017)....................................................... 38, 40

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)...........................................................................42

*Luis v. United States,*
  578 U.S. 5 (2016) ............................................................47

*Medimmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ........................................................21

*N.J. Bankers Ass'n v. Att'y Gen.,*
  49 F.4th 849 (3d Cir. 2022) ............................... 12, 17, 21

*N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.,*
  760 F.3d 297 (3d Cir. 2014) ...........................................22

N.J. Stat. Ann. §2C:58-33(c) ............................................. 14, 46

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  142 S.Ct. 2111 (2022) .....................................................47

*NAACP v. Button,*
  371 U.S. 415 (1963) ........................................................45

*NSSF v. James,*
  No. 1:21-cv-1348 (N.D.N.Y. filed Dec. 16, 2021) ............30

*NSSF v. Jenkins,*
  No. 1:22-cv-01499 (D. Del. filed Nov. 16, 2022) ............16

*People ex rel. Spitzer v. Sturm, Ruger & Co.,*
  761 N.Y.S.2d 192 (N.Y. App. Div. 2003) .........................31

*Ramsay v. Nat'l Bd. of Med. Exam'rs,*
  968 F.3d 251 (3d Cir. 2020) ...........................................53

*Reilly v. City of Harrisburg,*
  858 F.3d 173 (3d Cir. 2017) ...........................................52

*Reno v. ACLU,*
  521 U.S. 844 (1997) ........................................................45

*Rubin v. Coors Brewing Co.,*
  514 U.S. 476 (1995) ........................................................43

*Sherwin-Williams v. Cnty. of Delaware,*
  968 F.3d 264 (3d Cir. 2020) ...........................................18

*Sorrell v. IMS Health Inc.*,
  564 U.S. 522 (2011)...................................................................43

*Stilp v. Contino*,
  613 F.3d 405 (3d Cir. 2010).....................................................51

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)................................................... 12, 17, 21

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017)....................................................47

*TitleMax of Del., Inc. v. Weissman*,
  24 F.4th 230 (3d Cir. 2022).....................................................39

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010).......................................................46

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)................................................................52

*Wash. State Dep't of Soc. & Health Servs.*
  *v. Guardianship Est. of Keffeler*,
  537 U.S. 371 (2003)................................................................28

*Woods v. Steadman's Hardware, Inc.*,
  2013 WL 709110 (D. Mont. Feb. 26, 2013) .....................................23

**Statutes**

18 U.S.C. §924(h) ........................................................................32

42 U.S.C. §1983 ..........................................................................23

15 U.S.C. §7901(a)(2) ....................................................................7

15 U.S.C. §7901(a)(4) ..................................................................29

15 U.S.C. §7901(a)(5) .............................................................. 7, 29

15 U.S.C. §7901(a)(6)........................................................... *passim*

15 U.S.C. §7901(a)(7)........................................................... *passim*

15 U.S.C. §7901(a)(8) .............................................................. 7

15 U.S.C. §7901(b)(1) ............................................................31

15 U.S.C. §7901(b)(2) ............................................................19

15 U.S.C. §7902 .....................................................................24

15 U.S.C. §7902(a) ......................................................... *passim*

15 U.S.C. §7903(2) ...................................................................7

15 U.S.C. §7903(3) ............................................................. 7, 24

15 U.S.C. §7903(4) ...................................................................7

15 U.S.C. §7903(5) ............................................................. 7, 24

15 U.S.C. §7903(6) ...................................................................7

15 U.S.C. §7903(5)(A) .................................................... *passim*

15 U.S.C. §7903(5)(B) ..............................................................8

N.J. Stat. Ann. §2C:2-2(c)(3) ...............................................33

N.J. Stat. Ann. §2C:58-33(a) ............................................ 1, 44

N.J. Stat. Ann. §2C:58-33(d) ..................................................9

N.J. Stat. Ann. §2C:58-34 ............................................. *passim*

N.J. Stat. Ann. §2C:58-35(a) ........................................ *passim*

N.J. Stat. Ann. §2C:58-35(a)(1) .................................... *passim*

N.J. Stat. Ann. §2C:58-35(a)(2) .................................... *passim*

N.J. Stat. Ann. §2C:58-35(a)(3) .............................................10

N.J. Stat. Ann. §2C:58-35(b) ........................................... 10, 38

N.J. Stat. Ann. §2C:58-35(c) ............................................11, 33

N.J. Stat. Ann. §2C:58-35(e) ........................................ *passim*

N.J. Stat. Ann. §2C:58-35(f) ....................................................................11

Pub. L. No. 109-92, 119 Stat. 2095 (2005)................................................7

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ................................................36

*Governor Murphy Signs Sweeping Gun Safety Package 3.0 to Continue the Fight Against Gun Violence*, State of N.J. (July 5, 2022), https://bit.ly/3TdiCM0............................................................52

Office of the Att'y Gen., *Press Release, Acting AG Platkin Launches New Office to Enforce New Jersey's New Firearms Safety Legislation* (July 25, 2022), https://bit.ly/3ZgAM3a.................................. 18, 52

R.F.V. Heuston, *Salmond on the Law of Torts* (17th ed. 1977) .............................35

Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939 (2006) ....................................................................6

Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS............................6

**INTRODUCTION**

Congress passed the Protection of Lawful Commerce in Arms Act in 2005 to stamp out state and local efforts to make law-abiding members of the firearms industry pay for injuries caused by criminals who misuse their lawfully sold products. The PLCAA does not mince words about its preemptive scope. But that did not stop lawmakers in Trenton from trying to circumvent it. Displeased with Congress' judgment, New Jersey enacted a law unabashedly designed to end-run the PLCAA. Indeed, the very first provision of New Jersey Assembly Bill 1765 laments that, although state "officials" want "to pursue civil actions for abatement, damages, and other relief from the negligent, reckless and, in some cases, illegal conduct of bad actors in the gun industry," the PLCAA imposes a "barrier to this relief." N.J. Stat. Ann. §2C:58-33(a). Yet rather than end there—as the Supremacy Clause demands—New Jersey plowed ahead and enacted a law that revives the very sort of unmoored "public nuisance" liability that Congress enacted the PLCAA to inter.

Under A1765, a "gun industry member" can be saddled with liability for "the epidemic of gun violence in New Jersey" based on its "sale, manufacturing, distribution, importing, or marketing," even if *none* of its "conduct" was "unlawful in itself." N.J. Stat. Ann. §§2C:58-33(a), -35(a)(1). A1765 further imposes liability anytime an industry member fails to "establish, implement, and enforce *reasonable* controls regarding its manufacture, sale, distribution, importing, and marketing,"

again even if the industry member complied with all existing legal and regulatory obligations. *Id.* §2C:58-35(a)(2) (emphasis added). A1765 thus allows New Jersey to hold law-abiding industry members liable under nebulous "reasonableness" standards and to make them pay for harms caused by criminals. In other words, it authorizes exactly what the PLCAA forbids.

It is little surprise, then, that the state spends much of its brief trying to evade review of whether A1765 is preempted. But none of its efforts moves the needle. After having enacted a law that specifically targets the firearms industry, created and staffed a brand-new office charged only with enforcing that statute, declined repeated invitations to foreswear its intention to put its new office and statute to work against industry members (many of which are members of plaintiff NSSF), and sought an "emergency" stay on the theory that the state would suffer irreparable harm if it were unable to enforce A1765 against NSSF's members during the pendency of this appeal, New Jersey now argues that there is no case or controversy here. The reason that argument has gone 0-for-3 so far should be obvious: The state's own representations confirm that NSSF's members "face[] a substantial threat of future enforcement under A1765," which is all Article III requires. JA9.

When New Jersey finally turns to the merits, its assault on the district court's carefully reasoned decision would require reading the PLCAA to destroy itself. The PLCAA exempts from its broad preemptive scope suits alleging that a licensed

firearms manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm], and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. §7903(5)(A)(iii). According to New Jersey, this narrow exception empowers states to reinstate the exact sort of suits that led Congress to enact the PLCAA; so long as a state codifies those theories in a statute that applies to the firearms industry, New Jersey insists, the PLCAA is no obstacle. That implausible construction of the so-called predicate exception would make nonsense of the PLCAA, sneaking in through the back door what Congress kicked out the front. As the district court correctly recognized in rejecting that theory and enjoining enforcement of A1765, text, context, case law, and common sense squarely foreclose reading the "predicate exception to swallow the statute." *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008).

That is reason enough to affirm. But it is far from the only reason. In its haste to countermand Congress' judgment, New Jersey enacted a statute that directly regulates firearms commerce *anywhere in the country*, so long as it has some ultimate effect in New Jersey. Even if a manufacturer operating solely in (say) Wyoming complies with all federal and Wyoming laws and regulations, it still could be held be liable under A1765, based entirely on its commercial activities *in Wyoming*, if one of its firearms years later illegally finds its way into the hands of someone who misuses it to commit a crime in New Jersey and New Jersey deems

the manufacturer's or seller's out-of-state marketing or theft-protection controls to have been "unreasonable." Making matters worse, A1765 greenlights liability based on truthful, non-misleading speech about lawful (and constitutionally protected) products, yet offers no guidance as to what it means to market lawfully but "unreasonably." The statute also singles out lawful commerce in constitutionally protected arms for the imposition of potentially massive liability and authorizes injunctions imposing restrictions on how out-of-state industry members must conduct their businesses nationwide—restrictions without precedent in the historical traditions of this nation's regulation of firearms. And its amorphous liability provisions leave industry members guessing whether their lawful conduct will be deemed to have been "unreasonable" or to have "recklessly … contribute[d] to" the intentional actions of third-party criminals with whom they never dealt and over whom they have no control.

Finally, the remaining factors all favor an injunction as well, as the district court correctly concluded. For any and all of these reasons, this Court should affirm.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and §1343(a)(3). It entered an order granting a preliminary injunction on January 31, 2023. ECF 18. Plaintiffs timely filed a notice of appeal on February 2, 2023. ECF 19; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly concluded that NSSF is likely to succeed on the merits of its claim that the PLCAA preempts A1765.

2.      Whether A1765 violates the Commerce Clause, the First Amendment, the Second Amendment, and/or the Due Process Clause.

3.      Whether the district court acted within its broad discretion in concluding that balance of the preliminary-injunction factors favors enjoining A1765.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. In the 1990s, state and local governments initiated a series of lawsuits in response to concerns about violent crimes involving firearms.  Yet rather than train their sights on the criminals responsible for those acts, they sued federally licensed manufacturers and distributors of legal firearms that were lawfully manufactured and lawfully sold and that functioned as intended.  For instance, Camden County, New Jersey, sued licensed "handgun manufacturers" alleging that their (heavily regulated and fully lawful) "marketing and distribution policies and practices" rendered them "liable under a public nuisance theory for the governmental costs associated with the criminal use of handguns."  *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 538 (3d Cir. 2001) (per curiam). A district court dismissed the complaint, and this Court affirmed, *id.*, as it did when

it confronted a similar effort by Philadelphia a year later, *City of Phila. v. Beretta U.S.A. Corp.*, 277 F.3d 415, 419 (3d Cir. 2002).

But similar suits proliferated, and some courts were more solicitous of these novel theories. *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-44 (Ohio 2002) (allowing, *inter alia*, public nuisance claims); *James v. Arms Tech., Inc.*, 820 A.2d 27, 50-53 (N.J. Super. Ct. App. Div. 2003) (same); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32 (Ind. 2003) (same). And while not all such suits succeeded on the merits, winning in court was not the only, or even the principal, objective; the real goal was to hobble the industry. Recognizing that "[t]he legal fees" needed to defend against a rising tide of similar suits "alone" would have been "enough to bankrupt the industry," Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS, state and local governments "pressed on" with their novel suits "regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry," Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

Congress saw these lawsuits for what they were: a coordinated effort to saddle the firearms industry with liability for the acts of criminals. The state- and local-government plaintiffs not only pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States," but threatened

interstate comity, as much of the commercial conduct they sought to penalize took place in another state where it was fully lawful. 15 U.S.C. §7901(a)(7)-(8). Their novel suits also came at a substantial cost to individual rights, including the right to keep and bear arms and industry members' right to pursue their trade. *Id.* §7901(a)(2), (6)-(7). And Congress found it simply unfair for state and local governments to make heavily regulated and law-abiding businesses pay to redress "the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* §7901(a)(5).

2. Congress passed the PLCAA to put an end to such efforts. Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§7901-7903). The PLCAA broadly prohibits "any person," "including any governmental entity," from bringing any "civil liability action" against any federally licensed "manufacturer or seller" of a firearm or related product seeking any "relief[] resulting from the criminal or unlawful misuse of a qualified product by … a third party." 15 U.S.C. §§7902(a), 7903(2)-(6). This is not just a defense against liability. As the state itself previously acknowledged, the PLCAA confers a substantive "immunity" from certain kinds of suits altogether. CA3.Dkt.11 at 16; *see In re Acad., Ltd.*, 625 S.W.3d 19, 33-34 (Tex. 2021).

That immunity is subject to only a handful of exceptions for actions in which a federally licensed manufacturer or seller of a firearm or related product has

allegedly engaged in some well-defined type of wrongful conduct.  For example, the PLCAA does not preempt certain types of suits against sellers who have been convicted of transferring a firearm to a prohibited person.  *Id.* §7903(5)(A)(i).  It similarly exempts suits for negligence per se and negligent entrustment, *id.* §7903(5)(A)(ii), with the latter defined as supplying a firearm to someone "the seller knows, or reasonably should know, … is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others," *id.* §7903(5)(B).  And it exempts suits for breach of contract or warranty and product defect, as well as actions brought by the U.S. Attorney General to enforce certain federal laws.  *Id.* §7903(5)(A)(iv)-(vi).

Finally, the PLCAA does not preempt actions in which a federally licensed manufacturer or seller is alleged to have "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm or related] product" where "the violation was a proximate cause of the harm for which relief is sought."  *Id.* §7903(5)(A)(iii).  This provision has come to be known as the "predicate exception" because, "to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation."  *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008).  Congress made clear, however, that not just any statutory violation will suffice.  The predicate exception covers only those actions that require a "knowing[]" violation that was "a proximate cause" of

the plaintiff's injury.  15 U.S.C. §7903(5)(A)(iii).  And it includes two illustrative examples of the types of statutes that suffice, each of which imposes specific obligations on how firearms may be sold:  a law imposing record-keeping requirements; and a law prohibiting firearms suppliers from aiding, abetting, or conspiring in straw purchases of their products.  *Id.* §7903(5)(A)(iii)(I)-(II).

3. The PLCAA accomplished Congress' goal of deterring intrepid state and local governments from seeking to hold firearms manufacturers and sellers liable for criminals' misdeeds for a while.  But not forever.  In 2022, New Jersey joined a recent effort by a handful of states to jump back into the fray, enacting a law specifically crafted to try to circumvent the PLCAA.

First, A1765 creates a new "cause of action for public nuisance" that applies only to "gun industry members," *i.e.*, those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product."[1]  N.J. Stat. Ann. §§2C:58-33(d), -34.  Under A1765, industry members may be held liable for "the sale, manufacturing, distribution, importing, or marketing of a gun-related product," even if their conduct took place wholly out of state and was entirely lawful where it

---

[1] "Gun-related product" is defined as "any firearm, ammunition, ammunition magazine, firearm component or part" that "was possessed in this State" (by anyone) "and as to which it was reasonably foreseeable that the product would be possessed or used in this State" (by anyone), even if the industry member did not manufacture or sell it in New Jersey.  N.J. Stat. Ann. §2C:58-34.

occurred, if a New Jersey court later deems it to have "knowingly or recklessly create[d] … or contribute[d] to a public nuisance in this State." *Id.* §2C:58-35(a)(1). And "public nuisance" is broadly defined not just by reference to the "common law," but to include "any condition" that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others." *Id.* §2C:58-34.

Second, A1765 imposes liability anytime an industry member fails to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products"—which A1765 (unhelpfully) defines to mean unidentified "reasonable procedures, safeguards, and business practices" that are designed to "prevent the loss … or theft of a gun-related product" and "prevent the sale or distribution of a gun-related product to …. a person prohibited from possessing a firearm"—again, even if the industry member complied with all existing legal obligations. *Id.* §§2C:58-34, -35(a)(2). Failure to abide by this nebulous "reasonable controls" obligation likewise "shall be a public nuisance" if it results in harm to the public. *Id.* §2C:58-35(a)(3).

A1765 vests the Attorney General with the power to "commence an action to seek" injunctive relief; "an order providing for abatement of the nuisance at the expense of the defendant"; "restitution"; "damages;" attorneys' fees and costs; "and any other appropriate relief." *Id.* §2C:58-35(b).  It further empowers the Attorney

General to "establish" a distinct governmental "unit" whose sole charge is to enforce A1765, *id.* §2C:58-35(f), which the Attorney General has since established, *see* JA9.

A defendant's intent is not relevant to liability. "To prevail in an action under this section, the Attorney General shall not be required to demonstrate that the gun industry member acted with the purpose to engage in any public nuisance or otherwise cause harm to the public." N.J. Stat. Ann. §2C:58-35(c). Nor is proof of "special injury" required. *See id.* Finally, proximate cause is "deemed" to be satisfied based solely on a loose form of foreseeability: "[T]he conduct of a gun industry member shall be deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties." *Id.* §2C:58-35(e).

### B.    Procedural Background

Plaintiff National Sports Shooting Foundation ("NSSF") is the trade association for the firearm, ammunition, and hunting and shooting sports industry.[2] It filed suit shortly after A1765 took effect, seeking a preliminary injunction and a declaration that A1765 is preempted and unconstitutional. Dist.Ct.Dkt.4.

---

[2] The state suggests that NSSF does not know who its members are. NJ.Br.8. Nonsense. All NSSF "represented" to the state was that it does not share that private information without need. As the state ultimately concedes, NSSF offered to inform the state, in advance of any suit "against a suspected bad actor," NJ.Br.8, whether the person or entity is an NSSF member.

1. The district court granted a preliminary injunction.  It first found Article III standing easily satisfied.  As the court explained, A1765 was enacted for the express purpose of suing those who, like NSSF's members, are engaged in the (lawful and heavily regulated) manufacturing, distribution, sale, and marketing of firearms; "the Attorney General … created an entirely new office with the specific mandate of bringing civil enforcement actions under A1765"; and the Attorney General "appears intent to do just that."  JA7-9; *see Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 160 (2014); *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 855 (3d Cir. 2022).

Moving to the merits, the court concluded that NSSF is likely to succeed on its claim that A1765 is preempted.  As the court explained, "[i]t is contrary to the PLCAA to hold an industry member liable who complies with all laws but did not know that it failed to employ 'reasonable procedures, safeguards, and business practices,' or has conducted its lawful business in a manner so 'unreasonable under all the circumstances' that it can be said to have 'contribute[d] to'" a "public nuisance."  JA14-15.  Yet that is precisely what A1765 does.  And the predicate exception cannot save the statute, as "both the specific and broader context in which 'applicable to' is used"—including that "[t]he predicate exception exempts only those civil actions that require proof that the actor *knowingly* violated the relevant statute"—confirm that only those laws that "impose a concrete obligation with which industry members can confidently ensure compliance" can be predicate

statutes.  JA15.  In sum, the court concluded, A1765 "directly conflict[s] with the intention of Congress" and would "'gut the PLCAA.'" JA16.

As for NSSF's constitutional challenges, the court noted that it "has concerns as to whether A1765 can survive on Constitutional grounds" but declined to "address th[ose] issues at this time" given its preemption ruling.  JA17.

Finally, the court found that the other preliminary-injunction factors weigh in favor of relief too.  "NSSF members are … required to either comply with the statute, which would result in members being subject to the vague requirement to enforce 'reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products,' … or be faced with prosecution and fees upon Al765's enforcement for noncompliance."  JA20.  The risk of prosecution is particularly acute given that the Attorney General has set up a unit specifically to prosecute A1765 suits. JA20.  And in light of the Eleventh Amendment, "recovering money damages from either complying with A1765 or the fines assessed for noncompliance" would be impossible even if "the Court ultimately find[s] Al765 preempted (or unconstitutional)."  JA20.  Meanwhile, the state has no "legitimate interest in the enforcement of an unconstitutional law," while "'the public interest clearly favors the protection of constitutional rights.'"  JA21-22.

2. The state asked the district court to stay its injunction pending appeal. Before that court could rule, the state sought the same relief from this Court on an

"emergency" basis.  A few days later, the district court denied the state's motion. This Court subsequently denied the state's motion in substantial part, but narrowed the injunction to allow the Attorney General to "continue to enforce [A1765]" "against anyone other than [NSSF], its members, or their agents and licensees"; against persons and entities not protected by the PLCAA; "in cases not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third party' within the meaning of 15 U.S.C. §7903(5)(A)"; and "by bringing actions that fall within the exceptions set forth in 15 U.S.C. §7903(5)(A)(ii), (iii)(I), or (iii)(II)."  CA3.Dkt.16.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Plaintiffs are unaware of any other challenge to A1765.

## STANDARD OF REVIEW

The state's brief correctly outlines the standard of review.

## SUMMARY OF ARGUMENT

The PLCAA preempts state efforts to make firearms manufacturers and sellers pay for harms "resulting from the criminal or unlawful misuse of [their products] by … a third party."  15 U.S.C. §7903(5)(A).  That is precisely what A1765 authorizes. As its codified findings explain, A1765 is designed to facilitate efforts to hold those engaged in the lawful "sale, manufacture, distribution, and marketing of … legal[] gun-related products" liable for harms resulting from "gun violence" even if none of their own conduct is "unlawful in itself."  N.J. Stat. Ann. §§2C:58-33(c), -35(a)(1).

And A1765 does just that, subjecting industry members to liability for harms caused by "intervening … criminal actions" if they made, sold, or marketed firearms in a way that the state deems "unreasonable." *Id.* §§2C:58-34, -35(a), (e). A1765 thus seeks to revive the exact kind of nebulous tort actions against licensed industry members that the PLCAA says "may not be brought." 15 U.S.C. §7902(a).

According to New Jersey, the PLCAA's "predicate exception," 15 U.S.C. §7903(5)(A)(iii), empowers states to resurrect the very lawsuits the statute was enacted to inter, through the simple expedient of codifying the same novel theories that Congress derided as an "abuse of the legal system," *id.* §7901(a)(6), into a statute that applies to the firearms industry. Congress did not enact such a self-defeating law. To the contrary, the predicate exception makes clear in its text what sort of "statute[s] applicable to the sale or marketing of" firearms it saves: those that impose the kinds of concrete obligations or prohibitions that one can "knowingly violate[]," like a law prohibiting manufacturers and sellers from "ma[king] any false entry in" required records of their sales, *id.* §7903(5)(A)(iii)(I), or from "aid[ing]" or "abet[ing]" a straw purchase, *id.* §7903(5)(A)(iii)(II). A law that, like A1765, simply tells industry members to "act reasonably" when lawfully making, selling, or marketing guns, and allows them to be held liable for the distant consequences of others' misconduct even if they followed all applicable federal, state, and local laws,

manifestly does not fit that bill.  Any other conclusion "would allow the predicate exception to swallow the statute." *Beretta*, 524 F.3d at 403.

Making matters worse, A1765 is unconstitutional in multiple respects.  A1765 imposes liability on licensed and law-abiding members of the firearms industry for truthfully speaking about firearms in ways the state deems "unreasonable"; for lawfully manufacturing and selling lawful (and constitutionally protected) products out of state; in ways with no basis in this country's historical tradition of firearms regulation; and in terms so vague that one cannot even know how to comply.  All of that is unconstitutional, and flagrantly so.  The district court did not reach those claims given that it enjoined A1765 in its entirety.  Yet under this Court's narrowed injunction, some of those unconstitutional applications may slip through the cracks. And A1765 is just the tip of the iceberg:  Within this circuit, Delaware has enacted a materially indistinguishable statute of its own that soon will find its way to this Court.  *See NSSF v. Jenkins*, No. 1:22-cv-01499 (D. Del. filed Nov. 16, 2022) (challenging Del. Senate Bill 302 (2022)).  Outside this circuit, copycat laws are proliferating.  *See, e.g.*, Wash. Senate Bill 5078 (2023); Cal. Assembly Bill 1594 (2022).  Statutes like these are anathema, and this Court should hold as much.

## ARGUMENT

**I.    The State's Efforts To Evade The Merits Fail.**

**A.    Article III Is Satisfied.**

The state begins by arguing that NSSF lacks standing, on the theory that its members do not face "a substantial threat of future enforcement under the statute." NJ.Br.13 (quoting *N.J. Bankers Ass'n*, 49 F.4th at 855-56). This effort to evade federal-court review fares no better now than when the district court rejected it or the state renewed it in its stay papers before this Court. To bring a pre-enforcement challenge to a statute, a plaintiff must have "an intention to engage in a course of conduct arguably affected with a constitutional interest," that conduct must be "'arguably … proscribed by [the] statute,'" and "the plaintiff['s] fear of prosecution" must not be "'imaginary or wholly speculative.'" *Susan B. Anthony List,* 573 U.S. at 160-61. The state wisely does not contest the first factor, and the arguments it does make are inconsistent with the law and the facts.

First, the state's argument that NSSF's members do not face a real threat of enforcement under A1765 does not pass the straight-face test given the state's own actions. The Attorney General has "created an entirely new office with the specific mandate of bringing civil enforcement actions under A1765"—i.e., suing NSSF's members—and he has never disavowed his "intent to do just that." JA9; *see* Office of the Att'y Gen., *Press Release, Acting AG Platkin Launches New Office to Enforce New Jersey's New Firearms Safety Legislation* (July 25, 2022),

https://bit.ly/3ZgAM3a. Quite the opposite: The state filed an "emergency" motion to stay the district court's preliminary injunction, and claimed as injury that the injunction *prevents it from suing NSSF and/or its members under A1765 during the appeal*. CA3.Dkt.11 at 17. The state nowhere even tries to reconcile those positions, even though NSSF highlighted the inconsistency repeatedly in responding to the state's stay requests. Dist.Ct.Dkt.27 at 5-6; CA3.Dkt.14 at 8-9. The state still has no explanation for how it could claim irreparable harm from the injunction while simultaneously claiming that NSSF's members face no threat of enforcement.

Instead, the state points yet again to *Sherwin-Williams v. County of Delaware*, 968 F.3d 264 (3d Cir. 2020). But that case is readily distinguishable, as NSSF has repeatedly explained (in arguments the state continues to ignore). Dist.Ct.Dkt.27 at 6; CA3.Dkt.14 at 9. The principal problem there was not that Sherwin-Williams failed to show that the threatened lawsuit was sufficiently likely to occur. It was that Sherwin-Williams "did not establish that such a lawsuit would cause a concrete *injury* to its constitutional rights," because the injuries it alleged would have come to pass only if the county sued *and prevailed*. 968 F.3d at 270.

Here, by contrast, it is the very act of being subjected to an amorphous nuisance suit under A1765 that would injure NSSF and its members, as the PLCAA "creates a substantive rule of law granting [them] immunity" against the suits it bars. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009); *see also Beretta*, 524 F.3d

at 398; *In re Acad.*, 625 S.W.3d at 32-36. That is plain on the face of the statute, which provides that certain types of lawsuits "*may not be brought*" against federally licensed "manufacturer[s] or seller[s] of [firearms], or [their] trade association[s]." 15 U.S.C. §§7902(a), 7903(5)(A) (emphasis added). Notably, "Congress did *not* say that 'no liability may be imposed in a qualified civil liability action' or that 'a manufacturer or seller of a qualified product may not be held liable in a qualified civil liability action'; it said that such an action 'may not be brought.'" *In re Acad.*, 625 S.W.3d at 33. As the state itself acknowledges, *see* NJ.Br.19 n.1, "Congress elsewhere has distinguished between a prohibition against bringing a suit or claim and a prohibition against imposing liability." *In re Acad.*, 625 S.W.3d at 33 (citing examples). And in the PLCAA, it opted for the immunity approach.

That is no accident; one of the animating concerns behind the PLCAA was that being forced to defend against such sprawling suits would be so burdensome as to drive firearms industry members out of business. *See* 15 U.S.C. §7901(a)(6), (b)(2). That concern is especially acute when it comes to suits brought by states, which are immune under the Eleventh Amendment from any effort to recoup monetary losses. *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020). The state's argument that NSSF's members must sit and wait for the suits it has promised this Court it intends to bring is really an admission that they can *never* avoid the irreparable injury that the PLCAA guards against. And that is to say

19

nothing of the distinct injuries that NSSF and its members are *already* suffering on account of the state's failure to identify what exactly would make their lawful (and mostly out-of-state) manufacturing and marketing of firearms—conduct imbued with both First and Second Amendment protection—so "unreasonable" as to expose them to massive liability for harms caused by total strangers. *See infra* Part III.

The state protests that A1765 "does not create liability for making or selling firearms," but rather "imposes liability for an industry member's own *misconduct*." NJ.Br.15. But that ignores how the statute actually works. Under A1765, every "gun industry member" in the country is at constant risk of being sued by the Attorney General for the "sale, manufacturing, distribution, importing, or marketing of a gun-related product," even if its conduct is *not* "unlawful in itself," if someone else misuses one of its products in New Jersey and the Attorney General decides that its lawful (and constitutionally protected) manufacturing, marketing, or selling was "unreasonable." N.J. Stat. Ann. §2C:58-35(a)(1); *see also id.* §2C:58-35(a)(2) (requiring "reasonable controls"). Indeed, the state has never denied that A1765 puts industry members at risk of liability for commercial firearms activity that is not unlawful anywhere—not to mention for non-misleading advertising about lawful and constitutionally protected products. *See infra* Part III.B.

That readily satisfies the low legal bar of demonstrating that NSSF and its members are engaged in conduct that is at least "arguably … proscribed by [the]

statute." *N.J. Bankers Ass'n,* 49 F.4th at 855 (alterations in original). As this Court recently explained, "[a]rguably proscribed is not a stringent test. In *Susan B. Anthony List,* the Supreme Court deemed it sufficient that a statute appeared broad enough to cover the intended conduct." *Id.* A1765 is "broad enough" and then some. Indeed, the very fact that the state describes conduct not unlawful in itself as actionable "*misconduct*," NJ.Br.15, proves the point. It is not NSSF's burden to guess which lawful practices the Attorney General will decide are "unreasonable." Nor must NSSF plead its members into liability, *see Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-29 (2007), particularly given that A1765 sweeps so broadly, *see Susan B. Anthony List,* 573 U.S. at 162-63. The state has said—repeatedly—that it fully intends to deploy A1765 against NSSF's members, which it apparently considers appropriate targets for no other reason that they participate in the legal firearms industry. Article III requires nothing more.

**B.    The State's Remaining Arguments Are Waived and Wrong.**

The state's remaining efforts to avoid the merits fare no better. It first makes the extraordinary claim that *no one* can *ever* bring "an offensive lawsuit asserting that PLCAA preempts [state] law." NJ.Br.17-21. There are myriad problems with this argument, but this Court need not tarry over it for long, as the state admittedly "did not raise this issue below." NJ.Br.21.

New Jersey asks this Court to forgive its forfeiture, but it identifies no compelling reason to do so. To the contrary, the logic of its plea would effectively excuse government defendants (and them alone) from ordinary party presentation rules. After all, it is hardly unusual for a challenge to state action to "'affect a wide range' of entities 'beyond the immediate parties to the suit.'" NJ.Br.22. Moreover, the state's own cases confirm the impropriety of grace here. The two cases it cites that forgave forfeiture did so in favor of a party seeking to *enforce* federal rights, not to obliterate them. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 148-50 (3d Cir. 2017); *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 305 (3d Cir. 2014). The state should not be allowed to convert rights-protective precedents into a green light to assert a rights-denying argument it could have raised long ago. Forfeiture is to be forgiven only exceptionally, *see Barna*, 877 F.3d at 147, not just because the forgetful party is a government entity.

In all events, this late-breaking argument is wrong. The state argues at length that the PLCAA does not create a cause of action, NJ.Br.20-21, but NSSF filed this suit under Section 1983, which creates a federal cause of action against state-government officials for "the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws" of the United States.  42 U.S.C. §1983.[3]

Section 1983 allows private parties to enforce "*individual* entitlement[s]" conferred

on them "by federal statutes."  *Blessing v. Freestone*, 520 U.S. 329, 340, 343 (1997).

That is exactly what NSSF is doing here.  Indeed, while the state insists that the

PLCAA confers nothing more than an "affirmative defense," that argument is at odds

with more than a decade of precedent holding that the PLCAA confers an affirmative

right for federally licensed industry members to engage in the lawful manufacturing,

sale, and marketing of firearms free from amorphous public-nuisance suits.  *See*

*supra* pp.18-19; *Ileto*, 565 F.3d at 1142; *Beretta*, 524 F.3d at 398; *In re Acad.*, 625

S.W.3d at 32-36.

    Those holdings are eminently correct.  First, the PLCAA's "'rights-creating

language'" is clearly "phrased in terms of the persons benefitted," *Grammer v. John*

*J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 528 (3d Cir. 2009) (quoting *Gonzaga*

*Univ. v. Doe*, 536 U.S. 273, 287 (2002)), granting new rights exclusively to those

engaged in the manufacture or sale of firearms—i.e., to NSSF's members.  *See* 15

U.S.C. §§7901(b)(5), 7903(5)(A).    Second, far from being "so 'vague and

amorphous' that its enforcement would strain judicial competence," *Grammer*, 570

---

[3] That suffices to distinguish *Woods v. Steadman's Hardware, Inc.*, where the defendant confusingly argued, in a removal context, that its PLCAA defense was actually a cause of action.  2013 WL 709110, at *2-3 (D. Mont. Feb. 26, 2013).

F.3d at 525, the PLCAA's protections are set out in two short sentences that go to a core competency of the courts:  granting immunity from suit.  *See* 15 U.S.C. §7902. Third, "the statute unambiguously imposes a binding obligation on the states," *Grammer*, 570 F.3d at 525, prohibiting "any person," "*including any governmental entity*," from bringing "[a] qualified civil liability action … in any Federal or State court." 15 U.S.C. §§7902(a), 7903(3), (5) (emphasis added).  In short, when it comes to efforts to confer immunity from suit, the PLCAA is about as clear as it gets.

Rather than focus on the text, the state points to cases rejecting attempts to transform *spending power* legislation into individual-rights-conferring legislation. *See* NJ.Br.18 (citing *Blessing*, 520 U.S. at 340; *Gonzaga*, 536 U.S. at 290).  But NSSF is not a third-party beneficiary trying to infer rights from someone else's contract with the government; its members are the explicit and exclusive category of recipients of the immunity the PLCAA confers.  The state notes that most decisions "interpreting PLCAA arose from an affirmative defense," NJ.Br.18, but that says nothing about the availability of Section 1983 suits.  It simply serves as a reminder that, until last year, no state had enacted a law that authorizes the very sort of nebulous tort suits against which the PLCAA immunizes NSSF's members.

Finally, the state contends that "this Court need not even decide whether NSSF enjoys a private right or is properly construing the predicate exception" because (it says) NSSF is "demanding a facial injunction" to which it has not proven it is

entitled.  NJ.Br.34-35.  Wrong again.  NSSF did not confine itself to "demanding a facial injunction."  It argued that A1765 cannot lawfully be applied to hold NSSF or its members liable for specifically identified conduct and sought an injunction barring the state from enforcing the law to the extent it is preempted and/or unconstitutional.  *See* JA26 ¶7, JA90-93 ¶¶6-7, 13-17; JA94-96 ¶¶5-6, 12-14.  If the state thought there were potential applications of A1765 that do not implicate NSSF's challenges, it was free to make that argument below as a basis for narrowing any injunction that may issue, as it did in its stay motion to this Court.  Instead, the state chose to defend on an all-or-nothing basis, insisting that NSSF was entitled to no relief whatsoever.  *See* JA99-152.  It is thus *the state*'s litigation choices, not NSSF's, that led to a facial injunction.  In all events, to the extent this Court thinks that relief is overbroad, the answer is not to reward the state by depriving NSSF of any relief whatsoever.  It is simply to narrow the injunction as the Court deems necessary, just as it did in response to the state's stay request.[4]

---

[4] NSSF does not oppose this Court permanently narrowing the preliminary injunction to apply only to "[NSSF], its members, or their agents or licensees" and those who satisfy the definitions in 15 U.S.C. §7903, and to exclude actions "that fall within the exceptions set forth in 15 U.S.C. §7903(5)(A)(ii), (iii)(I), or (iii)(II)." CA3.Dkt.16 ¶¶a, b, d.  NSSF does, however, oppose narrowing the injunction to exclude cases "not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third party' within the meaning of 15 U.S.C. §7903(5)(A)," CA3.Dkt.16 ¶c, as the state seems to think that would cover *all* cases brought under A1765, *see* NJ.Br.33.  If this Court is inclined to keep that carve-out, at the very least it should make clear that it covers only cases in which an

## II.     A1765 Is Preempted.

It is little wonder why the state devotes so much attention to diversions from the merits:  The district court was spot-on in holding that A1765 is preempted.

1. Under the PLCAA, a "qualified civil liability action may not be brought." 15 U.S.C. §7902(a).  The state does not deny that the suits A1765 authorizes fit that bill.  Indeed, they are precisely the kinds of suits the PLCAA was enacted to inter.  This is not a case in which one must comb through obscure legislative history to divine "Congress' purposes and objectives."  *Hillman v. Maretta*, 569 U.S. 483, 491 (2013).  Congress enshrined them right in the statute.  The unambiguous goal of the PLCAA is to foreclose efforts to impose liability on those engaged in lawful commerce in firearms through novel and expansive "theories without foundation in hundreds of years of the common law and jurisprudence of the United States," 15 U.S.C. §7901(a)(7), like Camden's and Philadelphia's "unprecedented" attempts to declare the lawful sale and manufacturing of firearms a public nuisance, *see Camden*, 273 F.3d at 540; *Philadelphia*, 277 F.3d at 421.  New Jersey's claim that it may bring exactly the kind of public nuisance suits that Congress enacted the PLCAA to foreclose thus must be met with greatest of skepticism and confirmed by the plainest of text.  Yet, as the district court correctly recognized, all New Jersey

---

industry member's conduct is independently unlawful, lest the state convert it into an exception that swallows the injunction's rule and violates the Constitution. *See infra* Part III.

offers is a wooden reading of the statute at odds with text, context, case law, and common sense.

The state invokes only one of the PLCAA's exceptions to try to justify A1765: the predicate exception, which saves from preemption "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. §7903(5)(A)(iii). But the predicate exception cannot sensibly be read, as the state posits, to exempt any and all statutes that apply to the firearms industry, as such a capacious reading "would allow the predicate exception to swallow the statute." *Beretta*, 524 F.3d at 403. In reality, the predicate exception exempts only actions predicated on laws that impose concrete obligations or prohibitions that industry members can actually knowingly violate (or knowingly comply with), not laws that merely impose general duties of care, and do away with proximate cause for good measure. That conclusion follows directly from text, context, and common sense.

At the outset, the predicate exception exempts only civil actions that require proof that the defendant "*knowingly* violated" the relevant statute. 15 U.S.C. §7903(5)(A)(iii) (emphasis added). That presumes some requirement or obligation sufficiently concrete that an industry member can actually knowingly violate it at the time of manufacture or sale. The illustrative examples Congress supplied

confirm the point.  "The general language … []providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to" two illustrative examples. *Beretta*, 524 F.3d at 402. "Thus," under basic principles of interpretation, the general "applicable to" language must be "construed to embrace only objects similar to those enumerated by" the two specific examples that follow.  *Id.* (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)).

Notably, both of those examples require a violation of a concrete obligation or prohibition.  The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter information required at the time of the sale, or aiding, abetting, or conspiring with someone to make a false statement material to the lawfulness of a sale.  15 U.S.C. §7903(5)(A)(iii)(I).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  *Id.* §7903(5)(A)(iii)(II).  Those examples look nothing like A1765, which effectively just commands industry members to conduct their operations "reasonably," without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "unreasonable under all the

circumstances," and which could cover even circumstances that become evident only long after the manufacture or sale. *See* N.J. Stat. Ann. §2C:58-35(a).

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not duties of care. As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products" "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). As the Second Circuit has explained, the term "lawful" is best understood in light of statutory context to mean "activities having been done in compliance with statutes like those described in" the immediately preceding finding: "the Gun Control Act of 1968, the National Firearms Act, and the Arms [Export] Control Act." *Beretta*, 524 F.3d at 402-03; *see* 15 U.S.C. §7901(a)(4). Those statutes do not impose amorphous commands to manufacture and sell firearms "reasonably." They are comprehensive regulatory regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, can sensibly be said to violate *knowingly*) in real time.

2. That is precisely what the district court meant in concluding that, "[a]ccounting for both the specific and broader context in which 'applicable to' is

used," a predicate statute must be one that "impose[s] a concrete obligation with which industry members can confidently ensure compliance." JA15. The court explained that, given the surrounding text, including the "knowingly requirement," a regulated entity would "necess[arily]" need "to have a sufficiently concrete duty to have knowingly violated a relevant," *i.e.*, "applicable," "statute." JA15. The state has no answer for that contextual analysis. Instead, it just caricatures the decision below and derides the court's "construction of the predicate exception" as "unprecedented." NJ.Br.3, 23, 25. But the state neglects to mention that the district court was only the second court in history (and in so many years) to confront the dubious argument that the predicate exception permits states to evade the PLCAA simply by codifying in a firearms-specific statute the same public-nuisance theories that the PLCAA declares "an abuse of the legal system." 15 U.S.C. §7901(a)(6); *see NSSF v. James*, No. 1:21-cv-1348 (N.D.N.Y. filed Dec. 16, 2021), *appeal pending*, No. 22-1374 (2d Cir.).

Moreover, other courts *have* confronted the closely related argument that the PLCAA can be evaded by pointing to a *general* public-nuisance statute—and, in soundly *rejecting* that argument, they just as soundly rejected the argument that "applicable" means literally any statute that applies to the firearms industry. As those courts explained, "the text and purpose of the PLCAA show[] that Congress intended to preempt general tort theories of liability even in jurisdictions … that

have codified such causes of action" in statutes applicable to the firearms industry. *Ileto*, 565 F.3d at 1136; *Beretta*, 524 F.3d at 403. The problem Congress had with the novel and amorphous pre-PLCAA nuisance and tort suits was not that they were brought pursuant to the common law; it is that they sought to "expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States." 15 U.S.C. §7901(a)(7). That is why Congress opted "[t]o prohibit [such] causes of action" entirely, *id.* §7901(b)(1), not just when they are brought pursuant to the common law.

The absence of any distinction in the PLCAA's findings and purposes between common-law and statutory nuisance claims is especially telling given that several of the cases Congress enacted the PLCAA to shut down involved both common-law and statutory nuisance claims. *See, e.g.*, *Ileto*, 565 F.3d at 1130; *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 194 (N.Y. App. Div. 2003). Yet when Congress went to the trouble of articulating precisely what it enacted the PLCAA to accomplish, it said not a word about saving novel expansions of the common law that have the imprimatur of the state legislature, whether through a firearms-specific statute or otherwise. Congress instead explained that the goal of PLCAA is "[t]o prohibit *causes of action* against [firearms industry members] for the harm solely caused by the … unlawful misuse of [firearms and related products] by others." 15 U.S.C. §7901(b)(1) (emphasis added). The notion that states can

31

avoid that prohibition through the simple expedient of codifying the same "causes of action" the PLCAA was enacted to "prohibit" beggars belief.

Indeed, New Jersey does not even try to explain why Congress would want to leave such a gaping hole in the PLCAA. It instead just repeatedly insists that it seeks "to hold industry members accountable for their own misconduct." NJ.Br.1, 5, 15. That argument might cut it if the state had actually confined itself to authorizing civil suits against those who "sell[] illegal ghost guns in New Jersey or consciously sell[] weapons to straw purchasers," NJ.Br.6—*i.e.*, to conduct that is already illegal under state and/or federal law, *see, e.g.*, 18 U.S.C. §924(h). But that is not what A1765 does. By its terms, the statute renders industry members liable for conduct that is "*either* unlawful in itself *or* unreasonable under all the circumstances." N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added). Indeed, A1765 explicitly contemplates that full compliance with all state and federal laws governing commerce in firearms is *not* a defense to liability. *See id.* §2C:58-34. A1765 thus seeks "to hold industry members accountable for their own misconduct," NJ.Br.1, only in the exceedingly strained way that pre-PLCAA public-nuisance purported to do the same—namely, by deeming the lawful manufacturing and sale of firearms "misconduct." In essence, then, the state seeks to sneak in through the back door the very claims that Congress tossed out the front. Just as in *Beretta* and *Ileto*, that would produce the "[a]bsurd[]" result of making it trivially easy to evade the PLCAA's core command, *Beretta*, 524

F.3d at 402-03; *see* JA15-16, and flout the bedrock rule that an "act cannot be held to destroy itself," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343 (2011).

3. At a minimum, A1765 is preempted to the extent it authorizes suits that require neither knowing violations nor proximate cause. The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added). Yet A1765 authorizes actions that do not comply with either of the italicized requirements.

First, A1765 does not require a violation of either of its two operative provisions to be "knowing." The first operative provision permits liability for violating its terms *either* "knowingly" *or* "recklessly." N.J. Stat. Ann. §2C:58-35(a). The second lacks any *mens rea* at all; it just requires industry members to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products." *Id.* §2C:58-35(a)(2). And lest there be any doubt about what role intent has to play in such suits, the statute makes clear that the answer is none. *See id.* §2C:58-35(c).

The state now argues that A1765 "*does* require knowing conduct," because "under state law, a 'knowledge' requirement is read into otherwise-silent text housed within Title 2C." NJ.Br.31-32 (citing N.J. Stat. Ann. §2C:2-2(c)(3)). There is a

reason New Jersey never made this argument this below:  A1765 is not silent as to *mens rea*.  Section 35(a)(1) explicitly allows *both* "knowing" *and* non-knowing, "reckless[]"-based liability.  That is no accident; the type of liability Section 35(a)(2) authorizes is fundamentally inconsistent with the very notion of a knowledge requirement.  A manufacturer can knowingly comply (or not comply) with a command to manufacture in certain ways, and a seller can do the same with a command to conduct a background check, or to keep specified records, or to not sell a firearm to someone known to be prohibited from possessing one.  But it is hard to fathom how an industry member who complies with the multitude of federal, state, and local laws and regulations that explicitly state what it may and may not do would "know" that it nonetheless has failed to employ "reasonable controls," or has conducted its lawful business in a manner so "unreasonable under all the circumstances" that it can be said to have "create[d], maintain[ed], or contribute[d] to a public nuisance in [New Jersey].'"  N.J. Stat. Ann. §2C:58-35(a).

New Jersey also resists the conclusion that "knowingly" means "knowingly," homing in on the fact that one of the textually enumerated examples in the predicate exception allows suit for a sale to a straw purchaser where the dealer knows or has "reasonable cause to believe" that the sale is a straw purchase.  *See* NJ.Br.32 (emphasis omitted) (citing 15 U.S.C. §7903(5)(A)(iii)(II)).  But "reasonable cause to believe" requires actual knowledge of information that suffices to put one on

notice that the firearm is really being purchased by someone who is prohibited from possessing it. *See, e.g.*, *DiMartino v. Buckles*, 129 F.Supp.2d 824, 827-28 (D. Md.) (discussing whether information defendant knew was sufficient to establish "reasonable cause to believe" that the purchaser was ineligible), *aff'd sub nom.*, *DiMartino v. Buckley*, 19 F.App'x 114 (4th Cir. 2001). Recklessness, by contrast, "is the doing of something which in fact involves a grave risk to others, whether the doer realises it or not." R.F.V. Heuston, *Salmond on the Law of Torts* 194 (17th ed. 1977) (emphasis added). That is a significantly lower standard than "knowing," which is what the PLCAA requires of predicate statutes. *See* 15 U.S.C. §7903(5)(A)(iii). Moreover, the predicate exception requires the defendant to have "knowingly *violated*" a covered statute. *Id.* (emphasis added). A defendant does not "knowingly violate" a statute by engaging in conduct that it does not know creates the risk that the statute makes it unlawful to create. At most that may be a reckless violation; it is certainly not a knowing one.

Second, A1765 does not require the conduct that violates its terms to be a genuine "proximate cause of the harm" for which redress is sought. 15 U.S.C. §7903(5)(A)(iii). "To the extent causation is applicable" for A1765 purposes at all, the statute simply "deem[s]" proximate cause to be satisfied anytime "the harm to the public was a reasonably foreseeable effect of such conduct, *notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties*."

N.J. Stat. Ann. §2C:58-35(e) (emphasis added).  That is not proximate cause.  Under the common law, which Congress is presumed to incorporate when it uses a "common-law term[]" with a "well-settled meaning," *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), "foreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017). There must be a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).  A1765 explicitly discards any such inquiry, as evidenced by its use of the word "deemed"— a word of forced equivalence, *see Deem*, *Black's Law Dictionary* (11th ed. 2019) ("To treat something as if (1) it were really something else, or (2) it has qualities that it does not have").  The result is precisely the kind of non-"bona fide expansion of the common law," lacking "foundation in hundreds of years of … jurisprudence of the United States," that the PLCAA forecloses.  15 U.S.C. §7901(a)(7).

Indeed, this Court could not have been clearer in *Camden* that true proximate cause demands far more than showing "that conduct … merely *contributes* to the source of the interference."  273 F.3d at 538-41.  The most immediate reason that the county's pre-PLCAA public nuisance suit failed was because regulated entities "may not be held responsible" under the traditional proximate-cause requirements that government public nuisance claims "'without a more tangible showing that [they] … were realistically in a position to prevent the wrongs" perpetrated by

criminals who misused their products. *Id.* at 541 (quoting *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1062 (N.Y. 2001)). This Court held that proximate cause was the "fatal defect" in Camden's public nuisance claim. *Id.* Congress, alarmed at such cases, reinforced the common-law proximate-cause requirement with a statutory requirement in the PLCAA. *See* 15 U.S.C. §7903(5)(A)(iii). Yet New Jersey now claims it can simply "deem" this statutory requirement satisfied and move on. That itself is a vivid illustration that the whole point of this law is to enable suits against industry members based on the criminal misuse of firearms by third parties over whom a manufacturer or seller has no control —which is precisely what the PLCAA prohibits.

## III.    A1765 Is Unconstitutional In Multiple Respects.

In addition to being preempted, A1765 is unconstitutional in multiple respects. While the district court had no occasion to reach those arguments given its preemption ruling, to the extent this Court is inclined to alter the scope of the preliminary injunction, the Court should resolve these purely legal issues itself so that it can ensure that it does not authorize applications of the PLCCA that would violate the Constitution.

### A.    A1765 Directly Regulates Out-of-State Conduct.

Under A1765, a "gun industry member" can be held liable for manufacturing, selling, or marketing lawful products *in other states* if a criminal later misuses one

of its products in New Jersey and New Jersey decides that the industry member's conduct was "unreasonable." N.J. Stat. Ann. §2C:58-35(a). A1765 further allows New Jersey courts to grant "an injunction prohibiting the gun industry member from continuing that conduct," *id.* §2C:58-35(b), even if the offending conduct takes place wholly out of state and is fully lawful where it occurs.

None of that is consistent with the Constitution. Under settled precedent, a state law that imposes liability for wholly out-of-state conduct "exceeds the inherent limits of the enacting State's authority" and is per se invalid. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "If the transaction" or other commercial conduct "to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," full stop. *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999); *see, e.g.*, *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018) (enjoining California law that purported to "dictate the method by which" medical-waste companies treated medical waste "outside of California"); *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 832-37 (7th Cir. 2017) (invalidating Indiana law that regulated e-liquid manufacturing facilities' operations outside of Indiana if the manufacturers sold products in Indiana).

Indeed, this rule against extraterritorial state regulation applies with full force "whether or not the [out-of-state] commerce has effects within the State," *Healy*, 491 U.S. at 336, even if the state law is intended to protect the health and safety of state

residents, *see Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-23 (1935), and even if the defendant's products were destined to be possessed or used in the state, *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 491 (4th Cir. 2007) (explaining that the New York law struck down in *Baldwin* "applied only to milk that would eventually be sold to New York consumers").

New Jersey does not deny that A1765 regulates out-of-state manufacturing, selling, and marketing. It instead claims that this Court eliminated the extraterritoriality doctrine in favor of a rule that laws that regulate wholly out-of-state conduct violate the Commerce Clause only if they are discriminatory. NJ.Br.39 (citing *TitleMax of Del., Inc. v. Weissman*, 24 F.4th 230, 238 n.7 (3d Cir. 2022)). That would be quite a startling development, as it would require overriding the square holdings of at least three Supreme Court cases. Unsurprisingly, *TitleMax* did nothing of the sort. *TitleMax* simply found "the *Healy* line of cases" "inapt" on the facts before it, which involved a law that the Court concluded did *not* directly regulate wholly out-of-state conduct, but rather "only ha[d] *indirect effects* on interstate commerce." 24 F.4th at 238-40 & n.10 (emphasis added). As to statutes that *do* "directly regulate[] … interstate commerce," the Court reiterated that it does indeed still faithfully follow Supreme Court precedent: "[W]e have generally struck down [such] statute[s] without further inquiry." *Id.* at 238 (emphasis added) (quoting *Instr. Sys., Inc. v. Comput. Curriculum Corp.*, 35 F.3d 813, 824 (3d Cir. 1994)).

Unlike the law in *TitleMax*, A1765 falls squarely within the *Healy* line of cases. A1765 is just like the law the Seventh Circuit held unconstitutional in *Legato Vapors*, which "impos[ed] detailed requirements … on out-of-state manufacturing operations" for e-cigarettes, "dictat[ing] how out-of-state manufacturers must build and secure their facilities, operate assembly lines, clean their equipment, and contract with security providers, if any of their products are sold in Indiana." 847 F.3d at 827, 830. Indeed, A1765 is worse than that Indiana law—and the state laws struck down in *Healy* and *Baldwin*—all of which applied out of state only vis-à-vis conduct that was directed at the state. Here, by contrast, A1765 reaches out and authorizes New Jersey to control how a manufacturer in (say) Wyoming operates its business if a criminal illegally brings a gun into New Jersey and misuses it. That makes the Commerce Clause problem especially stark, as does the fact that, unlike in *Legato Vapors*, A1765's "reasonable controls" provision has not even "detailed" what out-of-state manufacturers and dealers must do to comply.

Imposing state-law liability for actions taken outside the regulating state is the definition of unconstitutional extraterritorial state regulation. Because A1765 indisputably (and undisputedly) does just that, it violates the Commerce Clause vis-à-vis wholly out-of-state conduct.

### B.    A1765 Violates the First Amendment.

In addition to regulating the manufacture and sale of constitutionally protected products, A1765 regulates—indeed, empowers courts to enjoin—constitutionally protected speech.  The statute expressly defines "gun industry member" to include those engaged in "marketing."  N.J. Stat. Ann. §2C:58-34.  It authorizes liability for "contribut[ing]" to a public nuisance "through … marketing" that the state deems "unreasonable."  *Id.* §2C:58-35(a)(1).  And it orders industry members to use "reasonable controls regarding" their "marketing."  *Id.* §2C:58-35(a)(2).  The statute thus plainly—and unconstitutionally—restricts protected speech.

As an initial matter, not even the state disputes that A1765 regulates speech based on content.  The statute does not apply to *all* marketing; it applies only to "marketing of a gun-related product."  *Id.* §2C:58-35(a)(1).  Indeed, it does not even apply to all speech about firearms; it applies only to the speech of those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product."  *Id.* §2C:58-34.  And while the state inexplicably claims that A1765 is viewpoint neutral, NJ.Br.45 n.8, by its terms A1765 applies only to "marketing"— i.e., speech expressing views in favor of purchasing and using firearms.

The topics and views New Jersey has singled out do not fall into any of the few "well-defined and narrowly limited classes of speech" that are not protected by the First Amendment.  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011).

To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980); NJ.Br.46. But A1765 does not purport to target false or misleading speech. It imposes liability for speech about (constitutionally protected) products *even when that speech is truthful*; the words "false," "misleading," and "deceptive" appear nowhere in the statute. Under black-letter law, truthful speech promoting a lawful product is protected by the First Amendment, even if the product is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (tobacco); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) (liquor).[5]

While the state conceded below that industry members can be held liable under A1765 for "truthful, non-misleading speech" about their lawful products, JA147 n.13, it now insists that "it is hard to see how Section 58-35 could apply to lawful, non-misleading speech at all," NJ.Br.46. In fact, it is hard to see how A1765 could *not* apply to lawful, non-misleading speech when the law explicitly restricts speech that is "*either* unlawful in itself *or* unreasonable under all the circumstances," N.J. Stat. Ann. §2C:58-35(a)(1) (emphasis added), and explicitly contemplates that full compliance with state and federal laws relating to the marketing of firearms (or

---

[5] Firearms are obviously different from products like tobacco and liquor. When responsibly used as intended, firearms help save lives.

any other product) is not a defense to liability, *see id.* §2C:58-34 (defining "[r]easonable controls"). Under the statute's plain terms, then, advertisements with entirely accurate specifications of lawful products may still trigger liability if they are later deemed to be "unreasonable" and to have "contribute[d]" to undermining the "comfort" or "convenience" of New Jerseyans. *Id.* §§2C:58-34, -35(a)(1).

A1765 thus strikes at the heart of the First Amendment. After all, laws "that target truthful, nonmisleading commercial messages rarely protect consumers from [the] harms" that may justify greater regulation of commercial speech, *44 Liquormart*, 517 U.S. at 503—namely, its "potential to mislead," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 494 (1995) (Stevens, J., concurring in the judgment). As the Supreme Court explained in *Sorrell v. IMS Health Inc.*, "the State may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading advertisements" just because it "finds expression too persuasive." 564 U.S. 552, 577-78 (2011). That is true *a fortiori*, of course, when the disfavored product is one the Constitution expressly entitles people to possess.

All of that means New Jersey must affirmatively prove that A1765 satisfies heightened scrutiny. Indeed, given the content-, speaker-, and viewpoint-based discrimination inherent in the statute, strict scrutiny should apply. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 139 (3d Cir. 2020) ("[S]omething more than intermediate scrutiny may be necessary" for commercial speech

restrictions that single out "some messages or some speakers based on the content of the speech or the identity of the speaker."). And New Jersey has now *twice* waived any argument that it can satisfy strict scrutiny—likely because it knows it cannot.

In all events, no matter which version of heightened scrutiny applies, A1765 flunks it. Despite ostensibly being motivated by a desire to resolve a purported "epidemic of gun violence," N.J. Stat. Ann. §2C:58-33(a), A1765 does nothing to police the conduct of criminals who misuse firearms to perpetrate that problem and endanger public health and safety. Nor does it regulate vast swaths of speech—*e.g.*, action and horror films, violent video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence. The statute is thus "wildly underinclusive." *Brown*, 564 U.S. at 801-02.

A1765 is "vastly overinclusive" as well, *id.* at 804, and far "broader than necessary" to serve any interest in public health (or even in "preventing unlawful or misleading marketing"), *contra* NJ.Br.46-47. As explained, A1765 explicitly permits liability for marketing that is entirely truthful, non-misleading, and not "unlawful in itself." N.J. Stat. Ann. §2C:58-35(a)(1). The state itself ultimately acknowledges as much, describing the law as an effort to prevent "heedless marketing of dangerous weapons," NJ.Br.47—by which it apparently means exercising the First Amendment right to encourage the exercise of Second

Amendment rights in a way that is not to New Jersey's liking (even if such encouragement took place entirely outside of New Jersey, *see supra* Part III.A).

Making matters worse, A1765 makes it virtually impossible to tell what speech is permitted, leaving industry members with no realistic choice but to err on the side of muzzling themselves and refraining from any speech that is even arguably "unreasonable." The statute renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," N.J. Stat. Ann. §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., truthful marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34. A1765 is thus bound to "provoke uncertainty among speakers," *Reno v. ACLU*, 521 U.S. 844, 871 (1997); *contra* NJ.Br.47-48, as such incomprehensible and subjective abstractions do not articulate *at all*—let alone with "narrow specificity," *see NAACP v. Button*, 371 U.S. 415, 433 (1963)—what speech may give rise to liability. Instead, *any* advertisement for a lawful product *anywhere* can be grounds for liability if it is later deemed to have indirectly *contributed* to gun-related problems in New Jersey—leaving any "legitimate" sweep of the marketing provisions miniscule.

In short, A1765's marketing provisions "prohibit[] or chill[]" vast swaths of protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002),

destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). They cannot stand.

### C.    A1765 Violates the Second Amendment.

By its terms, A1765 imposes (nebulous) restrictions on "the sale, manufacture, distribution, and marketing of lethal, *but nonetheless legal*, gun-related products." N.J. Stat. Ann. §2C:58-33(c) (emphasis added); *see id.* §2C:58-35(a). A1765 thus trenches on conduct protected by the Second Amendment. And this Court has already recognized that the sort of burdens it imposes lack any historical basis.

The state's contrary arguments rely on bad law and worse logic. While this Court held pre-*Bruen* that "a standalone right to *sell* guns" is not part of the supposed "core" of the Second Amendment, *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021); *see* NJ.Br.48, it reached that now-defunct search for the "core" only after concluding that commercial restrictions on firearms sellers "interfere with the right to bear arms" secured by the Amendment's plain text. *Drummond*, 9 F.4th at 234; *see id.* at 225-29; *see also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment."). While *Drummond*'s search for the "core" does not survive *Bruen*, *see Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022), that threshold conclusion does. And it is obviously correct. After all, one cannot "keep" or "bear" arms if one cannot acquire them, *Teixeira v. Cnty. of Alameda*, 873

F.3d 670, 687-88 (9th Cir. 2017), and long-settled precedent holds that a state may not thwart fundamental constitutional rights by attacking the means by which they are exercised. Simply put, a state cannot evade the Second Amendment by imposing novel burdens on "acts necessary to the[] exercise" of the rights it protects, with none more essential than acquiring arms in the first place. *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring).

And the burdens A1765 imposes are unquestionably novel. As Congress itself recognized in the PLCAA, efforts to make licensed members of the firearms industry pay for the harms caused by criminals who misuse their lawful products are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law." 15 U.S.C. §7901(a)(7). The mere fact that *some* "commercial restrictions on firearm sales are historically rooted," NJ.Br.49, makes no difference. As *Bruen* made clear (quoting one of the few parts of *Drummond* that survives it), "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2133 (2022) (alteration in original) (quoting *Drummond*, 9 F.4th at 226). And while *a* version of "the public-nuisance doctrine" has been around for centuries, NJ.Br.49, the *traditional* version could not be less similar to the one A1765 erects. Under

traditional public-nuisance doctrine, which is "confined to real property and violations of public rights" and which does not allow suits for damages resulting from criminals' unlawful acts, defendants "are not liable" unless they "control the misconduct of third parties" more immediately responsible for the harms for which redress is sought. *Camden*, 273 F.3d at 541; *see also Philadelphia*, 277 F.3d at 421 ("[T]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented…."). The state's decision "to expand state public nuisance law" to try to impose exactly that sort of novel liability, *see Camden*, 273 F.3d at 542, cannot survive after *Bruen*.

### D.    A1765 Violates the Due Process Clause.

A1765 violates due process in two related respects. First, it is void for vagueness, as it fails to "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A gun industry member can be held to violate A1765 merely for, among other things, "recklessly … contribut[ing] to a public nuisance in this State through the sale, manufacturing, distribution, importing, or marketing of a gun-related product," even if nothing it did was "unlawful." N.J. Stat. Ann. §2C:58-35(a)(1). The statute provides no direction as to what industry members are supposed to do to avoid acting "unreasonabl[y]." *Id.* Nor does it offer guidance as to what "controls" are or are not "reasonable" for purposes of §2C:58-35(a)(2), once again leaving industry members to guess what

will be deemed sufficient to avoid being saddled with liability for the independent decisions of criminals to misuse their products. All of that leaves the distinct impression that the only truly viable option to avoid liability under A1765 is to get out of the industry altogether. That is the definition of a vague law.

The state invokes the common-law definition of reasonableness, *see* NJ.Br.42, but that just begs the question how the PLCAA could preempt common-law nuisance claims but not A1765. *See Ileto*, 565 F.3d at 1135-36 (PLCAA intended to preempt "'classic negligence and nuisance'" claims). It also ignores that Section 35(a)(2)'s "reasonable controls" language has no historical pedigree, and that there is no settled common-law understanding of what it means to "contribute" to remote harms caused by third parties over which a defendant has no control, *see* N.J. Stat. Ann. §2C:58-35(a)(1), (e)—precisely because the common law has never permitted the imposition of such freewheeling liability. *See Camden*, 273 F.3d at 539-41.

That points to the second due process problem with A1765. As *Camden* and *Philadelphia* explained, attempts to use negligence law to make industry members pay for the costs of the misuse of firearms stretch traditional notions of proximate cause well past the breaking point and violate basic notions of fairness. *See Camden*, 273 F.3d at 539-40; *Philadelphia*, 277 F.3d at 421; *see also Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996) ("Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be

consequence is only fortuity."). By "deem[ing]" proximate cause met based on only an exceedingly lose concept of "foreseeab[ility]" (which alone would not be enough even to establish a legal duty sufficient for an ordinary negligence claim), *see* N.J. Stat. Ann. §2C:58-35(e), A1765 empowers courts to blow past that point. The statute is designed to assign blame where the "causal chain is simply too attenuated to attribute sufficient control to the [gun industry members] to make out a public nuisance claim." *Camden*, 273 F.3d at 541; *see Hamilton*, 750 N.E.2d at 1062. None of that comports with due process or basic notions of fair play.

*    *    *

Ultimately, it is little surprise that A1765 suffers from so many fatal defects. That is what happens when a state unabashedly sets out to reinstate litigation that Congress has declared "an abuse of the legal system" that "erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). New Jersey is certainly free to disagree with Congress' judgment. But it is not free to override it. By endeavoring to do so, A1765 runs afoul of the Constitution several times over.

Case: 23-1214     Document: 53     Page: 62     Date Filed: 05/01/2023


## IV.    The Other Factors All Favor Injunctive Relief.

The district court acted well within its discretion in concluding that the remaining factors weigh in favor of injunctive relief.  The constitutional injuries A1765 is inflicting on NSSF and its members are sufficient irreparable injury alone to justify injunctive relief, especially given the significant chilling effect A1765 has on constitutionally protected speech.  *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010).  But they do not stand alone.  First, as noted, the PLCAA confers not just a defense against liability, but an immunity from suit.  No court can make NSSF's members whole for having to defend against suits that should never have been brought in the first place.

Second, the process of trying to ascertain what the vague terms of A1765 mean and what steps, if any, industry could try to take today to avoid being deemed to have acted unreasonably tomorrow will be considerable—and, thanks to the Eleventh Amendment, unrecoverable.  That is an irreparable and immediate injury.  *See* JA92-93 ¶¶13-17; JA96 ¶¶12-14.  And industry cannot delay in considering steps to limit future liability.  A1765 allows the Attorney General to bring a civil action for practically any kind of relief if he suspects a violation of the statute.  *See* N.J. Stat. Ann. §2C:58-35(b).  All indications are that he intends to use that authority.  Even before A1765 became law, Attorney General Platkin made public statements supporting it and lambasting the industry as purportedly "profit[ing] from …

bloodshed." *Governor Murphy Signs Sweeping Gun Safety Package 3.0 to Continue the Fight Against Gun Violence*, State of N.J. (July 5, 2022), https://bit.ly/3TdiCM0. Since then, he has staffed up a brand-new office devoted entirely to enforcing A1765, *see* Office of the Att'y Gen., *Press Release*, *Acting AG Platkin Appoints Leaders of New Firearms Enforcement Office* (Sept. 7, 2022), https://bit.ly/3GGNIbm, and declined repeated attempts to deny his obvious intent to sue NSSF's members.

The state's position that irreparable harm is not imminent, *see* NJ.Br.49-50, is especially untenable now that it has spent several rounds of briefing trying to convince this Court and the district court that *the state* has been irreparably harmed by *not* being able to sue NSSF's members *immediately*. Indeed, the state has called that restriction an "emergency." Just as with standing, so too at the irreparable-harm prong, the state cannot have it both ways. If it so desperately needed to sue NSSF's members that it wanted the injunction lifted ASAP, then it cannot turn around and claim that there is not even a serious risk that it will sue if the injunction is lifted.

NSSF's showing on the "two gateway factors" suffices to affirm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). But the public interest favors an injunction as well. A1765 encroaches on federal authority by flouting Congress' express purposes in passing the PLCAA. *See, e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (public interest favored injunction where state law conflicted with "Congress' policy choice, articulated in a

statute"); *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 263 (3d Cir. 2020) (same).  A1765 foments interstate conflict and burdens interstate commerce by setting New Jersey up as the judge of lawful business practices in other states.  *See, e.g.*, *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 795 (4th Cir. 1991) (public interest favored injunction where state law burdened interstate commerce).  And A1765 tramples on individual rights—the right to keep and bear arms, the freedom of speech, the privilege of pursuing a common calling, and more.  *See, e.g.*, *Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020) (public interest favored injunction where law burdened constitutional rights).  The public interest does not favor in the slightest keeping in place a statute that poses such a grave threat to fundamental constitutional rights.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy

JONATHAN M. PREZIOSI
LEWIS BRISBOIS
  BISGAARD & SMITH LLP
1037 Raymond Boulevard
Suite 800
Newark, NJ 07102
(979) 792-8736

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellee*

May 1, 2023

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Brief of Appellant was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2013, and is presently a member in good standing at the Bar of said Court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 12,944 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program Windows Security, version 4.18.2207.5, has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy