No. 23-1214

# In the
# United States Court of Appeals
# for the Third Circuit

◆

NATIONAL SHOOTING SPORTS FOUNDATION,

*Plaintiff-Appellee,*

v.

ATTORNEY GENERAL OF NEW JERSEY,

*Defendant-Appellant.*

◆

On Appeal from the United States District Court
for the District of New Jersey
No. 22-cv-06646

◆

## BRIEF OF *AMICUS CURIAE* INDEPENDENCE INSTITUTE IN SUPPORT OF APPELLEE AND AFFIRMANCE

◆

DAVID B. KOPEL
 *Counsel of Record*
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae*

make the following statements:

**Independence Institute** has no parent corporation, nor is there any

publicly held corporation that owns more than 10% of its stock.

/s/ *David B. Kopel*
Counsel for *Amicus Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ...................................................... iv

STATEMENT OF *AMICUS CURIAE* .................................... 1

CONSENT TO FILE ................................................................... 1

SUMMARY OF ARGUMENT .................................................... 2

ARGUMENT ............................................................................. 3

   I.   The British attempted to disarm the Founders by stopping arms commerce ................................................................. 3

      A.  Great Britain prevented domestic arms commerce. .................. 5

      B.  Great Britain banned the import of arms. ............................... 7

  II.  Americans resisted the commerce restrictions with words and deeds. ............................................................................. 10

      A.  Americans denounced arms commerce restrictions as an effort to enslave them. ............................................................ 10

      B.  Americans used force to thwart arms prohibition. .................. 12

      C.  Americans smuggled arms imports. ......................................... 13

      D.  Americans encouraged domestic arms manufacture and commerce. ............................................................................... 15

 III.  Before *Sullivan*, tort law was often misused against the First Amendment. ............................................................. 21

 IV.  Before the Protection of Lawful Commerce in Arms Act, tort law was often misused against the First and Second Amendments. ......................................................................... 26

      A.  Abusive suits in the 1980s and 1990s. ..................................... 26

      B.  Suits against the free speech of trade associations. ................ 28

      C.  Structuring and coordination of suits to destroy defendants via litigation costs. ............................................................... 28

  V.  Like printing press manufacturers, arms manufacturers may not be punished for third-party misuse of their products. ........... 33

CONCLUSION ................................................................................ 35

CERTIFICATE OF COMPLIANCE ....................................................... 36

CERTIFICATE OF SERVICE ............................................................. 37

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................ 4

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) .............................................................. 34

*Konigsberg v. State Bar of California,*
  366 U.S. 36 (1961) ............................................................... 34

*Kyllo v. United* States,
  533 U.S. 27 (2001) ............................................................... 20

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................. 35

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ......................................... 23, 26, 34, 35

*Patterson v. Rohm Gesellschaft,*
  608 F. Supp. 1206 (N.D. Tex. 1985) .................................. 27

*United States v. Cruikshank,*
  92 U.S. 542 (1875) ............................................................... 35

## Constitutional Provisions

U.S. Const. amend. I ................................................. 21, 33, 34

U.S. Const. amend. II ...................................................... 26, 34

## Statutes and Regulations

15 U.S.C. §7901(a)(8) .......................................................... 33

## Other Authorities

146 CONG. REC. H2017 (Apr. 11, 2000) .................................................. 31

151 CONG. REC. S9063 (July 27, 2005) ................................................... 32

A Watchman, *To the Inhabitants of British America* (Dec. 24, 1774) .... 11

ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES,
A.D. 1766–1783, vol. 5 (2005) (James Munro & Almeric Fitzroy
eds., 1912) ...................................................................................... 7

Allen, Mike, *Colt's to Curtail Sale of Handguns*, N.Y. TIMES,
Oct. 11, 1999 .................................................................................. 30

AMERICAN ARCHIVES, vol. 1 (4th Ser., Peter Force ed., 1837) ......... 6, 7, 11

ANDREWS, JOHN, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON
(Winthrop Sargent ed., 1866) ....................................................... 5, 6

Atkinson, Rick, THE BRITISH ARE COMING (2019) ................................. 15

Barrett, Paul, *Lawsuits Trigger Gun Firms' Bankruptcy*,
WALL ST. J., Sept. 13, 1999 ............................................................ 29

Boyer, Peter, *Big Guns*, NEW YORKER, May 17, 1999 ........................... 29

Brown, M.L., FIREARMS IN COLONIAL AMERICA (1980) ..................... 16, 19

Butterfield, Fox, *Lawsuits Lead Gun Maker to File for Bankruptcy*,
N.Y. TIMES, June 24, 1999 ............................................................. 29

CATALOGUE OF MANUSCRIPTS AND RELICS IN WASHINGTON'S HEAD-
QUARTERS, NEWBURGH, N.Y. (E.M. Ruttenber ed., 1890) .................... 16

Clark, Charles Hopkins, *The 18th Century Diary of Ezra Stiles*,
208 N. AM. REV. 410 (Sept. 1918) .................................................. 7

CONNECTICUT JOURNAL, Dec. 28, 1774 ..................................................... 8

DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF
NEW YORK, vol. 8 (1857) ............................................................... 8

Drayton, John, MEMOIRS OF THE AMERICAN REVOLUTION (1821) ............ 12

Edmondson, Aimee, IN SULLIVAN'S SHADOW: THE USE AND
ABUSE OF LIBEL LAW ARISING FROM THE CIVIL RIGHTS
MOVEMENT (2019) ............................................................. 22, 23, 24, 25

ELLIOT'S DEBATES ON THE FEDERAL CONSTITUTION, vol. 4 (1876) .......... 34

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER
ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR
HERETOFORE FORMING THE UNITED STATES OF AMERICA, vols. 3, 7
(Francis Thorpe ed., 1909) .................................................................. 4

Fischer, David Hackett, PAUL REVERE'S RIDE (1994) .............................. 9

Greenlee, Joseph G.S., *The American Tradition of Self-Made
Arms*, 54 ST. MARY'S L.J. 35 (2023) ............................................... 17, 20

Halbrook, Stephen P., THE FOUNDERS' SECOND AMENDMENT:
ORIGINS OF THE RIGHT TO KEEP AND BEAR ARMS (2008) ........... 6, 9, 15

Hall, Grover, *State Finds Formidable Legal Club to Swing at
Out-of-State Press*, MONTGOMERY ADVERT., May 22, 1960 ................. 25

Johnson, Nicholas, et al., FIREARMS LAW AND THE SECOND
AMENDMENT: REGULATION, RIGHTS AND POLICY (3d ed. 2021) ............. 18

JOURNALS OF THE CONTINENTAL CONGRESS, vol. 1 (1904) ...................... 10

Kopel, David B. & Gardiner, Richard E., *The Sullivan Principles:
Protecting the Second Amendment from Civil Abuse*, 19 SETON
HALL LEGISL. J. 737 (1995) ............................................................. 27

Kopel, David B., *How the British Gun Control Program
Precipitated the American Revolution*, 6 CHARLESTON L. REV.
283 (2012) .................................................................................... 8, 19

Lee, Edward, *Guns and Speech Technologies: How the Right
to Bear Arms Affects Copyright Regulations of Speech
Technologies*, 17 WM. & MARY BILL OF RTS. J. 1037 (2009) ........... 33, 34

Letter from Earl of Dartmouth to the Governors in America (Oct. 19, 1774) ................................................................. 8

Letter from Gov. Gage to Lieut. Col. Smith (Apr. 18, 1775) ................. 19

Letter from Gov. Wentworth to Gov. Gage (Dec. 14, 1774) ............. 12, 13

Letter from Thomas Gage to Earl of Dartmouth (Nov. 2, 1774) ............. 7

Letter from Thomas Jefferson to George Hammond (May 15, 1793) .... 21

LETTERS OF HUGH EARL PERCY FROM BOSTON AND NEW YORK, 1774–1776 (Charles Knowles Bolton ed., 1902) .................................. 13

MacKenzie, Frederick, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON: DIARY OF LIEUTENANT FREDERICK MACKENZIE (Allen French ed., 1926) ................................................................. 18

MD. GAZETTE, Aug. 31, 1775 .................................................... 16

Miller, Daniel A., SIR JOSEPH YORKE AND ANGLO-DUTCH RELATIONS 1774–1780 (1970) ....................................................... 8, 14

MINUTES OF THE PROVINCIAL CONGRESS OF PENNSYLVANIA, FROM THE ORGANIZATION TO THE TERMINATION OF THE PROPRIETARY GOVERNMENT, vol. 10 (1852) ................................................. 15

Moore, Frank, DIARY OF THE AMERICAN REVOLUTION, vol. 1 (1860) ......... 9

Musante, Fred, *After Tobacco, Handgun Lawsuits*, N.Y. TIMES, Jan. 31, 1999 ................................................................. 28

NAVAL DOCUMENTS OF THE AMERICAN REVOLUTION, vol. 1 (William Bell Clark ed., 1964) ................................................................. 9

Neumann, George C., *American Made Muskets in the Revolutionary War*, AM. RIFLEMAN, Mar. 29, 2010 .................................... 18

NEW YORK IN THE REVOLUTION AS COLONY AND STATE SUPPLEMENT (Frederic G. Mather ed., 1901) ........................................... 16

vii

Olson, Walter, *Plaintiffs Lawyers Take Aim at Democracy*, WALL ST. J., Mar. 21, 2000 ................................................................... 29

Olson, Walter, THE RULE OF LAWYERS (2003) ................................... 31, 32

PA. GAZETTE, Dec. 21, 1774 ......................................................................... 9

PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803, vol. 18 (1813) ............................................................ 12

PROVIDENCE GAZETTE, Jan. 14, 1775 ......................................................... 9

Report of the Pennsylvania Committee of Safety (Jan. 3, 1776) ........... 15

Reynolds, Glenn H., *Permissible Negligence and Campaigns to Suppress Rights*, 68 FLA. L. REV. FORUM 51 (2016) ............................ 33

Richmond, Robert P., POWDER ALARM (1971) ......................................... 14

Rowe, John, LETTERS AND DIARY OF JOHN ROWE (Anne Rowe Cunningham ed., 1903) .......................................................................... 6

Salay, David L., *The Production of Gunpowder in Pennsylvania During the American Revolution*, 99 PENN. MAG. HIST. & BIOGRAPHY 422 (Oct. 1975) ..................................................................... 14

Salisbury, Harrison, *Fear and Terror Grip Birmingham*, N.Y. TIMES, Apr. 8, 1960 ................................................................... 23

Schenkman, David, *The Green Family's Maryland Currency*, AM. NUMISMATIST 31 (Apr. 2023) ................................................................. 17

Smolla, Rodney, SUING THE PRESS (1986) .............................................. 25

SOURCES OF AMERICAN INDEPENDENCE: SELECTED MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY (Howard Peckham ed., 1978) ............................................................................ 20

Stephenson, O.W., *The Supply of Gunpowder in 1776*, 30 AM. HIST. REV. 271 (1925) ................................................................... 13, 14

viii

THE BOOK OF ABIGAIL & JOHN: SELECTED LETTERS OF THE ADAMS
    FAMILY 1762–1784 (L.H. Butterfield et al. eds., 2002) ........................ 12

*The HUD Gun Suit*, WASH. POST, Dec. 17, 1999 ..................................... 27

THE JOURNALS OF EACH PROVINCIAL CONGRESS OF
    MASSACHUSETTS IN 1774 AND 1775 AND OF THE COMMITTEE OF
    SAFETY (William Lincoln ed., 1838) ............................................... 10, 11

THE WRITINGS OF THOMAS JEFFERSON, vol. 7 (Paul Ford ed., 1904) ....... 21

Tourtellot, Arthur B., LEXINGTON AND CONCORD: THE BEGINNING OF
    THE WAR OF THE AMERICAN REVOLUTION (1959) .................................. 19

Unsigned report, Sept. 5, 1774 ................................................................ 6

VA. GAZETTE, Apr. 22, 1775 .................................................................... 14

Wallace, David, MASSIVE RESISTANCE AND MEDIA SUPPRESSION:
    THE SEGREGATIONIST RESPONSE TO THE DISSENT DURING THE
    CIVIL RIGHTS MOVEMENT (2013) ................................................. *passim*

Walsh, Sharon, *Gun Industry Views Pact as Threat to Its Unity*,
    WASH. POST, Mar. 18, 2000 .................................................................. 29

Weisman, Jonathan, *Gun maker, U.S. reach agreement*, BALT. SUN,
    Mar. 18, 2000 ...................................................................................... 30

## STATEMENT OF *AMICUS CURIAE*

**Independence Institute** is the nation's second-oldest state level think tank, founded in 1985 on the eternal truths of the Declaration of Independence. The scholarship and *amicus* briefs of the Institute's Research Director, David Kopel, and of the Institute's Senior Fellow in Constitutional Jurisprudence, Robert G. Natelson, have been cited in nine U.S. Supreme Court cases, by Justices Alito, Breyer, Kagan, Roberts, Stevens, and Thomas, and also by then-Judges Gorsuch and Kavanaugh.

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *amicus* and its members contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

Arms commerce has been a protected right since the first permanent English settlements in America, when King James I granted colonists the perpetual right to import and transfer arms.

In the 1770s, Britain turned a political crisis into war when it prevented arms commerce within the colonies and banned the importation of arms. Had the British won, they planned to make the arms commerce prohibition permanent, to keep Americans forever subjugated.

If the Founders had not managed to circumvent the violations of their right to buy and sell arms, they would have lost their war for independence against tyranny. Therefore, under the protections of the government the Founders designed, citizens were always free to vend and export arms, as Secretary of State Thomas Jefferson explained to the British ambassador.

Arms commerce rights came under attack again starting in the 1980s, when abusive lawsuits aimed to coerce and bankrupt firearm manufacturers and retailers. Although the plaintiffs won only one case, they succeeded in imposing heavy legal costs on the firearms industry. A similar strategy had been used to oppose the Civil Rights Movement,

when abusive lawsuits silenced newspapers that exposed problems in the Jim Crow South.

Thus, just as the Supreme Court in *New York Times v. Sullivan* halted the abusive lawsuits against the press, Congress enacted the Protection of Lawful Commerce in Arms Act to end the abusive lawsuits against the firearms industry. While the instant case can be decided by straightforward application of the Protection of Lawful Commerce in Arms Act, New Jersey's abusive lawsuit statute is more patently unconstitutional than was the Alabama libel law at issue in *Sullivan*. Alabama's law was susceptible to abuse; New Jersey's statute is designed for abuse. Under the First and Second Amendments, neither printing press manufacturers nor arms manufacturers may be held liable for third party misuse of their products.

## ARGUMENT

## I.  The British attempted to disarm the Founders by stopping arms commerce.

Arms commerce in America was a protected right from the beginning. King James I in 1606, binding his "Heirs and Successors,"  granted the "Southern Colony" (today's Virginia and the entire South) the perpetual right to import from Great Britain, "the Goods, Chattels, Armour,

Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES 3787–88 (Francis Thorpe ed., 1909).[2] The 1620 Charter of New England (originally the entire North) similarly guaranteed the right "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in … Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 FEDERAL AND STATE CONSTITUTIONS, at 1834–35.

Later, the Revolutionary War was precipitated by the British attempting to disarm America by forbidding arms commerce, and by confiscating firearms and gunpowder, including from merchants.

---

[2] "Armour" included all equipment for fighting, including firearms. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

## A.   Great Britain prevented domestic arms commerce.

In 1774, Massachusetts royal governor Thomas Gage attempted to disarm the colonists by blocking gunpowder commerce. In colonial towns, large quantities of gunpowder were stored in central "powder houses" or "magazines." Unlike modern smokeless gunpowder, the black powder of the eighteenth century was volatile, so merchants' and government reserves were often stored in reinforced brick buildings. On July 22, 1774, Boston merchant John Andrews wrote that "the Governor has order'd the Keeper of the Province's Magazine not to deliver a kernel of powder (without his express order) of either public or private property[.]" John Andrews, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772–1776, at 19 (Winthrop Sargent ed., 1866). On September 2, Andrews reported that "[a] Guard of Soldiers is set upon the Powder house at the back of ye. Common, so that people are debar'd from selling their own property." *Id.* at 39. Andrews noted, "it's now five or six weeks since the Governor has allow'd any [powder] to be taken out of the magazine here, whereby for some weeks there has not been a pound to be sold or bought in town." *Id.* at 52.

Even more provocatively, on September 1, 1774, Gage "sent a Party of Two hundred men" to the powder house near Charlestown and Cambridge. John Rowe, LETTERS AND DIARY OF JOHN ROWE 283–84 (Anne Cunningham ed., 1903).[3] They seized "two hundred and fifty half barrels of powder, the whole store there." Unsigned report, Sept. 5, 1774, *in* 1 AMERICAN ARCHIVES 762 (4th Ser., Peter Force ed., 1837).

Rumors that the British had shot colonists while confiscating the gunpowder set off the "Powder Alarm" throughout New England. The colonists "began to collect in large bodies, with their arms, provisions, and ammunition, determining by some means to give a check to a power which so openly threatened their destruction, and in such a clandestine manner rob them of the means of their defence." *Id.* Andrews reported that "at least a hundred thousand men were equipt with arms, and moving towards us from different parts of the country." Andrews, LETTERS, at 52. A patriot in Litchfield, Connecticut, wrote:

> all along were armed men rushing forward, some on foot, some on horseback; at every house women and children making cartridges, running bullets, making wallets, baking

---

[3] The powder house was on Quarry Hill, between Charlestown and Cambridge. Stephen Halbrook, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO KEEP AND BEAR ARMS 40 (2008). People used either town to describe the location.

> biscuit, crying and bemoaning, and at the same time
> animating their husbands and sons to fight for their liberties
> tho not knowing whether they should ever see them again.

Charles Clark, *The 18th Century Diary of Ezra Stiles*, 208 N. AM. REV.

410, 419 (Sept. 1918).

In November, Gage wrote his superior in London, describing the "order

to the Storekeeper not to deliver out any Powder from the Magazine,

where the Merchants deposite it, which I judged a very necessary and

prudent measure in the present circumstances, as well as removing the

Ammunition from the Provincial Arsenal at Cambridge." Letter from

Thomas Gage to Earl of Dartmouth (Nov. 2, 1774), *in* 1 AMERICAN

ARCHIVES, at 951.

## B.   Great Britain banned the import of arms.

King George's government already favored the same policy. On

October 19, 1774, King George issued an order-in-council prohibiting the

importation of arms and ammunition into America. 5 ACTS OF THE PRIVY

COUNCIL OF ENGLAND, COLONIAL SERIES, A.D. 1766–1783, at 401 (2005)

(Munro & Fitzroy eds., 1912). Secretary of State Lord Dartmouth sent a

letter that day "to the Governors in America," announcing "His Majesty's

Command that [the governors] do take the most effectual measures for

7

arresting, detaining and securing any Gunpowder, or any sort of arms or ammunition, which may be attempted to be imported into the Province under your Government." Letter from Earl of Dartmouth to the Governors in America (Oct. 19, 1774), *in* 8 DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 509 (1857). The embargo proclamation was initially for six months, but was "repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783." David Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297 (2012).

The "proclamation, it is said, was occasioned by intelligence received from Sheffield and Birmingham of amazing quantities of fire arms, &c. being nearly ready to be sent to America." CONNECTICUT JOURNAL, Dec. 28, 1774, at 1.

The embargo was swiftly enforced. In October 1774, an armed British cutter near Amsterdam blockaded a Rhode Island vessel that "had been sent expressly to load different sorts of firearms, and had already taken on board forty small pieces of cannon." Daniel Miller, SIR JOSEPH YORKE AND ANGLO-DUTCH RELATIONS 1774–1780, at 39 (1970). Then, "[t]wo vessels, laden with gun-powder and other military utensils, bound for the

other side of the Atlantick, were stopped at Gravesend … by the out clearers, in consequence of the King's proclamation." PA. GAZETTE, Dec. 21, 1774, at 2.

The British deployed "several capital ships of war, and six cutters" in the Atlantic "to obstruct the American trade, and prevent all European goods from going there, particularly arms and ammunition." 1 Frank Moore, DIARY OF THE AMERICAN REVOLUTION 61 (1860) (entry of Apr. 4, 1775). A December 26, 1774, letter from Bristol, England, observed "several frigates to be fitted out immediately to sail for America, to be stationed there in order to cruise along the coasts, to prevent any ammunition or arms being sent to the Americans by any foreign power." Halbrook, FOUNDERS' SECOND AMENDMENT, at 64; *see also* PROVIDENCE GAZETTE, Jan. 14, 1775, *reprinted in* 1 NAVAL DOCUMENTS OF THE AMERICAN REVOLUTION 62 (William Bell Clark ed., 1964) ("Orders have been given for the seizing every Ship, of what Nation soever, employed in conveying Arms or Ammunition to the Americans.").

Additionally, "[s]tocks of powder and arms in the possession of merchants were forcibly purchased by the Crown." David Hackett Fischer, PAUL REVERE'S RIDE 50 (1994).

II.    **Americans resisted the commerce restrictions with words and deeds.**

   A.    **Americans denounced arms commerce restrictions as an effort to enslave them.**

Defying a ban on public meetings, residents of Suffolk County (including Boston) convened in September 1774 and adopted the Suffolk Resolves: Gage's "hostile intention" was demonstrated when "in a very extraordinary manner" he confiscated the Charlestown powder, and forbade "the keeper of the magazine at Boston to deliver out to the owners the powder which they had lodged in said magazine." THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775 AND OF THE COMMITTEE OF SAFETY 603 (William Lincoln ed., 1838).

The Suffolk Resolves "were sent express to [the Continental] Congress by Paul Revere," and the Congress unanimously denounced "these wicked ministerial measures." 1 JOURNALS OF THE CONTINENTAL CONGRESS 39 & 39 n.1 (1904). The Suffolk Resolves were reprinted verbatim in the *Journals of the Continental Congress*, and the Congress had the Resolves disseminated in newspapers throughout America. *Id.* at 40. The Massachusetts Provincial Congress—also meeting in defiance of Gage—twice condemned him for "unlawfully seizing and retaining

large quantities of ammunition." JOURNALS OF EACH PROVINCIAL CONGRESS, at 31 (Oct. 25, 1774), 47 (Oct. 29, 1774).

"A Watchman," writing in the *New Hampshire Gazette*, called the arms embargo a violation of the right to self-defense. A Watchman, *To the Inhabitants of British America* (Dec. 24, 1774), *in* 1 AMERICAN ARCHIVES, at 1063–65. So "when we are by an arbitrary decree prohibited the having Arms and Ammunition by importation … the law of self-preservation" includes "a right to seize upon those within our power, in order to defend the liberties which God and nature have given to us." *Id.* at 1065. A Watchman reminded readers that "the surrender of [the Carthaginians'] Arms" to the Romans "proved the destruction of that City." *Id.* at 1064.

After a British seizure of imported arms in New York, a handbill "secretly conveyed into almost every house in town," asked, "when Slavery is clanking her infernal chains, ... will you supinely fold your arms, and calmly see your weapons of defence torn from you?" 1 AMERICAN ARCHIVES, at 1071.

South Carolina's legislature, now operating independently of British control as the General Committee, declared: "by the late prohibition of

exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." 1 John Drayton, MEMOIRS OF THE AMERICAN REVOLUTION 166 (1821).

## B. Americans used force to thwart arms prohibition.

Americans emptied their own powder houses before the British could. For example, Abigail Adams wrote on September 17, 1774, that about 200 patriots had seized gunpowder from the powder house in the Adams' hometown of Braintree, Massachusetts, "in consequence of the powders being taken from Charlstown." THE BOOK OF ABIGAIL & JOHN: SELECTED LETTERS OF THE ADAMS FAMILY 1762–1784, at 72 (L.H. Butterfield et al. eds., 2002). Knowing her to be a patriot, the men offered her gunpowder on their way past the Adams home. *Id.*

Americans also recaptured arms the British had confiscated. After learning that a New Hampshire fort contained seized arms, around 400 patriots "attacked, overpowered, wounded and confined the captain, and thence took away all the King's powder." Letter from Gov. Wentworth to Gov. Gage (Dec. 14, 1774), *in* 18 PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803, at 146–47 (1813). The

patriots took "upwards of 100 barrels of powder, 1500 stand of small arms, and several pieces of light cannon." Letter from Hugh Percy to Grey Cooper, *in* LETTERS OF HUGH EARL PERCY FROM BOSTON AND NEW YORK, 1774–1776, at 46 (Charles Bolton ed., 1902).

New Hampshire's royal governor, John Wentworth, understood that "this mischief originates from the … order … prohibiting the exportation of military stores from Great Britain." Letter from Wentworth to Gage, at 146. He bemoaned "the imbecility [incapability] of this government to carry into execution his Majesty's order in council, for seizing and detaining arms and ammunition imported into this province, without some strong ship in this harbour." *Id.* at 145.

Similarly, "[i]n May, 1775, the 'Liberty Boys' in Savannah, Georgia, seized 600 pounds [of gunpowder] stored in the magazine of that town, and, July 10, one of the king's ships was boarded and something like 12,700 pounds were carried away." O.W. Stephenson, *The Supply of Gunpowder in 1776*, 30 AM. HIST. REV. 271, 272 (1925).

**C. Americans smuggled arms imports.**

The Continental Congress established secret committees and agents to obtain arms from overseas. Miller, YORKE AND ANGLO-DUTCH

RELATIONS, at 42–43. Benjamin Franklin was the mastermind of smuggling arms from the Spanish, French, and Dutch. Robert Richmond, POWDER ALARM 95 (1971). The Continental Congress's agents "made contracts which totaled about $2,000,000.00." Miller, YORKE AND ANGLO-DUTCH RELATIONS, at 43. "From May to June alone, in 1775, the Pennsylvania Committee spent £20,300 (plus £4,000 for freight) to procure arms, ammunition, and medicine from Europe[.]" David L. Salay, *The Production of Gunpowder in Pennsylvania During the American Revolution*, 99 PENN. MAG. HIST. & BIOGRAPHY 422, 423 (Oct. 1975).

The *Virginia Gazette* in April 1775 published a report from London that "six large ships sailed lately, three from Holland, and the rest from France, with arms, ammunition, and other implements of war, for our colonies, and more are absolutely preparing for the same place." VA. GAZETTE, Apr. 22, 1775, at 1. In May 1776, "eighteen Dutch ships … left Amsterdam … with powder and ammunition for America," in addition to "powder shipments disguised as tea chests, rice barrels, *et cetera*." Miller, YORKE AND ANGLO-DUTCH RELATIONS, at 41. The French surreptitiously increased gunpowder exports to America. *See* Stephenson, *The Supply of Gunpowder*, at 279–80.

**D. Americans encouraged domestic arms manufacture and commerce.**

Besides imports, Americans needed domestic manufacture and commerce. Paul Revere, in August 1774, "engraved a plate diagramming how to refine saltpeter, an essential component in the making of gunpowder"; his instructions were published in the *Royal American Magazine*. Halbrook, FOUNDERS' SECOND AMENDMENT, at 33. "Saltpeter recipes … appeared in American newspapers and pamphlets[.]" Rick Atkinson, THE BRITISH ARE COMING 127–28 (2019). To "instruct the inhabitants of the different Counties in the manufactory of Salt Petre," the Pennsylvania's Committee of Safety's handbills were "printed & distributed in the English & German Languages, setting forth the process for extracting and refining Salt Petre." Report of the Pennsylvania Committee of Safety (Jan. 3, 1776), *in* 10 MINUTES OF THE PROVINCIAL CONGRESS OF PENNSYLVANIA, FROM THE ORGANIZATION TO THE TERMINATION OF THE PROPRIETARY GOVERNMENT 443 (1852). The New York Provincial Congress paid entrepreneurs to establish powder mills, commissioned ships to trade for gunpowder or saltpeter, paid bounties to manufacturers, and on March 14, 1776, paid for printing 3,000 copies of a 40-page manual on making gunpowder and saltpeter.

15

NEW YORK IN THE REVOLUTION AS COLONY AND STATE SUPPLEMENT 56–62 (Frederic Mather ed., 1901); *see also* CATALOGUE OF MANUSCRIPTS AND RELICS IN WASHINGTON'S HEAD-QUARTERS, NEWBURGH, N.Y. 55 (E.M. Ruttenber ed., 1890) (listing "Essays upon the making of Salt-Petre and Gun-Powder Published by order of the Committee of Safety of the Colony of New York" among the literature present in Washington's headquarters). "Printing presses throughout the colonies worked overtime, making and distributing broadsides and pamphlets with explicit instructions for manufacturing gunpowder and locating and preparing the ingredients." M.L. Brown, FIREARMS IN COLONIAL AMERICA 301 (1980).

Maryland's Provincial Convention on August 14, 1775, ordered issuance of bills of credit "for encouraging and promoting the manufacture of salt-petre, erecting of a powder mill," and other purposes. MD. GAZETTE, Aug. 31, 1775, at 1 ($266,666, denomination of 2 2/3 dollars).[4] The bills showed personified female America trampling a scroll with the word "slavery," while King George's feet stood on the Magna

---

[4] https://msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/001282/html/m1282-0927.html.

Carta as he used a torch to light a city on fire. *See* David Schenkman, *The Green Family's Maryland Currency*, AM. NUMISMATIST 31, 36–37 (Apr. 2023).

The patriot governments likewise encouraged domestic production and sale of firearms. Massachusetts's Provincial Congress, Massachusetts's House of Representatives, Maryland's Council of Safety, New Hampshire's House of Representatives, Pennsylvania's Committee of Safety, South Carolina's Provincial Congress, New York's Provincial Congress, North Carolina's Provincial Congress, and Connecticut's General Assembly all solicited arms manufactured and sold by private citizens throughout the war. The legislatures guaranteed money and often militia exemptions for anyone willing to provide arms. Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 54–61 (2023).

Of course, individual Americans were required to possess firearms. Arms mandates applied to all militiamen, and, in many colonies, to men with militia exemptions due to age or occupation. Seven colonies also mandated arms for female heads of households. Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND

POLICY 188 (3d ed. 2021). In an emergency, women and old men would help defend their community. *Id.* As British Lieutenant Frederick MacKenzie recorded in his diary: "Arms of all kinds are so much sought after by the Country people, that they use every means of procuring them." Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON: DIARY OF LIEUTENANT FREDERICK MACKENZIE, at 39–40 (Allen French ed., 1926).

Of the 300,000 muskets used by American line troops in the Revolutionary War, America's 2,500 to 3,000 gunsmiths manufactured over 80,000, often by repairing and combining mixed parts from damaged firearms. *See* George Neumann, *American Made Muskets in the Revolutionary War*, AM. RIFLEMAN, Mar. 29, 2010.[5]

The Revolutionary War had almost begun with the September 1774 (inaccurate) Powder Alarm reports that Governor Gage's redcoats had shot people when seizing gunpowder. And the "War almost began in Virginia in April 1775 when Governor Dunmore ordered the Royal Marines to remove the colony gunpowder supply from the magazine" in

---

[5]     https://www.americanrifleman.org/content/american-made-muskets-in-the-revolutionary-war/.

Williamsburg. Brown, FIREARMS IN COLONIAL AMERICA, at 298. Upon learning of the nonviolent seizure, the Virginia militia assembled to fight, but Governor Dunmore "placated the irate populace by making immediate restitution for the powder." *Id.*

The War did begin on April 19, 1775, at Lexington and Concord, Massachusetts, when Governor Gage, ruling Boston under martial law, dispatched his army to Concord to "seize and destroy all artillery, ammunition, provisions, tents, small arms, and all military stores whatever." Letter from Gov. Gage to Lieut. Col. Smith (Apr. 18, 1775), *in* Arthur Tourtellot, LEXINGTON AND CONCORD: THE BEGINNING OF THE WAR OF THE AMERICAN REVOLUTION 103 (1959). This time, the Americans were forewarned and forearmed.

At the Lexington Green and the Concord Bridge, the British demonstrated that they were willing to kill Americans to take their arms. Coercive disarmament initiated the war. *See* Kopel, *How the British Gun Control Program Precipitated the American Revolution*, at 308–12.

During the War, both sides agreed that the suppression of arms commerce and disarmament of the Americans were the *sine qua non* of

what the Americans called the British plan to "enslave" them. *See* Greenlee, *American Tradition of Self-Made Arms*, at 48–62.

To the Americans, being "enslaved" meant being under the absolute will of another, as they would be if they could not defend themselves. Instead of saying "enslave," the British called their objective "due subordination," but it meant the same thing. It depended on terminating arms commerce in the colonies. The plan of Britain's Undersecretary of State was:

> The Militia Laws should be repealed and none suffered to be re-enacted, [and] the Arms of all the People should be taken away … nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence.

William Knox, *Considerations on the Great Question, What Is Fit to be Done with America* (1777), *in* 1 SOURCES OF AMERICAN INDEPENDENCE: MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 176 (Howard Peckham ed., 1978).

The Bill of Rights protects against abuses that the Founders never endured and could not foresee, such as warrantless thermal imaging of homes. *See, e.g.*, *Kyllo v. United* States, 533 U.S. 27 (2001). The Bill of Rights also protects against the abuses the Founders *did* suffer—

including obstructions to firearms commerce. Thomas Jefferson, when serving as America's first Secretary of State, wrote to the British Ambassador, "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Thomas Jefferson to George Hammond (May 15, 1793), *in* 7 THE WRITINGS OF THOMAS JEFFERSON 326 (Paul Ford ed., 1904) (rejecting British demand that the U.S. forbid individuals from selling arms to the French).

## III.   Before *Sullivan*, tort law was often misused against the First Amendment.

During Jim Crow days in the South, photographs of black people rarely appeared in the mainstream press, except in crime stories. The concerns and aspirations of black people got little attention. David Wallace, MASSIVE RESISTANCE AND MEDIA SUPPRESSION: THE SEGREGATIONIST RESPONSE TO THE DISSENT DURING THE CIVIL RIGHTS MOVEMENT 43–44 (2013).

The gap was filled by the black press, which almost always operated on a shoestring. When the black press exposed or criticized abuses by the white power structure, including illegal violence by law enforcement officers, retribution sometimes came as a libel suit. Aimee Edmondson,

IN SULLIVAN'S SHADOW: THE USE AND ABUSE OF LIBEL LAW ARISING FROM THE CIVIL RIGHTS MOVEMENT 17–71 (2019).

Even when newspaper articles were impeccably accurate, there was a significant risk of enormous verdicts from all-white juries. Jurors were selected from voter rolls, and blacks were often prevented from registering.

Verdicts aside, the simple costs of legal defense threatened the newspapers' existence. For example, notwithstanding Thurgood Marshall's legal defense, South Carolina's *Lighthouse and Informer* was driven out of business in 1954 by a criminal libel prosecution. *Id.* at 40–51. On advice of attorneys—including Thurgood Marshall—the *Sumter Daily Item* paid $10,000 to settle a non-meritorious libel suit. *Id.* at 57–61.

A 1954 suit against the *Lexington Advertiser* was eventually decided in the defendant's "favor, but not before a costly legal battle." Wallace, MASSIVE RESISTANCE AND MEDIA SUPPRESSION, at 70–71, 92–94. Another unsuccessful libel case against the *Lexington Advertiser* was brought in 1963. The cumulative effect of the two libel suits, plus the loss of

advertising due to violent threats against advertisers, put the editor $100,000 in debt. *Id.* at 95–101.

When the Oklahoma *Black Dispatch* asked the national NAACP for help in a libel suit involving a shooting by police, NAACP attorney Robert Carter convinced the paper to settle, due to "the toll these libel suits were taking on the bank account of the organization." Edmondson, IN SULLIVAN'S SHADOW, at 128.

As civil rights became a growing national issue, "outsider" national media coverage in the South increased. So did libel suits. *New York Times Co. v. Sullivan* arose from a full-page advertisement in the *Times*, "Heed Their Rising Voices." 376 U.S. 254, 256 (1964). The libel suit was one of many brought by civil rights opponents.

In 1960, the *Times* sent Pulitzer Prize winner Harrison Salisbury to Birmingham. His facts were accurate; his analysis compared Birmingham to Johannesburg, and local police behavior to that of Nazi police. Harrison Salisbury, *Fear and Terror Grip Birmingham*, N.Y. TIMES, Apr. 8, 1960. In retaliation, Salisbury and the *Times* were sued in multiple cases by local officials, with millions sought in damages. Edmondson, IN SULLIVAN'S SHADOW, at 99–120.

For the next year, the *Times* kept its reporters out of Alabama, lest a reporter be served with process for the suit, thereby eliminating the *Times*'s argument that its small circulation in Alabama was insufficient for state court jurisdiction. Wallace, MASSIVE RESISTANCE AND MEDIA SUPPRESSION, at 183–84. The *Times* killed two stories, one about Mississippi and another about voting in Birmingham; although the stories were accurate, the lawsuit risk was too great. *Id.* at 186–87.

For coverage of the police-sanctioned mob assault against Freedom Riders on May 14, 1961, and the follow-up, the *Times* relied on CBS Television reports. Edmondson, IN SULLIVAN'S SHADOW, at 121. CBS was sued for that coverage, and for a November 1961 story about how voting registrars in Montgomery County, Alabama, impeded blacks from registering. Although none of the reporting had factual errors, CBS retracted both stories, apologized on air, fired the reporter (award-winning Howard K. Smith), and settled the Montgomery case for an undisclosed amount. *Id.* at 120–25.

The *Montgomery Advertiser* hoped that "the recent checkmating of the Times in Alabama will impose a restraint upon other publications." Grover Hall, *State Finds Formidable Legal Club to Swing at Out-of-State*

*Press*, MONTGOMERY ADVERT., May 22, 1960. According to the *Times*'s Managing Editor, the paper's bank accounts "were coming out 'cleaned.' This is an expensive business." Edmondson, IN SULLIVAN'S SHADOW, at 2.

"No strategy for squelching the media's portrayal of conditions in the South … carried more potential for success than the creative use of the law of libel." Rodney Smolla, SUING THE PRESS 43 (1986). As the *Washington Post*'s executive editor observed, the southern libel suits "enormously increase the liability of the press for its defense against such suits in communities where jurors may be hostile to them[.]" Wallace, MASSIVE RESISTANCE AND MEDIA SUPPRESSION, at 187. The ability to report would be destroyed "if the costs of defending against bare allegations of error threaten the survival of the newspaper." *Id.* at 188.

When *Sullivan* was before the Supreme Court, more "huge verdicts" were

> lurking just around the corner for the Times or any other newspaper or broadcaster which might dare to criticize public officials. In fact, briefs before us show that in Alabama there are now pending eleven libel suits by local and state officials against the Times seeking $5,600,000, and five such suits against the Columbia Broadcasting System seeking $1,700,000. Moreover, this technique for harassing and punishing a free press—now that it has been shown to be possible—is by no means limited to cases with racial overtones; it can be used in other fields where public feelings

> may make local as well as out-of-state newspapers easy prey
> for libel verdict seekers.

*Sullivan*, 376 U.S. at 294–95 (Black, J., concurring). According to the Southern Publishers Association, as of 1964 there were 17 pending libel suits against the media in southern courts, seeking total damages of $238,000,000. Wallace, MASSIVE RESISTANCE AND MEDIA SUPPRESSION, at 174–75.

The circumstances that led to *Sullivan* are like those that led to the Protection of Lawful Commerce in Arms Act ("PLCAA"): decades of abusive suits, including litigation designed to coerce submission by driving up defendants' legal expenses.

## IV.   Before the Protection of Lawful Commerce in Arms Act, tort law was often misused against the First and Second Amendments.

### A.   Abusive suits in the 1980s and 1990s.

American legislatures have always been able to enact gun control laws, provided such laws comply with the federal and state constitutions. Frustrated by insufficient progress in legislatures, gun control advocates in the 1980s brought product liability suits against firearm manufacturers and retailers. The cases invented many novel theories. For example, guns that were well-suited for self-defense were said to be

"defective," because such guns were also used by criminals. The mere manufacture of a handgun was alleged to be "ultrahazardous activity"— akin to blasting with dynamite. As one district court judge observed, "the plaintiff's attorneys simply want to eliminate handguns." *Patterson v. Rohm Gesellschaft*, 608 F. Supp. 1206, 1212 (N.D. Tex. 1985); *see also* David Kopel & Richard Gardiner, *The Sullivan Principles: Protecting the Second Amendment from Civil Abuse*, 19 SETON HALL LEGISL. J. 737, 750 n.43 (1995) (listing 26 cases decided from 1983–90, plus one from 1973).

There was only one verdict for the plaintiffs. But every case necessarily created attorney fees for the defendants. *Id.*

Starting in the mid-1990s, suits against law-abiding firearms businesses were based on even more imaginative grounds: public nuisance, recovery of government medical expenses for crime victims, unfair trade practices, deceptive advertising, and so on. Starting in 1998, a coordinated series of lawsuits were filed by 28 local governments. Further, Secretary of Housing and Urban Development Andrew Cuomo organized federally funded housing authorities to bring additional suits. *The HUD Gun Suit*, WASH. POST, Dec. 17, 1999.

Bridgeport, Connecticut, mayor Joseph Ganim described his lawsuit as "creating law with litigation." Fred Musante, *After Tobacco, Handgun Lawsuits*, N.Y. TIMES, Jan. 31, 1999. "The Bridgeport suit named 12 American firearms manufacturers, three handgun trade associations, and a dozen southwestern Connecticut gun dealers, and asked for damages in excess of $100 million." *Id.* (internal quotations omitted).

## B.  Suits against the free speech of trade associations.

Bridgeport's lawsuit was typical in that it sued firearms trade associations. These trade associations did not manufacture or sell firearms. Instead, the National Shooting Sports Foundation and similar groups were standard trade associations: advocating for their industry and promoting best practices within the industry.

The suits against the industry associations abridged the freedom of speech. They retaliated against the trade associations' often-successful public advocacy.

## C.  Structuring and coordination of suits to destroy defendants via litigation costs.

While coordinated libel multi-suits did not begin until the Alabama cases in the 1960s, the anti-gun lawsuits of the latter 1990s were coordinated from the start. Brought in as many jurisdictions as possible

28

and well-designed to resist consolidation, they were organized to destroy. "If twenty cities do bring suits, defending against them, according to some estimates, could cost the gun manufacturers as much as a million dollars a day." Peter Boyer, *Big Guns*, NEW YORKER, May 17, 1999.

Plaintiffs' attorney John Coale aimed for "critical mass … where the costs alone of defending these suits are going to eat up the gun companies." Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, N.Y. TIMES, June 24, 1999. As Coale put it, "the legal fees alone are enough to bankrupt the industry." Sharon Walsh, *Gun Industry Views Pact as Threat to Its Unity*, WASH. POST, Mar. 18, 2000. Secretary Cuomo threatened manufacturers with "death by a thousand cuts." Walter Olson, *Plaintiffs Lawyers Take Aim at Democracy*, WALL ST. J., Mar. 21, 2000.

As intended, some manufacturers did go bankrupt, including Sundance Industries, Lorcin Engineering, and Davis Industries. Paul Barrett, *Lawsuits Trigger Gun Firms' Bankruptcy*, WALL ST. J., Sept. 13, 1999. Davis Industries was "one of the 10 largest makers of handguns." Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*.

The most venerable manufacturers were driven to the brink. Colt's Manufacturing Company stopped producing handguns for the public. Facing "28 lawsuits from cities and counties hoping to punish gun makers … the company could no longer get loans to finance manufacturing because the lawsuits 'could be worth zero, or a trillion dollars.'" Mike Allen, *Colt's to Curtail Sale of Handguns*, N.Y. TIMES, Oct. 11, 1999.

Owned by a British conglomerate, Smith & Wesson ("S&W") was ordered to accept the Cuomo demands in exchange for immunity from some of the litigation. "Smith & Wesson made it clear … that the company was driven to the agreement by the lawsuits. The settlement would ensure 'the viability of Smith & Wesson as an ongoing business entity in the face of the crippling cost of litigation,' the company said in a statement." Jonathan Weisman, *Gun maker, U.S. reach agreement*, BALT. SUN, Mar. 18, 2000.

"[T]he litigants vowed to press on until all the manufacturers joined." *Id.* Indeed, "to get more aggressive." *Id.* Alex Panelas, mayor of Miami-Dade County, Florida, warned that the S&W deal would be "'a floor, not a ceiling' for any other gun maker that wants to sign on." *Id.*

Under the terms accepted by S&W, the company's practices would be perpetually controlled by a five-member Oversight Commission. The cities, counties, and states that joined the litigation would select three members, while those that had declined to sue were excluded. The ATF would select one member, leaving gun manufacturers with only one member of their own. Walter Olson, THE RULE OF LAWYERS 125–26 (2003). In effect, corporate control would be removed from the stockholders and given to the new gun control committee.

No other company signed the agreement. Glock came closest. As the company was wavering, New York Attorney General Eliot Spitzer warned a Glock executive: "if you do not sign, your bankruptcy lawyers will be knocking at your door." 146 CONG. REC. H2017 (Apr. 11, 2000) (Rep. Stearns). Spitzer and Connecticut Attorney General Richard Blumenthal announced they would sue other manufacturers for shunning S&W—for instance, by no longer sharing joint legal defense with S&W. Olson, THE RULE OF LAWYERS, at 127. This would have been "the first antitrust action in history aimed at punishing smaller companies for not cooperating with the largest company in the market in an agreement restraining trade." *Id.* Blumenthal did not have evidence

of illegal behavior; "the point was sheer intimidation." *Id.* S&W's capitulation never went into effect, because no plaintiff dismissed any case against the company.

As in the 1960s, plaintiffs in a single state could destroy a constitutional right nationally. By the time PLCAA was enacted in 2005, "33 State legislatures [had] acted to block similar lawsuits…. However, it only takes one lawsuit in one State to bankrupt the entire industry, making all those State laws inconsequential. That is why it is essential that we pass Federal legislation," Senator Jefferson Sessions explained. 151 CONG. REC. S9063 (July 27, 2005).

The attempt to bankrupt the gun industry via litigation had—and still has—national security implications. The Department of Defense "strongly support[ed]" PLCAA, to "safeguard our national security by limiting unnecessary lawsuits against an industry that plays a critical role in meeting the procurement needs of our men and women in uniform." 151 CONG. REC. S9395 (July 29, 2005).

PLCAA also protects the legislative branch. "The liability actions … attempt to use the judicial branch to circumvent the Legislative branch of government … thereby threatening the Separation of Powers

doctrine." 15 U.S.C. §7901(a)(8); *see also* Glenn Reynolds, *Permissible Negligence and Campaigns to Suppress Rights*, 68 FLA. L. REV. FORUM 51, 57 (2016).

## V. Like printing press manufacturers, arms manufacturers may not be punished for third-party misuse of their products.

Aggrieved by false statements in a newspaper advertisement, Commissioner Sullivan did not sue the manufacturer of the printing presses that the *Times* misused to publish the false statements. Allowing lawsuits against press manufacturers for third-party misuse would abridge "the freedom … of the press." U.S. CONST. amend. I.

The same constitutional principle applies to arms manufacturers. To "the Framing generation, the connection" between presses and arms was "commonsensical. The right to bear arms and the freedom of the press presented the exact same type of question for the Framers: can there ever be a natural right to a man-made device? In the case of arms and presses, the Framers believed so." Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 WM. & MARY BILL OF RTS. J. 1037, 1049–50 (2009).

Owners of presses and arms had both been harassed by English governments. *Id.* at 1058–64. "It is not hard to imagine why the Framers

singled out only these two technologies for constitutional protection. Madison and his contemporaries spoke about the two rights in the same breath, and often in similar ways describing them separately as private rights, the 'palladium of liberty,' and necessary or essential to a 'free state.'" *Id.* at 1070. This is one reason why the First and Second Amendments were placed next to each other.

Imposing tort liability for third-party misuse would eliminate press manufacturers and arms manufacturers. It has always been known that presses and arms are sometimes misused. "As Madison said, 'Some degree of abuse is inseparable from the proper use of every thing.'" *Sullivan*, 376 U.S. at 271 (citing 4 ELLIOT'S DEBATES ON THE FEDERAL CONSTITUTION 571 (1876)).

The First and Second Amendments are "civil-rights Amendments." *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950). "[T]he commands of the First Amendment" are like "the equally unqualified command of the Second Amendment." *Konigsberg v. State Bar of California*, 366 U.S. 36, 51 n.10 (1961). Both Amendments protect inherent rights that predate the Bill of Rights. *United States v. Cruikshank*, 92 U.S. 542, 551–52

(1875). Both are equally fundamental. *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

While the instant case can be decided by a straightforward application of PLCAA, New Jersey's abusive lawsuit statute is more plainly unconstitutional than was the Alabama libel law at issue in *Sullivan*. The latter was susceptible to abusive suits against constitutional rights. The former was designed for such suits.

## CONCLUSION

The decision below should be affirmed, and the statute held facially unconstitutional.

Respectfully submitted,

/s/ *David B. Kopel*
DAVID B. KOPEL
  *Counsel of Record*
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,479 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

I certify that the text of the electronic brief and the hard copies of the brief are identical.

I certify that the PDF was scanned with Windows Defender Antivirus version 1.295.1532.0, and according to the program, the document is virus free.

I certify that I am admitted to practice in the Third Circuit Court of Appeals, and that I am a member in good standing.

Dated this 8th day of May 2023.

/s/ *David B. Kopel*
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2023, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Third Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 8th day of May 2023.

/s/ *David B. Kopel*
*Counsel for Amicus Curiae*